## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| *In re:* | Chapter 15 |
| CLINE MINING CORPORATION, [1] | Case No. 14-26132 (EEB) |
| Debtor in a Foreign Proceeding. | (Joint Administration Requested) |
| *In re:* | Chapter 15 |
| NEW ELK COAL COMPANY LLC, | Case No. 14-26133 (EEB) |
| Debtor in a Foreign Proceeding. | (Joint Administration Requested) |
| *In re:* | Chapter 15 |
| NORTH CENTRAL ENERGY COMPANY, | Case No. 14-26134 (EEB) |
| Debtor in a Foreign Proceeding. | (Joint Administration Requested) |

### NOTICE OF FILING ENDORSEMENT OF THE ONTARIO COURT

**PLEASE TAKE NOTICE** that on Dec 3, 2014, FTI Consulting Canada Inc., the court-appointed monitor (the "**Monitor**") and foreign representative of Cline Mining Corporation, New Elk Coal Company LLC, and North Central Energy Company in a proceeding under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice, Commercial List (the "**Ontario Court**")., by its undersigned counsel, filed in the above-captioned cases the Endorsement of the Ontario Court, dated December 3, 2014 (the "**Endorsement**"), a copy of which is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Endorsement is also available on the Monitor's website, http://cfcanada.fticonsulting.com/cline or upon request to the Monitor's counsel.

---

[1]   The last four digits of the United States Tax Identification Numbers, or similar foreign identification numbers, as applicable, for the Cline Debtors follow in parentheses: Cline (6094); New Elk (0615); and North Central (N/A).

Dated: December 3, 2014
Denver, Colorado

**ALLEN & OVERY LLP**


/s/  Ken Coleman

Ken Coleman
Jonathan Cho
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
jonathan.cho@allenovery.com

*Attorneys for FTI Consulting Canada Inc., as*
*Monitor and Foreign Representative of the Cline*
*Debtors*

# **EXHIBIT A**

*Endorsement*

**CITATION:** Cline Mining Corporation (Re), 2014 ONSC 6998
**COURT FILE NO.:** CV-14-10781-00CL
**DATE:** 2014-12-03

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMOISE AND ARRANGEMENT OF CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND NORTH CENTRAL ENERGY COMPANY

**BEFORE:**  Regional Senior Justice G.B. Morawetz

**COUNSEL:**  *Robert J. Chadwick* and *Logan Willis*, for the Applicants

*J. Swartz*, for the Secured Noteholders

*Marc Wasserman and Michael De Lellis*, for FTI Consulting Canada Inc., Proposed Monitor

**HEARD:**  December 3, 2014

## ENDORSEMENT

[1]     Cline Mining Corporation ("Cline"), New Elk Coal Company LLC ("New Elk"), North Central Energy Company ("North Central") and, together with Cline and New Elk (the "Applicants") are in the business of locating, exploring and developing mineral resource properties, with a focus on gold and metallurgical coal (the "Cline Business"). The Applicants, along with their wholly-owned subsidiary, Raton Basin Analytical LLC ("Raton Basin") and, together with the Applicants (the "Cline Group") have interests in resource properties in Canada, the United States and Madagascar.

[2]     The Applicants apply for an initial order pursuant to the provisions of the *Companies' Creditors Arrangement Act* ("CCAA") and, if granted, the Applicants also seek an order (the "Claims Procedure Order") approving a claims process (the "Claims Procedure") for the identification and determination of claims against the Applicants and their present and former directors and officers. The Applicants also seek an order (the "Meetings Order") *inter alia*: (i) accepting the filing of a plan of compromise and arrangement in respect of the Applicants (the "Plan"); (ii) authorizing the Applicants to call, hold and conduct meetings (the "Meetings") of creditors whose claims are to be affected by the Plan for the purpose of enabling such creditors to consider and vote on a resolution to approve the Plan; and (iii) approving the procedures to be followed with respect to the calling and conduct of the Meetings.

[3]     The Cline Group has experienced financial challenges that necessitate a recapitalization of the Applicants under the CCAA. As set out in the affidavit of Mr. Matthew Goldfarb, Chief

- 2 -

Restructuring Officer and Acting Chief Executive Officer of Cline, the performance of the Cline Business has been adversely affected by the broader industry wide challenges, particularly the protracted downturn in prevailing prices for metallurgical coal.  Operations at the New Elk metallurgical coal mine in Colorado (the "New Elk Mine") were suspended in July 2012 because the mine could not operate profitably as a result of a decline in the market price of metallurgical coal.  The suspension of mining activities was intended to be temporary.  However, Mr. Goldfarb contends that market conditions in the coal industry have not sufficiently recovered and the suspension of full scale mining activities is still in effect.

[4]     Mr. Goldfarb contends that the Cline Group's other resource investments remain at the feasibility, exploration and/or development stages and the Cline Group's current inability to derive profit from the New Elk Mine has rendered the Applicants unable to meet their financial obligations as they become due.

[5]     Cline is in default of its 2011 series 10% Senior Secured Notes (the "2011 Notes") as well as its 2013 series 10% Senior Secured Notes (the "2013 Notes", and collectively with the 2011 Notes, the "Secured Notes").  As at December 1, 2014, total obligations in excess of $110 million are owed in respect of the Secured Notes, which matured on June 15, 2014.  The Secured Notes were subject to Forbearance Agreements that expired on November 28, 2014 and Mr. Goldfarb contends that the Applicants do not have the ability to repay the Secured Notes.

[6]     The Secured Notes are issued by Cline and guaranteed by New Elk and North Central.  The indenture trustee in respect of the Secured Notes (the "Trustee") holds a first ranking security interest over substantially all the assets of Cline, New Elk and North Central.  Mr. Goldfarb states that the amounts owing under the Secured Notes exceed the value of the Cline Business and that there would be no recovery for unsecured creditors if the Trustee were to enforce its security against the Applicants in respect of the Secured Notes.

[7]     The Secured Notes are held by beneficial owners whose investments are managed by Marret Asset Management Inc. ("Marret").  Marret exercises all discretion and authority in respect of the holders of the Secured Notes (the "Secured Noteholders").  Cline has engaged in discussions with representatives of Marret regarding a consensual recapitalization of the Applicants and these discussions have resulted in a proposed recapitalization transaction that is supported by Marret, on behalf of the Secured Noteholders (the "Recapitalization").

[8]     Mr. Goldfarb states that if implemented, the Recapitalization would:

    a.  maintain the Cline Group as a unified corporate enterprise;

    b.  reduce the Applicants' secured indebtedness by more than $55 million;

    c.  reduce the Applicants' annual interest expense in the near term;

    d.  preserve certain tax attributes within the restructured company; and

    e.  effectuate a reduced debt structure to enable the Cline Group to better withstand prolonged weakness in the price of metallurgical coal.

- 3 -

[9]     Mr. Goldfarb also states that the Recapitalization would also provide a limited recovery for the Applicants' unsecured creditors, who would otherwise receive no recovery in a security enforcement or asset sale scenario.  It is contemplated that the Recapitalization would be implemented pursuant to a plan of compromise and arrangement under the CCAA (the "CCAA Plan) that is recognized in the United States under Chapter 15, Title 11 of the United States Bankruptcy Code ("Chapter 15").

[10]     Cline and Marret have entered into a Support Agreement dated December 2, 2014 that sets forth the principal terms of the proposed Recapitalization.  Based on Marret's agreement to the Recapitalization (on behalf of the Secured Noteholders), the Applicants have achieved support from their senior ranking creditors, which represent in excess of 95% of the Applicants' total indebtedness.

[11]     The Applicants seek the Initial Order to stabilize their financial situation and to proceed with the Recapitalization as efficiently as possible, and to this end, the Applicants request that the Court also grant the Claims Procedure Order and the Meetings Order.

[12]     Cline is a public company incorporated under the laws of British Columbia, with its registered head office located in Vancouver.  Cline commenced business under the laws of Ontario in 2003 and Mr. Goldfarb states that its principal office, which serves as the head office and nerve centre of the Cline Group is located in Toronto.

[13]     Cline is the direct or indirect parent company of New Elk, North Central and Raton Basin.  Cline also holds minority interests in Iron Ore Corporation in Madagascar SARL, Strike Minerals Inc. and UMC Energy plc, all of which are exploration companies.

[14]     Cline is the sole shareholder of New Elk, a limited liability company incorporated pursuant to the laws of Colorado.  New Elk holds mining rights in the New Elk Mine and maintains a Canadian bank account with the Bank of Montreal in Toronto.

[15]     New Elk is the sole shareholder of North Central and Raton Basin, both of which are incorporated pursuant to the laws of Colorado.  North Central holds a fee-simple interest in certain coal parcels on which the New Elk Mine is situated and maintains a Canadian bank account with the Bank of Montreal in Toronto.  Raton Basis in inactive and is not an applicant in the proceedings.

[16]     Cline Group prepares its financial statements on a consolidated basis.  The required financial statements are in the record.  As at August 31, 2014, the Cline Group's liabilities were approximately $99 million.  The primary secured liabilities were the 2011 Notes in the principal amount in excess of $71 million, plus accrued and unpaid interest, and the 2013 Notes in the principal amount of approximately $12 million, plus accrued and unpaid interest.  Both the 2011 Notes and the 2013 Notes matured on June 15, 2014.

[17]     Pursuant to an Inter-Creditor Agreement, the 2011 Notes and the 2013 Notes have a first ranking security interest on the property and undertakings of the Applicants and rank *pari passu* as between each other.

- 4 -

[18]    Cline and New Elk are defendants in an uncertified class action lawsuit alleging that they violated the *WARN Act* by failing to provide personnel who provided services to New Elk with at least 60 days advance written notice of the suspension of both scale production at the New Elk Mine. These allegations are disputed.

[19]    The Applicants are aware of approximately $3.5 million in other unsecured claims.

[20]    On December 16, 2013, Cline was unable to make semi-annual interest payments in respect of both the 2011 and 2013 Notes. A Forbearance Agreement was entered into. During the forbearance period, the Applicants engaged Moelis & Company to conduct a comprehensive sale process in an effort to maximize value for the Applicant and its stakeholders (the "Sales Process"). No offers or expressions of interest were received in the Sale Process.

[21]    The forbearance period expired on November 28, 2014 and Mr. Goldfarb has stated that Marret has confirmed that the Secured Noteholders have given instructions to the Trustee to accelerate the Secured Notes.

[22]    Accordingly, Cline is immediately required to pay in excess of $110 million in respect of the Secured Notes. Mr. Goldfarb states that the Cline Group does not have the ability to pay these amounts and consequently the Trustee is in a position to enforce its security over the assets and property of the Applicants.

[23]    In light of these financial conditions, Mr. Goldfarb states that the Applicants are insolvent.

[24]    Mr. Goldfarb also contends that without the benefit of CCAA protection, there could be an erosion of the value of the Cline Group and that the stay of proceedings under the CCAA is required to preserve the value of the Cline Group.

[25]    The Applicants are seeking the appointment of FTI Consulting Canada Inc. ("FTI") as the proposed monitor in these proceedings (the "Monitor").

[26]    The proposed Initial Order also provides for a court ordered charge (the "Administration Charge") to be granted in favour of the Monitor, its counsel, counsel to the Applicants, the Chief Restructuring Officer (the "CRO") and counsel to Marret in respect of their fees and disbursements incurred at the standard rates and charges. The proposed Administration Charge is an aggregate amount of $350,000.

[27]    The directors and officers have expressed their desire for certainty with respect to potential personal liability if they continue in their current capacities. Mr. Goldfarb states that in order to continue to carry on business during the CCAA proceedings and in order to conduct the Recapitalization most effectively, the Applicants require the active and committed involvement of the board and, accordingly, the proposed Initial Order provides for a court ordered charge (the "Directors' Charge") in the amount of $500,000 to secure the Applicants' indemnification of its directors and officers in respect of liabilities they may incur during the CCAA proceedings. The amount of the Directors' Charge has been calculated based on the estimated exposure of the directors and officers and has been reviewed with the prospective Monitor. The proposed

- 5 -

Directors Charge would only apply to the extent that the directors and officers do not have coverage under the D&O insurance policy with AIG Insurance Company of Canada.

[28]   The Applicants seek to complete the Recapitalization as quickly as reasonably possible and they anticipate that their existing cash resources will provide the Cline Group with sufficient liquidity during the CCAA proceedings.

[29]   It is also contemplated that foreign recognition proceedings will be sought in Colorado pursuant to Chapter 15.  The Applicants seek the authorization for the Monitor to act as the foreign representative of the Applicants in the CCAA proceedings and to seek recognition of these proceedings in the United States pursuant to Chapter 15.

[30]   Having reviewed the record, including the affidavit of Mr. Goldfarb and the pre-filing report submitted by FTI, I am satisfied that each of the Applicants is "a debtor company" within the meaning of the defined term in s. 2 of the CCAA.

[31]   Cline is a "company" within the meaning of the CCAA.  It is incorporated under the laws of British Columbia with gold development assets in Ontario and does business from its head office in Toronto.

[32]   New Elk and North Central are incorporated in Colorado, have assets in Canada, namely bank accounts in Toronto and are directed from Cline's head office in Toronto.  In my view, each of New Elk and North Central is a "company" within the meaning of the CCAA because it is an incorporated company having assets in Canada.

[33]   I am also satisfied that the Applicants meet both the traditional test for insolvency under the *Bankruptcy and Insolvency Act* and the expanded test for insolvency based on a looming liquidity condition given that Cline has been unable to make interest payments under the Secured Notes, the Secured Notes have matured, the Forbearance Agreement has expired and the Trustee is in a position to enforce its security over the property of the Applicants.  Further, I am satisfied that the Applicants are unable to obtain traditional or alternative financing to support the day-to-day operations and there is no reasonable expectation that the Applicants will be able to generate sufficient cash flow from operations to support their existing debt obligations (see: *(Re) Stelco Inc.* (2004), 48 CBR (4th) 299 (Ont. Sup. Ct. (Commercial List)); leave to appeal to CA refused (2004) O.J. No. 1903; leave to appeal to SCC refused (2004) SCC No. 336).

[34]   It is also clear that the Applicants' liabilities far exceed the $5 million threshold amount under the CCAA.

[35]   In my view, the CCAA applies to the Applicants' as "debtor companies" in accordance with s. 3(1) of the CCAA.

[36]   The Applicants have filed the required financial information, including audited financial statements and the cash-flow forecast.

[37]   The Applicants in the Initial Order seek authorization (but not a requirement) to make certain pre-filing payments, including, *inter alia*:

- 6 -

    a.   payments to employees of effective wages, benefits and related amounts;

    b.   the amounts owing to respective individuals working as independent contractors;

    c.   the fees and disbursements of any consultants, agents, experts, accountants, counsel or other persons currently retained by the Applicants in respect of the CCAA; and

    d.   certain expenses incurred by the Applicants in carrying on the business in the ordinary course, that pertains to the period prior to the date of the Initial Order, if, in the opinion of the Applicants and with the consent of the Monitor, the applicable supplier or service provider is critical to the Cline Business and the ongoing operations of the Cline Group.

[38]    The court has jurisdiction to permit payment of pre-filing obligations to persons whose services are critical to the ongoing operations of the debtor's companies (see: *(Re) Canwest Global Communications Corp.* (2009), 59 CBR (5th) 72; *(Re) Cinram International Inc.*, 2012 ONSC 3767 and *(Re) Skylink Aviation Inc.*, 2013 ONSC 1500). In granting such authorization, the courts consider a number of factors, including:

    a.   whether the goods and services were integral to the business of the applicants;

    b.   the applicants' need for the uninterrupted supply of the goods or services;

    c.   the fact that no payments would be made without the consent of the monitor;

    d.   the monitor's support and willingness to work with the applicants to ensure that payments to suppliers in respect of pre-filing liabilities were appropriate;

    e.   whether the applicants had sufficient inventory of goods on hand to meet their needs; and

    f.   the effect on the debtor's ongoing operations and ability to restructure if they were unable to make pre-filing payments to their critical suppliers.

[39]    In this case, the Applicants are of the view that their employees and certain of their independent contractors, certain suppliers of goods and services and certain providers of permits and licences are critical to the operation of the Cline Business. Mr. Goldfarb believes that such persons should be paid in the ordinary course, including in respect of pre-filing amounts, in order to avoid disruption to the Applicants' operations during the CCAA proceedings.

[40]    I am satisfied that it is appropriate in the present circumstances to grant the Applicants the authority to pay certain pre and post-filing obligations, subject to the terms and conditions in the proposed Initial Order.

[41]    Turning now to the request for the Administration Charge, s. 11.52 of the CCAA expressly provides the court with the jurisdiction to grant the Administration Charge. In *(Re)*

- 7 -

*Canwest Publishing Inc.*, 2010 ONSC 222, the court noted that s. 11.52 does not contain any specific criteria for a court to consider in granting an administration charge and provide a list of non-exhaustive factors to consider in making such an assessment. The list of factors to consider include:

    a.  the size and complexity of the business being restructured;

    b.  the proposed role of the beneficiaries of the charge;

    c.  whether there is unwarranted duplication of roles;

    d.  whether the quantum of the proposed charge appears to be fair and reasonable;

    e.  the position of the secured creditors likely to be affected by the charge; and

    f.  the position of the monitor.

[42]    The Applicants submit that the Administration Charge is warranted and necessary for the reasons set forth in Mr. Goldfarb's affidavit at paragraphs 133 – 140.

[43]    I am satisfied that in these circumstances, the granting of the Administration Charge is warranted and necessary and that it is appropriate for the court to exercise its jurisdiction to grant the Administration Charge in the amount of $350,000.

[44]    The Applicants also seek a Directors' Charge in the amount of $500,000.

[45]    Section 11.51 of the CCAA affords the court the jurisdiction to grant a charge relating to directors' and officers' indemnification on a priority basis. The court has granted director and officer charges in a number of cases including *Canwest Global, supra, Canwest Publishing, supra, Cinram, supra* and *Skylink, supra.*

[46]    The Applicants submit that the Directors' Charge is warranted and necessary and that it is appropriate in the present circumstances for the court to exercise its jurisdiction and grant the charge in the amount of $500,000.

[47]    For the reasons set out in Mr. Goldfarb's affidavit at paragraphs 134 - 138, I accept these submissions.

[48]    The Applicants have also indicated that, with the assistance of the Monitor as foreign representative, they intend to commence Chapter 15 proceedings in the United States Bankruptcy Court for the District of Colorado. Pursuant to s. 56 of the CCAA, the court has the authority to appoint a foreign representative of the Applicants for the purpose of having these proceedings recognized in a jurisdiction outside of Canada.

[49]    The Applicants seek authorization for each of the Applicants and the Monitor to apply to any court for recognition of the Initial Order and authorization for the Monitor to act as representative in respect of these CCAA proceedings for the purpose of having the CCAA proceedings recognized outside of Canada.

- 8 -

[50]    I am satisfied that it is appropriate to appoint the Monitor as foreign representative of the Applicants with respect to these proceedings.

[51]    The Applicants, in their factum, also address the issue of the Applicants' "center of main interest" as being in Ontario.  These submissions are set out at paragraphs 77 – 84 of the Applicants' Factum.

[52]    Although the submissions are of interest, the determination of the Applicants' "center of main interest" ("COMI") is an issue to be considered by the United States Bankruptcy Court for the District of Colorado, rather than this court.

[53]    The Applicants also seek a postponement of the Annual Shareholders Meeting.  The previous Annual Meeting of Cline was held on August 15, 2013 and therefore Cline was required by statute to hold an annual general meeting by November 15, 2014.

[54]    Mr. Goldfarb states that it would serve no purpose for Cline to call and hold its annual meeting of Shareholders given that the Shareholders of Cline no longer have an economic interest in Cline as a result of the insolvency.  The Applicants submit that it is appropriate for the court to exercise its jurisdiction to relieve Cline from its obligation to call and hold its annual meeting of Shareholders until after the termination of the CCAA proceedings or further order of the court.  In support of this request, the Applicants reference *Canwest Global, supra* and *Skylink, supra.*

[55]    In my view, the request to postpone the annual Shareholders meeting is appropriate in the circumstances and is granted.

[56]    In the result, I am satisfied that the Applicants meet all of the qualifications required to obtain the requested relief under the CCAA and the Initial Order is granted in the form presented.

[57]    The Applicants also request two additional orders that they believe are necessary to advance the Recapitalization:

    a.  an order establishing a process for the identification and determination of claims against the Applicants and their present and former directors and officers (the Claims Procedure Order); and

    b.  an order authorizing the Applicants to file the Plan and to convene meetings of their affected creditors to consider and vote on the Plan (the Meetings Order).

[58]    The Applicants seek the Claims Procedure Order and the Meetings Order at this stage because they wish to effectuate the recapitalization as efficiently as possible.  Further, the Applicants submit that the "comeback clauses" included in the draft Claims Procedure Order and Meetings Order ensure that no party is prejudiced by the granting of such order at this time.

[59]    The Applicants have submitted a factum in support of the Claims Procedure Order and Meetings Order.  In the factual background to the Recapitalization and proposed Plan, the Claims

- 9 -

Procedure and the meeting of creditors is set out at paragraphs 8 – 29 of the factum.   For informational purposes, these paragraphs are set out in Appendix "A" to this Endorsement.

[60]   The issues to be considered on this motion are whether:

(a) it is appropriate to proceed with the Claims Procedure;

(b) it is appropriate to permit the Applicants to file the Plan and call the meetings;

(c) the proposed classification of creditors is appropriate; and

(d) a consolidated plan is appropriate in the circumstances.

[61]   In *(Re) Skylink, supra* at paragraph 35, I noted that while it is not the usual practice for applicants to request claims procedure and meetings order concurrently with an initial CCAA application, the court has granted such relief in appropriate circumstances.   The support for a restructuring proposal from the only creditors with an economic interest, and the existence of a comeback hearing at which any issues in respect of the orders can be addressed, are two factors that militate in favour of granting the Claims Procedure and Meetings Order concurrently with the initial application.

[62]   In my view, the foregoing comment is applicable in these proceedings.

[63]   I also note that both the Claims Procedure Order and the Meetings Order provide that any interested party that wishes to amend the Claims Procedure Order or the Meetings Order, as applicable, can bring a motion on a comeback date to be set by the court.

[64]   I also accept that most of the Applicants' known creditors are familiar with the Applicants and the Cline Business and the determination of most of the claims against the Applicants would be carried out by the Applicants using the Notice of Claim Procedure.   As such, the Applicants submit that a claims bar date of January 13, 2015 will provide sufficient time for creditors to assert their claims and will not result in any prejudice to said creditors.

[65]   Based on the submissions of the Applicants, I accept this submission.

[66]   Accordingly, I am satisfied that the court should exercise its discretion and grant the requested Claims Procedure Order at this time.

[67]   Turning now to the issue as to whether it is appropriate to permit the Applicants to file the Plan and call the meetings, the court is not required to address the fairness and reasonableness of the Plan at this stage.

[68]   In these circumstances, I am satisfied that it is appropriate to grant the Meetings Order at this time in order to allow the Meetings Procedure to proceed concurrently with the Claims Procedure, with a view to completing the Recapitalization as efficiently as possible.

[69]   Commencing at paragraph 42 of the factum, the Applicants make submissions with respect to the proposed classification of creditors for voting purposes.

- 10 -

[70]    The Applicants submit that the holders of the 2011 Notes and the 2013 Notes have a commonality of interest in respect of their *pro rata* share of the Secured Noteholders Allowed Secured Claim and should be placed in the same class for voting purposes.

[71]    For the purposes of the motion today, I am prepared to accept that it is appropriate for the Secured Noteholders to vote in the same class in respect of their Secured Noteholders Allowed Secured Claim.

[72]    The Affected Unsecured Creditors' Class includes creditors with unsecured claims against the Applicants, including the Secured Noteholders in respect of their Secured Noteholders Allowed Unsecured Claim and, if applicable, Marret in respect of the Marret Unsecured Claim.   The Applicants submit that the affected Unsecured Creditors have a commonality of interest and should be placed in the same class for voting purposes.

[73]    It is noted that the determination of the Secured Noteholders Allowed Unsecured Claim has been determined by the Applicants and Marret and, for purposes of voting at the Secured Noteholders Meeting, is set at $17.5 million.

[74]    For the purposes of the motion today, I am prepared to accept the submissions of the Applicants including their determination of the affected Unsecured Creditors class.

[75]    The *WARN Act* plaintiffs class consists of potential members of an uncertified class action proceeding.  The Applicants submit that the *WARN Act* claims have been asserted by only two *WARN Act* plaintiffs on behalf of other potential members of the class and these claims have not been proven and are contested by the Applicants.

[76]    Due to the unique nature and status of these claims, the Applicants have offered the *WARN Act* plaintiffs consideration that is different than the consideration offered to the Affected Unsecured Creditors.

[77]    I accept, for the purposes of this motion, that the *WARN Act* plaintiffs should be placed in a separate class for voting purposes.

[78]    With respect to holders of "Equity Claims", the Meetings Order provides that any person with a claim that meets the definition of "equity claim" under s. 2(1) of the CCAA will have no right to, and will not, vote at meetings; and the Plan provides that equity claimants will not receive a distribution under the Plan or otherwise recover anything in respect of their equity claims or equity interest.

[79]    For the purposes of this motion, I accept the submission of the Applicants that it is appropriate for equity claimants to be prohibited from voting on the Plan.

[80]    The Plan as proposed by the Applicants is a consolidated plan of arrangement that is intended to address the combined claims against all the Applicants.  Courts will authorize a consolidated plan of arrangement to be filed for two or more related companies in appropriate circumstances (see, for example:  *(Re) Northland Properties Ltd.* (1988), 69 CBR (NS) 226 (BCSC)*; (Re) Lehndorff General Partners Ltd.* (1993), 17 CBR (3d) 24).

- 11 -

[81]   In this case, the Applicants submit that a consolidated plan is appropriate because:

    a.   New Elk is a wholly-owned subsidiary of Cline and North Central is a wholly-owned subsidiary of New Elk;

    b.   the Applicants are integrated members of the Cline Group, and there is significant sharing of business functions within the Cline Group;

    c.   the Applicants have prepared consolidated financial statements;

    d.   all three of the Applicants are obligors in respect of the Secured Notes;

    e.   the Secured Noteholders are the only creditors with an economic interest in any of the three Applicants and have a first ranking security interest over all or substantially all of the assets, property and undertakings of each of the Applicants;

    f.   the *WARN Act* claims are asserted against both Cline and New Elk under a "single employer" theory of liability;

    g.   North Central has no known liabilities other than its obligations in respect of the Secured Notes;

    h.   Unsecured Creditors of the Applicants would receive no recovery outside of the Plan; and

    i.   the filing of a consolidated plan does not prejudice any affected Unsecured Creditor or *WARN Act* plaintiff, since a consolidated plan will not eliminate any veto position with respect to approval of the plan that such creditors would have if separate plans of arrangement were filed in respect of each of the Applicants.

[82]   For the purposes of the motion today, I accept these submissions and consider it appropriate to authorize the filing of a consolidated plan.

[83]   In the result, I am satisfied that it is appropriate to grant both the Claims Procedure Order and the Meetings Order at this time.

[84]   It is specifically noted that the "comeback clause" that is included in both the Claims Procedure and the Meetings Orders will allow parties to come back before this court to amend or vary the Claims Procedure Order or the Meetings Order.  The comeback hearing has been scheduled for Monday, December 22, 2014.

_____
Regional Senior Justice G.B. Morawetz

**Date:** December 3, 2014

APPENDIX "A"

## A.  RECAPITALIZATION AND PROPOSED PLAN

### (1)  Overview of the Recapitalization

8.  The Applicants have been actively engaged in discussions with Marret, on behalf of the Secured Noteholders, regarding a possible recapitalization of the Applicants.  The Applicants believe that that the Recapitalization, in the circumstances, is in the best interests of the Applicants and their stakeholders.  The Recapitalization provides for, *inter alia*, the following:

(a)  the Secured Noteholders Allowed Secured Claim will be compromised, released and discharged as against the Applicants upon implementation of the Plan (the "**Plan Implementation Date**") for new Cline common shares representing 100% of the equity in Cline (the "**New Cline Common Shares**"), and new indebtedness in favour of the Secured Noteholders in the principal amount of $55 million (the "**New Secured Debt**");

(b)  Cline will be the borrower and New Elk and North Central will be the guarantors of the New Secured Debt, which will be evidenced by a credit agreement with a term of seven (7) years, bearing interest at a rate of 0.01% per annum plus an additional variable interest payable only once the Applicants have achieved certain operating revenue targets;

(c)  the claims of Affected Unsecured Creditors, which exclude the WARN Act Plaintiffs but include the Secured Noteholders in respect of the Secured Noteholders Allowed Unsecured Claim, will be compromised, released and discharged as against the Applicants on the Plan Implementation Date in exchange for an unsecured, subordinated, non-interest bearing entitlement to receive $225,000 from Cline on the date that is eight (8) years from the Plan Implementation Date (the "**Unsecured Plan Entitlement**");

(d)  notwithstanding the Secured Noteholders Allowed Unsecured Claim, the Secured Noteholders will waive their entitlement to the proceeds of the Unsecured Plan Entitlement, and all such proceeds will be available for distribution to the other Affected Unsecured Creditors with valid claims who are entitled to the Unsecured Plan Entitlement, allocated on a *pro rata* basis;

(e)  all Affected Unsecured Creditors with Affected Unsecured Claims of up to $10,000 will, instead of receiving their *pro rata* share of the Unsecured Plan Entitlement, be paid in cash for the full value of their claim and will be deemed to vote in favour of the Plan unless they indicate otherwise, provided that this cash payment will not apply to any Secured Noteholder with respect to its Secured Noteholders Allowed Unsecured Claim;

(f)     all WARN Act Claims will be compromised, released and discharged as against the Applicants on the Plan Implementation Date in exchange for an unsecured, subordinated, non-interest bearing entitlement to receive $100,000 from Cline on the date this is eight (8) years from the Plan Implementation Date (the "**WARN Act Plan Entitlement**");

(g)     certain claims against the Applicants, including claims covered by insurance, certain prior-ranking secured claims of equipment providers and the secured claim of Bank of Montreal in respect of corporate credit card payables, will remain unaffected by the Plan;

(h)     existing equity interests in Cline will be cancelled for no consideration; and

(i)     the shares of New Elk and North Central will not be affected by the Recapitalization and will remain owned by Cline and New Elk, respectively.

> Goldfarb Affidavit at para. 124; Application Record, Tab 4.

9.      Any Affected Creditor with a Disputed Distribution Claim will not be entitled to receive any distribution under the Plan with respect to such Disputed Distribution Claim unless and until such Claim becomes an Allowed Affected Claim.  A Disputed Distribution Claim will be resolved in the manner set out in the Claims Procedure Order.

> Plan, Section 3.6.

10.     Unaffected Creditors will not be affected by the Plan and will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are paid in full on the Plan Implementation Date in accordance with the express terms of the Plan).

> Plan, Sections 1.1, 2.3 and 3.5.

11.     If implemented, the Recapitalization would result in a reduction of over $55 million in interest-bearing debt.

> Goldfarb Affidavit at para. 126; Application Record, Tab 4.

12.     The proposed Recapitalization is supported by Marret, which has the ability to exercise all discretion and authority of the Secured Noteholders.  Consequently, the proposed Recapitalization is supported by 100% of the Secured Noteholders, both as secured creditors of the Applicants and as unsecured creditors of the Applicants in respect of the portion of their claims that is unsecured.

> Goldfarb Affidavit at paras. 63, 67 and 145; Application Record, Tab 4.

### (2)   Classification for Purposes of Voting on the Plan

13.   The only classes of creditors for the purposes of considering and voting on the Plan will be (i) the Secured Noteholders Class, (ii) the Affected Unsecured Creditors Class, and (iii) the WARN Act Plaintiffs Class.

> Plan, Section 3.2.
>
> Goldfarb Affidavit at para. 153; Application Record, Tab 4.

14.   The Secured Noteholders Class consists of the Secured Noteholders in respect of the Secured Noteholders Allowed Secured Claim, being the portion of the Secured Noteholders Allowed Claim against the Applicants that is designated as secured. Each Secured Noteholder will be entitled to vote its *pro rata* portion of that amount in the Secured Noteholders Class.

> Goldfarb Affidavit at para. 154; Application Record, Tab 4.

15.   The Affected Unsecured Creditors Class consists of the unsecured creditors of the Applicants who are to be affected by the Plan, excluding the WARN Act Plaintiffs (who are addressed in a separate class). The Affected Unsecured Creditors Class includes the Secured Noteholders in respect of the Secured Noteholders Allowed Unsecured Claim, being the portion of the Secured Noteholders Allowed Claim that is designated as unsecured. Each Secured Noteholder will be entitled to vote its *pro rata* portion of the Secured Noteholders Allowed Unsecured Claim in the Affected Unsecured Creditors Class.

> Goldfarb Affidavit at para. 155; Application Record, Tab 4.

16.   Within the Affected Unsecured Creditors Class, unsecured creditors with Affected Unsecured Claims of up to $10,000 will be paid in full and will be deemed to vote in favour of the Plan, unless they indicate otherwise.

> Goldfarb Affidavit at para. 156; Application Record, Tab 4.

17.   The WARN Act Plaintiffs Class consists of all WARN Act Plaintiffs in the WARN Act Class Action who may assert WARN Act Claims against the Applicants. Each WARN Act Plaintiff will be entitled to vote its *pro rata* portion of all WARN Act Claims.

> Goldfarb Affidavit at para. 157; Application Record, Tab 4.

18.   Unaffected Creditors and Equity Claimants are not entitled to vote on the Plan at the Meetings in respect of their Unaffected Claims and Equity Claims, respectively.

> Plan, Sections 3.4(3) and 3.5.

19.    The Plan provides that, if the Plan is not approved by the required majorities of both the Unsecured Creditors Class and the WARN Act Plaintiffs Class, or the Applicants determine that such approvals are not forthcoming, the Applicants are permitted to withdraw the Plan and file an amended and restated plan with the features described on Schedule "B" to the Plan (the "Alternate Plan"). The Alternate Plan would provide, *inter alia*, that all unsecured claims and all WARN Act Claims against the Applicants would be treated as unaffected claims, the only voting class under the Alternate Plan would be the Secured Noteholders Class, and all assets of the Applicants would be transferred to an entity designated by the Secured Noteholders in exchange for a release of the Secured Noteholders Allowed Secured Claim.

Goldfarb Affidavit at para. 125; Application Record, Tab 4.

## B.    CLAIMS PROCEDURE

20.    The Applicants wish to commence the Claims Procedure as soon as possible to ascertain all of the Claims against the Applicants for the purpose of voting and receiving distributions under the Plan.

21.    Liabilities and claims against the Applicants that the Applicants are aware of, include, *inter alia*, secured obligations in respect of the Secured Notes, secured obligations in respect of leased equipment used at the New Elk Mine, contingent claims for damages and other amounts in connection with certain pending litigation claims against the Applicants, and unsecured liabilities in respect of accounts payable relating to ordinary course trade and employee obligations.

Goldfarb Affidavit at paras. 52-57; Application Record, Tab 4.

22.    The draft Claims Procedure Order provides a process for identifying and determining claims against the Applicants and their directors and officers, including, *inter alia*, the following:

(a)    Cline, with the consent of Marret, will determine the aggregate of all amounts owing by the Applicants under the 2011 Indenture and the 2013 Indenture up to the Filing Date, such aggregate amounts being the "**Secured Noteholders Allowed Claim**";

(b)    the Secured Noteholders Allowed Claim will be apportioned between the Secured Noteholders Allowed Secured Claim and the Secured Noteholders Allowed Unsecured Claim (being the amount of the Secured Noteholders Allowed Claim that is designated as unsecured in the Plan);

(c)    the Monitor will send a Claims Package to all Known Creditors, which Claims Package will include a Notice of Claim specifying the Known Creditor's Claim against the Applicants for voting and distribution purposes, as valued by the

Applicants based on their books and records, and specifying whether the Known Creditor's Claim is secured or unsecured;

(d) the Claims Procedure Order contains provisions allowing a Known Creditor to dispute its Claim as set out in the applicable Notice of Claim for either voting or distribution purposes or with respect to whether such Claim is secured or unsecured, and sets out a procedure for resolving such disputes;

(e) the Monitor will publish a notice to creditors in The Globe and Mail (National Edition), the Denver Post and the Pueblo Chieftain to solicit Claims against the Applicants by Unknown Creditors who are as yet unknown to the Applicants;

(f) the Monitor will deliver a Claims Package to any Unknown Creditor who makes a request therefor prior to the Claims Bar Date, containing a Proof of Claim to be completed by such Unknown Creditor and filed with the Monitor prior to the Claims Bar Date;

(g) the proposed Claims Bar Date for Proofs of Claim for Unknown Creditors and for Notices of Dispute in the case of Known Creditors is January 13, 2015;

(h) the Claims Procedure Order contains provisions allowing the Applicants to dispute a Proof of Claim as against an Unknown Creditor and provides a procedure for resolving such disputes for either voting or distribution purposes and with respect to whether such claim is secured or unsecured;

(i) the Claims Procedure Order allows the Applicants to allow a Claim for purposes of voting on the Plan without prejudice to whether that Claim has been accepted for purposes of receiving distributions under the Plan;

(j) where the Applicants or the Monitor send a notice of disclaimer or resiliation to any Creditor after the Filing Date, such notice will be accompanied by a Claims Package allowing such Creditor to make a claim against the Applicants in respect of a Restructuring Period Claim;

(k) the Restructuring Period Claims Bar Date, in respect of claims arising on or after the date of the Applicants' CCAA filing, will be seven (7) days after the day such Restructuring Period Claim arises;

(l) for purposes of the matters set out in the Claims Procedure Order in respect of any WARN Act Claims: (i) the WARN Act Plaintiffs will be treated as Unknown Creditors since the Applicants are not aware of (and have not quantified) any bona fide claims of the WARN Act Plaintiffs; and (ii) Class Action Counsel shall be entitled to file Proofs of Claim, Notices of Dispute of Revision and Disallowance, receive service and notice of materials and to otherwise deal with the Applicants and the Monitor on behalf of the WARN Act Plaintiffs, provided that Class Action Counsel shall require an executed proxy in order to cast votes on behalf of any WARN Act Plaintiffs at the WARN Act Plaintiffs' Meeting; and

(m)   Creditors may file a Proof of Claim with respect to a Director/Officer Claim.

> Goldfarb Affidavit at para. 151; Application Record, Tab 4.

23.   As further discussed below, the Applicants may elect to proceed with the Meetings notwithstanding that the resolution of Claims in accordance with the Claims Procedure may not be complete.  The Meetings Order provides for the separate tabulation of votes cast in respect of Disputed Voting Claims and provides that the Monitor will report to the Court on whether the outcome of any vote would be affected by votes cast in respect of Disputed Voting Claims.

> Goldfarb Affidavit at paras. 161(f)-(h) and 162; Application Record, Tab 4.

24.   The Claims Procedure Order includes a comeback provision providing interested parties who wish to amend or vary the Claims Procedure Order with the ability to appear before the Court or bring a motion on a date to be set by this Court.

> Goldfarb Affidavit at para 149; Application Record, Tab 4.

## C.   **MEETINGS OF CREDITORS**

25.   It is proposed that the Meetings to vote on the Plan will be held at Goodmans LLP, 333 Bay Street, Suite 3400, Toronto, Ontario on January 21, 2015 at 10:00 a.m. for the WARN Act Plaintiffs Class, 11:00 a.m. for the Affected Unsecured Creditors Class, and 12:00 p.m. for the Secured Noteholders Class.

> Goldfarb     Affidavit     at     para.     160;     Application     Record,     Tab     4.
>
> Meetings Order, Section 20.

26.   The draft Meetings Order provides for, *inter alia*, the following in respect of the governance of the Meetings:

(a)   an officer of the Monitor will preside as the chair of the Meetings;

(b)   the only parties entitled to attend the Meetings are the Eligible Voting Creditors (or their proxyholders), representatives of the Monitor, the Applicants, Marret, all such parties' financial and legal advisors, the Chair, the Secretary, the Scrutineers, and such other parties as may be admitted to a Meeting by invitation of the Applicants or the Chair;

(c)   only Creditors with Voting Claims (or their proxyholders) are entitled to vote at the Meetings; provided that, in the event a Creditor holds a Disputed Voting Claim as at the date of a Meeting, such Disputed Voting Claim may be voted at

the Meeting but will be tabulated separately and will not be counted for any purpose unless such Claim is ultimately determined to be a Voting Claim;

(d)     each WARN Act Plaintiff (or its proxyholder) shall be entitled to cast an individual vote on the Plan as part of the WARN Act Plaintiffs Class, and Class Action Counsel shall be permitted to cast votes on behalf of those WARN Act Plaintiffs who have appointed Class Action Counsel as their proxy;

(e)     the quorum for each Meeting is one Creditor with a Voting Claim, provided that if there are no WARN Act Plaintiffs voting in the WARN Act Plaintiffs Class, the Applicants will have the right to combine the WARN Act Plaintiffs Class with the Affected Unsecured Creditors Class and proceed without a vote of the WARN Act Plaintiffs Class, in which case there shall be no WARN Act Plan Entitlement under the Plan;

(f)     the Monitor will keep separate tabulations of votes in respect of:

      i.     Voting Claims; and

      ii.    Disputed Voting Claims, if any;

(g)     the Scrutineers will tabulate the vote(s) taken at each Meeting and will determine whether the Plan has been accepted by the required majorities of each class; and

(h)     the results of the vote conducted at the Meetings will be binding on each creditor of the Applicants whether or not such creditor is present in person or by proxy or voting at a Meeting.

Goldfarb Affidavit at para. 161; Application Record, Tab 4.

27.     The Applicants may elect to proceed with the Meetings notwithstanding that the resolution of Claims in accordance with the Claims Procedure may not be complete. The Meetings Order, if approved, authorizes and directs the Scrutineers to tabulate votes in respect of Voting Claims separately from votes in respect of Disputed Voting Claims, if any. If the approval or non-approval of the Plan may be affected by the votes cast in respect of Disputed Voting Claims, then the Monitor will report such matters to the Court and the Applicants and the Monitor may seek advice and directions at that time. This way, the Meetings can proceed concurrently with the Claims Procedure without prejudice to the Applicants' Creditors.

Goldfarb Affidavit at paras. 161(f)-(h) and 162; Application Record, Tab 4.

28.     Like the Claims Procedure Order, the Meetings Order includes a comeback provision providing interested parties who wish to amend or vary the Meetings Order with the ability to appear before the Court or bring a motion on a date to be set by the Court.

Meetings Order, Section 68.

29.   By seeking the Claims Procedure Order and the Meetings Order concurrently, the Applicants hope to move efficiently and expeditiously towards the implementation of the Recapitalization.

> Goldfarb Affidavit at para. 148; Application Record, Tab 4.