## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re:<br><br>CLINE MINING CORPORATION,<br><br>Debtor in a Foreign Proceeding. | Bankruptcy Case No.  14-26132 EEB<br><br>Chapter 15 |
| In re:<br><br>NEW ELK COAL COMPANY LLC,<br><br>Debtor in a Foreign Proceeding. | Bankruptcy Case No.  14-26133 EEB<br><br>Chapter 15 |
| In re:<br><br>NORTH CENTRAL ENERGY COMPANY,<br><br>Debtor in a Foreign Proceeding. | Bankruptcy Case No.  14-26134 EEB<br><br>Chapter 15<br><br>**Jointly Administered Under<br>Case No. 14-26132 EEB** |

## ORDER ENFORCING PLAN SANCTION ORDER
## OF THE ONTARIO COURT

**THIS MATTER** was brought before the Court by FTI Consulting Canada Inc.,  the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Cline Mining Corporation, New Elk Coal Company LLC, and North Central Energy Company (collectively, the "**Cline Debtors**") in a proceeding (the "**Canadian Proceeding**") pending before the Ontario Superior Court of Justice, Commercial List (the "**Ontario Court**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**Motion**") seeking entry of an order pursuant to section 105(a), 1507 and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), giving full force and effect in the United States to the Ontario Court's order (the "**Plan Sanction Order**") sanctioning the Cline Debtors' plan of compromise and arrangement (as the same may be

amended, revised or supplemented in accordance with its terms, the "**Plan**").  Copies of the Plan

Sanction Order and the Plan are annexed hereto as Exhibit 1 and Exhibit 2, respectively.

Due and timely notice of the filing of the Motion was given to those creditors of the

Cline Debtors required to be served under the Bankruptcy Code, other parties in interest, and the Office

of the United States Trustee, which notice is adequate for purposes of the Motion and no other or

further notice thereof need be given. Any objections to the Motion that have not been withdrawn or

resolved have been overruled.

After due deliberation and sufficient cause appearing therefore, the Court finds and

concludes as follows:

(A)         this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 1501;

(B)         this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P);

(C)         venue is proper in this District pursuant to 28 U.S.C. § 1410(3);

(D)         the relief granted is necessary and appropriate, in the interests of the public and international comity, consistent with United States public policy, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting that relief;

(E)         pursuant to section 1507(b), the relief granted will reasonably assure:

(1)     just treatment of all holders of claims against or interests in the Cline Debtors' property;

(2)     protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the Canadian Proceeding;

(3)     prevention of preferential or fraudulent dispositions of property of the Cline Debtors; and

(4)     distribution of proceeds of the Cline Debtors' property substantially in accordance with the order prescribed by the Bankruptcy Code.

(F)        the interest of the public will be served by this Court granting the relief requested by the Monitor.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.    The Plan Sanction Order is hereby given full force and effect in the United States and is binding on all persons subject to this Court's jurisdiction pursuant to sections 1507, 1521(a)(7), and 105(a) of the Bankruptcy Code.

2.    The Motion and this Order shall be available on the Monitor's website at http://cfcanada.fticonsulting.com/cline or upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, Attention: Mark Nixdorf, (212) 610-6300, mark.nixdorf@allenovery.com.

3.    Notwithstanding Rule 7062 of the Federal Rules of Bankruptcy Procedure, made applicable to these cases by 1018 of the Federal Rules of Bankruptcy Procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

4.     The hearing set on the Motion for Thursday, January 29, 2015 is hereby VACATED.

5.    The Monitor shall give notice of this Order to all creditors and parties in interest or their consel of record. The notice need not include the exhibits to this Order, but should provide information on where copies of the exhibits may be obtained

Dated:  January 28, 2015

BY THE COURT:

Elizabeth E. Brown,
United States Bankruptcy Judge

## __EXHIBIT 1__

Plan Sanction Order

Court File No. CV14-10781-00CL



**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| THE HONOURABLE REGIONAL | ) | TUESDAY, THE 27TH |
|---|---|---|
| | ) | |
| SENIOR JUSTICE MORAWETZ | ) | DAY OF JANUARY, 2015 |

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE AND ARRANGEMENT OF CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND NORTH CENTRAL ENERGY COMPANY

### <u>PLAN SANCTION ORDER</u>

**THIS MOTION** made by Cline Mining Corporation ("**Cline**"), New Elk Coal Company LLC ("**New Elk**") and North Central Energy Company ("**North Central**" and, together with Cline and New Elk, the "**Applicants**") for an Order (the "**Plan Sanction Order**"), pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), sanctioning the Amended and Restated Plan of Compromise and Arrangement dated January 20, 2015, which is attached as Schedule "A" hereto (and as it may be further amended, varied or supplemented from time to time in accordance with the terms thereof, the "**Plan**"), was heard on January 27, 2015 at 330 University Avenue, Toronto, Ontario.

**ON READING** the Notice of Motion, the Affidavit of Matthew Goldfarb sworn January 21, 2015 (the "**Goldfarb Affidavit**"), filed, the second report (the "**Second Report**") and third report (the "**Third Report**") of FTI Consulting Canada Inc., in its capacity as monitor of the Applicants (the "**Monitor**"), filed, and on hearing the submissions of counsel for each of the Applicants, the Monitor, Marret Asset Management Inc. (on behalf of the Applicants' secured noteholders), and such other counsel as were present, no one else appearing although duly served as appears from the affidavit of service, filed.

## DEFINED TERMS

1.  **THIS COURT ORDERS** that any capitalized terms not otherwise defined in this Plan Sanction Order shall have the meanings ascribed to such terms in the Plan and the Meetings Order granted by this Court on December 3, 2014 (the "**Meetings Order**"), as applicable.

## SERVICE, NOTICE AND MEETING

2.  **THIS COURT ORDERS** that the time for service of the Notice of Motion, the Motion Record in support of this motion, the Second Report and the Third Report be and are hereby abridged and validated so that the motion is properly returnable today and service upon any interested party other than those parties served is hereby dispensed with.

3.  **THIS COURT ORDERS AND DECLARES** that there has been good and sufficient notice, service and delivery of the Meetings Order, the Information Package and the Plan to all Persons upon which notice, service and delivery was required, and that the Meetings were duly convened and held on January 21, 2015, in conformity with the CCAA and the Meetings Order.

## SANCTION OF THE PLAN

4.  **THIS COURT DECLARES** that the relevant Voting Classes of Affected Creditors of the Applicants are the Secured Noteholders Class, the Affected Unsecured Creditors Class and the WARN Act Plaintiffs Class and that the Plan has been approved by the Required Majorities of Affected Creditors in each Voting Class, as required by the Meetings Order, and in conformity with the CCAA.

5.  **THIS COURT DECLARES** that the activities of the Applicants have been in compliance with the provisions of the CCAA, the Initial Order granted by this Court on December 3, 2014 (the "**Initial Order**"), the Claims Procedure Order granted by this Court on December 3, 2014 (the "**Claims Procedure Order**") and the Meetings Order (together with the Initial Order and the Claims Procedure Order, the "**Orders**"), the Court is satisfied that the Applicants have not done or purported to do anything that is not

- 3 -

authorized by the CCAA and the Plan and the transactions contemplated thereby are fair and reasonable.

6.    **THIS COURT ORDERS AND DECLARES** that the Plan is hereby sanctioned and approved pursuant to section 6 of the CCAA.

**PLAN IMPLEMENTATION**

7.    **THIS COURT ORDERS** that each of the Applicants and the Monitor are authorized and directed to take all steps and actions, and do all things, necessary or appropriate to implement the Plan in accordance with its terms and to enter into, execute, deliver, complete, implement and consummate all of the steps, transactions, distributions, deliveries, allocations and agreements contemplated by the Plan. All payments and distributions to be made by the Applicants to the WARN Act Plaintiffs pursuant to the Plan shall be made to Class Action Counsel, and Class Action Counsel shall allocate and distribute such payments in accordance with the Plan. Neither the Applicants nor the Monitor shall incur any liability as a result of acting in accordance with the terms of the Plan and the Plan Sanction Order.

8.    **THIS COURT ORDERS AND DECLARES** that the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby shall be deemed to be implemented, binding and effective in accordance with the provisions of the Plan as of the Plan Implementation Date, and the steps required to implement the Plan, including without limitation the release of all Affected Claims, Released Director/Officer Claims and Released Claims in accordance with the terms of the Plan, shall be deemed to occur and to take effect in the sequential order and at the times contemplated in section 5.3 of the Plan, without any further act or formality, on the Plan Implementation Date, beginning at the Effective Time.

9.    **THIS COURT ORDERS** that, pursuant to section 6(2) of the CCAA, the Articles of Cline shall be amended on the Plan Implementation Date in accordance with the provisions of, and as required to implement, the Plan. Any fractional Cline Common Shares held by any holder of Cline Common Shares immediately following the

consolidation of the Cline Common Shares referred to in section 5.3(h) of the Plan shall be cancelled without any liability, payment or other compensation in respect thereof and all Equity Interests (for greater certainty, not including any Cline Common Shares that remain issued and outstanding immediately following the cancellation of fractional interests pursuant to section 5.3(i) of the Plan) shall be cancelled without any liability, payment or other compensation in respect thereof.

10.   **THIS COURT ORDERS** that upon the satisfaction or waiver of the conditions precedent set out in section 9.1 of the Plan in accordance with the terms of the Plan, as confirmed by the Applicants and Marret or their counsel in writing, the Monitor is authorized and directed to deliver to counsel to the Applicants a certificate substantially in the form attached hereto as Schedule "B" (the "**Monitor's Certificate**") signed by the Monitor, certifying that the Plan Implementation Date has occurred and that the Plan is effective in accordance with its terms and the terms of the Plan Sanction Order.  The Monitor shall file the Monitor's Certificate with this Court and the U.S. Court promptly following the Plan Implementation Date.

11.   **THIS COURT ORDERS** that, subject to the payment of any amounts secured by the Charges that remain owing on the Plan Implementation Date, if any, each of the Charges shall be terminated, discharged and released on the Plan Implementation Date.

## EFFECT OF PLAN AND CCAA ORDERS

12.   **THIS COURT ORDERS** that, from and after the Plan Implementation Date, the Plan shall inure to the benefit of and be binding upon the Applicants, the Released Parties, the Affected Creditors, the Directors and Officers, any Person with a Director/Officer Claim or a Released Claim, and all other Persons and parties named or referred to in or affected by the Plan, including, without limitation, their respective heirs, administrators, executors, legal representatives, successors, and assigns.

13.   **THIS COURT ORDERS** that, without limiting the provisions of the Claims Procedure Order, any Person that did not file a Proof of Claim, a Notice of Dispute or a Notice of Dispute of Revision or Disallowance, as applicable, by the Claims Bar Date, the

- 5 -

Restructuring Period Claims Bar Date or such other bar date provided for in the Claims Procedure Order, as applicable, whether or not such Person received direct notice of the claims process established by the Claims Procedure Order, shall be and is hereby forever barred from making any Claim or any Director/Officer Claim and shall not be entitled to any consideration under the Plan, and such Person's Claim or Director/Officer Claim, as applicable, shall be and is hereby forever barred and extinguished.

14.     **THIS COURT ORDERS AND DECLARES** that, subject to performance by the Applicants of their obligations under the Plan and except as provided in the Plan, all obligations, agreements or leases to which any of the Applicants is a party on the Plan Implementation Date shall be and remain in full force and effect, unamended, as at the Plan Implementation Date and no party to any such obligation or agreement shall on or following the Plan Implementation Date, accelerate, terminate, refuse to renew, rescind, refuse to perform or otherwise disclaim or resiliate its obligations thereunder, or enforce or exercise (or purport to enforce or exercise) any right or remedy under or in respect of any such obligation or agreement, by reason: (i) that the Applicants sought or obtained relief or have taken steps in connection with the Plan or under the CCAA; (ii) of any default or event of default arising as a result of the financial condition or insolvency of the Applicants on or prior to the Plan Implementation Date; (iii) of the effect upon the Applicants of the completion of any of the transactions contemplated under the Plan; or (iv) of any compromises, settlements, restructurings, recapitalizations or reorganizations effected pursuant to the Plan.

## THE MONITOR

15.     **THIS COURT ORDERS** that the activities and conduct of the Monitor prior to the date hereof in relation to the Applicants, the CCAA Proceedings, and in conducting and administering the Meetings on January 21, 2015 be and are hereby ratified and approved.

16.     **THIS COURT ORDERS** that the pre-filing report of the Monitor dated December 2, 2015, the first report of the Monitor dated December 16, 2015 and the Second Report, and the conduct and activities of the Monitor as described therein are hereby approved.

17.   **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA and the powers provided to the Monitor herein and in the Orders and the Plan, shall be and is hereby authorized, directed and empowered to perform its functions and fulfill its obligations under the Plan to facilitate the implementation of the Plan.

18.   **THIS COURT ORDERS** that the Monitor has satisfied all of its obligations up to and including the date of this Plan Sanction Order, and that: (i) in carrying out the terms of this Plan Sanction Order and the Plan, the Monitor shall have all the protections given to it by the CCAA, the Initial Order, the Meetings Order, the Claims Procedure Order, and as an officer of the Court, including the stay of proceedings in its favour; (ii) the Monitor shall incur no liability or obligation as a result of carrying out the provisions of this Plan Sanction Order and/or the Plan and in performing its duties as Monitor in the CCAA Proceedings, save and except for any gross negligence or wilful misconduct on its part; (iii) the Monitor shall be entitled to rely on the books and records of the Applicants and any information provided by the Applicants without independent investigation; and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information, or with respect to any such information disclosed to or provided by the Monitor, including with respect to reliance thereon by any Person.

19.   **THIS COURT ORDERS** that as of the Effective Time on the Plan Implementation Date, the Monitor shall be discharged and released from its duties other than those obligations, duties and responsibilities: (i) necessary or required to give effect to the terms of the Plan and this Plan Sanction Order, (ii) in relation to the claims procedure and all matters relating thereto as set out in the Claims Procedure Order, and (iii) in connection with the completion by the Monitor of all other matters for which it is responsible in connection with the Plan or pursuant to the Orders of this Court made in the CCAA Proceedings.

20.   **THIS COURT ORDERS** that upon completion by the Monitor of its duties in respect of the Applicants pursuant to the CCAA, the Plan and the Orders, the Monitor may file with

the Court a certificate stating that all of its duties in respect of the Applicants pursuant to the CCAA, the Plan and the Orders have been completed and thereupon, FTI Consulting Canada Inc. shall be deemed to be discharged from its duties as Monitor and released of all claims relating to its activities as Monitor.

**BOARD OF DIRECTORS OF CLINE**

21.     **THIS COURT ORDERS AND DECLARES** that those persons listed on a certificate to be filed with the Court by the Applicants prior to the Plan Implementation Date shall be deemed to be appointed as the board of directors of Cline on the Plan Implementation Date, provided that such certificate and the persons listed thereon shall be subject to the prior written consent of Marret, on behalf of the Secured Noteholders. Concurrently with the appointment of such directors, all directors serving immediately prior to the Plan Implementation Date shall be deemed to resign (unless they are re-appointed in accordance with this paragraph).

**EXTENSION OF THE STAY OF PROCEEDINGS**

22.     **THIS COURT ORDERS** that the Stay Period, as such term is defined in and used throughout the Initial Order, be and is hereby extended to and including 11:59 p.m. on April 1, 2015, and that all other terms of the Initial Order shall remain in full force and effect, unamended, except as may be required to give effect to this paragraph or otherwise provided in the Plan or this Plan Sanction Order.

**EFFECT, RECOGNITION AND ASSISTANCE**

23.     **THIS COURT ORDERS** that the Applicants and the Monitor may apply to this Court for advice and direction with respect to any matter arising from or under the Plan or this Plan Sanction Order.

24.     **THIS COURT ORDERS** that this Plan Sanction Order shall have full force and effect in all provinces and territories of Canada and abroad as against all persons and parties against whom it may otherwise be enforced.

25.     **THIS COURT REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, or in any other foreign jurisdiction, to give effect to this Order or to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants or the Monitor and their respective agents in carrying out the terms of this Order. Without limiting the generality of the foregoing, the Monitor is hereby authorized, as foreign representative of the Applicants to, if deemed advisable by the Monitor and the Applicants, apply for recognition of this Plan Sanction Order in any proceedings in the United States pursuant to Chapter 15, Title 11 of the United States Code.

## GENERAL

26.     **THIS COURT ORDERS** that this Plan Sanction Order shall be posted on the Monitor's Website at http://cfcanada.fticonsulting.com/cline and is only required to be served upon the parties on the Service List and those parties who appeared at the hearing of the motion for this Plan Sanction Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JAN 2 7 2015

## Schedule "A"

### (Plan of Compromise and Arrangement)

Court File No. CV-14-10781-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND**

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
**CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND
NORTH CENTRAL ENERGY COMPANY**

**APPLICANTS**

---

**AMENDED AND RESTATED**
**PLAN OF COMPROMISE AND ARRANGEMENT**
pursuant to the *Companies' Creditors Arrangement Act*
concerning, affecting and involving

**CLINE MINING CORPORATION,**
**NEW ELK COAL COMPANY LLC and**
**NORTH CENTRAL ENERGY COMPANY**

---

**January 20, 2015**

# TABLE OF CONTENTS

ARTICLE 1 INTERPRETATION...............................................................................1
1.1    Definitions.................................................................................................1
1.2    Certain Rules of Interpretation................................................................16
1.3    Successors and Assigns............................................................................17
1.4    Governing Law.........................................................................................17
1.5    Schedules..................................................................................................17

ARTICLE 2 PURPOSE AND EFFECT OF THE PLAN.......................................17
2.1    Purpose.....................................................................................................17
2.2    Persons Affected......................................................................................18
2.3    Persons Not Affected...............................................................................18

ARTICLE 3 CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED
MATTERS.............................................................................................................18
3.1    Claims Procedure.....................................................................................18
3.2    Classification of Creditors.......................................................................18
3.3    Creditors' Meetings.................................................................................18
3.4    Treatment of Affected Claims.................................................................19
3.5    Unaffected Claims...................................................................................21
3.6    Disputed Distribution Claims..................................................................22
3.7    Director/Officer Claims...........................................................................22
3.8    Extinguishment of Claims........................................................................22
3.9    Guarantees and Similar Covenants..........................................................23
3.10   Set-Off23

ARTICLE 4 PROVISIONS REGARDING DISTRIBUTIONS AND PAYMENTS.................23
4.1    Distributions of New Cline Common Shares and New Secured Debt.............................23
4.2    Distribution Mechanics with respect to the Unsecured Plan Entitlement.........................23
4.3    Distribution Mechanics with respect to Convenience Claims............................................24
4.4    Distribution Mechanics with respect to the WARN Act Plan Entitlement and the
       WARN Act Cash Payment........................................................................24
4.5    Modifications to Distribution Mechanics.................................................25
4.6    Cancellation of Certificates and Notes....................................................25
4.7    Currency...................................................................................................26
4.8    Interest26
4.9    Allocation of Distributions......................................................................26
4.10   Treatment of Undeliverable Distributions...............................................26
4.11   Withholding Rights..................................................................................27
4.12   Fractional Interests..................................................................................27
4.13   Calculations.............................................................................................27

ARTICLE 5 RECAPITALIZATION.......................................................................27
5.1    Corporate Actions....................................................................................27
5.2    Issuance of Plan Consideration...............................................................28
5.3    Sequence of Plan Implementation Date Transactions.............................29
5.4    Issuances Free and Clear..........................................................................31

5.5      Stated Capital ...................................................................................................31

ARTICLE 6 PROCEDURE FOR DISTRIBUTIONS REGARDING DISPUTED
DISTRIBUTION CLAIMS ......................................................................................31
6.1      No Distribution Pending Allowance ...............................................................31
6.2      Disputed Distribution Claims .........................................................................31

ARTICLE 7 RELEASES ...................................................................................................32
7.1      Plan Releases ...................................................................................................32
7.2      Limitation on Insured Claims ..........................................................................33
7.3      Injunctions .......................................................................................................33
7.4      Applicants' Release of Class Action Counsel .................................................34

ARTICLE 8 COURT SANCTION ....................................................................................34
8.1      Application for Sanction Order ........................................................................34
8.2      Sanction Order .................................................................................................34

ARTICLE 9 CONDITIONS PRECEDENT AND IMPLEMENTATION.....................36
9.1      Conditions Precedent to Implementation of the Plan ......................................36
9.2      Monitor's Certificate .......................................................................................38

ARTICLE 10 GENERAL ...................................................................................................38
10.1     Binding Effect ..................................................................................................38
10.2     Waiver of Defaults ...........................................................................................39
10.3     Deeming Provisions .........................................................................................39
10.4     Non-Consummation ..........................................................................................39
10.5     Modification of the Plan ..................................................................................39
10.6     Marret and the Secured Noteholders ...............................................................40
10.7     Paramountcy .....................................................................................................41
10.8     Severability of Plan Provisions .......................................................................41
10.9     Responsibilities of the Monitor .......................................................................41
10.10    Different Capacities .........................................................................................42
10.11    Notices .............................................................................................................42
10.12    Further Assurances ...........................................................................................43

## AMENDED AND RESTATED
## PLAN OF COMPROMISE AND ARRANGEMENT

**WHEREAS** Cline Mining Corporation ("**Cline**"), New Elk Coal Company LLC ("**New Elk**") and North Central Energy Company ("**North Central**" and together with Cline and New Elk, the "**Applicants**") are debtor companies under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**");

**AND WHEREAS** the Applicants have obtained an order (as may be amended, restated or varied from time to time, the "**Initial Order**") of the Ontario Superior Court of Justice (the "**Court**") under the CCAA (the date of such Initial Order being the "**Filing Date**");

**AND WHEREAS** Marret Asset Management Inc. ("**Marret**") exercises sole investment discretion and control over all of the beneficial holders of (i) the $71,381,900 million aggregate principal amount of 10% senior secured notes due June 15, 2014 issued by Cline pursuant to the indenture dated December 13, 2011, as amended (the "**2011 Notes**") and (ii) the $12,340,998 aggregate principal amount of 10% senior secured notes due June 15, 2014 issued by Cline pursuant to the indenture dated July 8, 2013, as amended (the "**2013 Notes**", and collectively with the 2011 Notes, the "**Secured Notes**");

**AND WHEREAS** the Applicants have developed a recapitalization transaction (the "**Recapitalization**") as set forth herein, and Marret (on behalf of all of the beneficial holders of the Secured Notes) has agreed to support the terms of the Recapitalization;

**AND WHEREAS** the Applicants filed a Plan of Compromise and Arrangement dated December 3, 2014 pursuant to the Meetings Order (as defined below) (the "**Original Plan**");

**AND WHEREAS**, following discussions with counsel for the WARN Act Plaintiffs, Marret and the Monitor, the Applicants have agreed to make certain amendments to the Original Plan to address the settlement of the WARN Act Claims;

**AND WHEREAS** the Applicants file this amended and restated consolidated plan of compromise and arrangement with the Court pursuant to the CCAA and hereby propose and present the plan of compromise and arrangement to the Secured Noteholders Class, the Affected Unsecured Creditors Class and the WARN Act Plaintiffs Class (each as defined below) under and pursuant to the CCAA.

## ARTICLE 1
## INTERPRETATION

### 1.1   Definitions

In the Plan, unless otherwise stated or unless the subject matter or context otherwise requires:

"**2011 Indenture**" means the note indenture dated December 13, 2011 that was entered into between Cline, Marret and the 2011 Trustee in connection with the issuance of the 2011 Notes, as amended from time to time.

- 2 -

"**2011 Noteholders**" means the holders of the 2011 Notes, and "**2011 Noteholder**" means any one of them.

"**2011 Trustee**" means the Indenture Trustee, Computershare Trust Company of Canada, specifically in its capacity as trustee in respect of the 2011 Secured Notes under the 2011 Indenture.

"**2013 Indenture**" means the note indenture dated July 8, 2013 that was entered into between Cline, Marret and the 2013 Trustee in connection with the issuance of the 2013 Notes, as amended from time to time.

"**2013 Noteholders**" means the holders of the 2013 Notes, and "**2013 Noteholder**" means any one of them.

"**2013 Trustee**" means the Indenture Trustee, Computershare Trust Company of Canada, specifically in its capacity as trustee in respect of the 2013 Secured Notes under the 2013 Indenture.

"**Affected Claim**" means any Claim that is not an Unaffected Claim, and, for greater certainty, includes any Secured Noteholder Claim, Affected Unsecured Claim, WARN Act Claim and Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claims**" means all Claims against one or more of the Applicants that are not secured by a valid security interest over assets or property of the Applicants and that are not (i) Unaffected Claims, (ii) the Claims comprising the Secured Noteholders Allowed Secured Claim, (iii) WARN Act Claims or (iv) Equity Claims; and, for greater certainty, the Affected Unsecured Claims shall include the Secured Noteholders Allowed Unsecured Claim, the Marret Unsecured Claim and any portion of any other Affected Claim that is secured but in respect of which there is a deficiency in the realizable value of the security held in respect of such Claim relative to the amount of such Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditors Class**" means the class of Affected Unsecured Creditors entitled to vote on the Plan at the Unsecured Creditors Meeting in accordance with the terms of the Meetings Order.

"**Agreed Number**" means, with respect to the New Cline Common Shares, that number of New Cline Common Shares to be issued on the Plan Implementation Date pursuant to the Plan as agreed to by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders).

"**Allowed**" means, with respect to a Claim, any Claim or any portion thereof that has been finally allowed as a Distribution Claim (as defined in the Claims Procedure Order) for purposes of receiving distributions under the Plan in accordance with the Claims Procedure Order or a Final Order of the Court.

- 3 -

"**Applicable Law**" means any law, statute, order, decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision of any Governmental Entity.

"**Articles**" means the articles and/or the notice of articles of Cline, as applicable.

"**Assessments**" has the meaning ascribed thereto in the Claims Procedure Order.

"**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended.

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in Toronto, Ontario and New York, New York.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada), as amended.

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceeding**" means the proceeding commenced by the Applicants pursuant to the CCAA.

"**CDS**" means CDS Clearing and Depository Services Inc. or any successor thereof.

"**CDS Participants**" means CDS participant holders of the 2011 Notes and the 2013 Notes.

"**Chapter 15**" means Chapter 15, Title 11 of the United States Code.

"**Chapter 15 Proceeding**" means the proceeding to be commenced by the foreign representative of the Applicants pursuant to Chapter 15.

"**Charges**" means the Administration Charge and the Directors' Charge, each as defined in the Initial Order.

"**Claim**" means:

(a)     any right or claim of any Person against any of the Applicants, whether or not asserted, in connection with any indebtedness, liability or obligation of any kind whatsoever of any such Applicant in existence on the Filing Date, and costs payable in respect thereof to and including the Filing Date, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including any Assessment and any right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation is based in whole or in part on facts which existed prior to the Filing Date and any other claims that would have been claims provable in bankruptcy had such Applicant become bankrupt on the

- 4 -

Filing Date, including for greater certainty any Equity Claim and any claim against any of the Applicants for indemnification by any Director or Officer in respect of a Director/Officer Claim (but excluding any such claim for indemnification that is covered by the Directors' Charge (as defined in the Initial Order)); and

(b)     any right or claim of any Person against any of the Applicants in connection with any indebtedness, liability or obligation of any kind whatsoever owed by any such Applicant to such Person arising out of the restructuring, disclaimer, resiliation, termination or breach by such Applicant on or after the Filing Date of any contract, lease or other agreement whether written or oral and includes any other right or claim that is to be treated as a Restructuring Period Claim under the Plan,

provided that, for greater certainty, the definition of "Claim" herein shall not include any Director/Officer Claim.

"**Claims Bar Date**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Claims Procedure Order**" means the Order under the CCAA establishing a claims procedure in respect of the Applicants, as same may be further amended, restated or varied from time to time.

"**Class Action Counsel**" means The Gardner Firm, P.C., in its capacity as counsel to James Gerard Jr. and Michael Cox, on behalf of themselves and all others who are alleged to be similarly situated, in the WARN Act Class Action.

"**Class Action Initial Expense Reimbursement**" means an amount to be agreed by Class Action Counsel and James Gerard Jr. and Michael Cox, as representative plaintiffs in the WARN Act Class Action, in respect of: the reasonable attorneys fees, expenses and costs of the WARN Act Plaintiffs' counsel; the reasonable local attorneys fees, expenses and costs incurred by the WARN Act Plaintiffs' counsel; and class representative fees, expenses and costs in connection with the WARN Act Class Action. The Class Action Initial Expense Reimbursement is to be paid on the Plan Implementation Date and shall not exceed $90,000 (being the maximum amount of the WARN Act Cash Payment).

"**Class Action Second Expense Reimbursement**" means an amount to be agreed by Class Action Counsel and James Gerard Jr. and Michael Cox, as representative plaintiffs in the WARN Act Class Action, in respect of the reasonable attorneys fees and expenses of the WARN Act Plaintiffs' counsel. The Class Action Second Expense Reimbursement is to be paid on the WARN Act Plan Entitlement Date and shall not exceed $120,000 (being the maximum amount of the WARN Act Plan Entitlement).

"**Cline Common Shares**" means the common shares in the capital of Cline designated as Common Shares in the Notice of Articles of Cline.

"**Cline Companies**" means Cline, New Elk, North Central Energy Company, Raton Basin Analytical, LLC.

"**Company Advisors**" means Goodmans LLP, Moelis & Company and Aab & Botts, LLC.

- 5 -

"**Consolidation Ratio**" means, with respect to the Cline Common Shares, the ratio by which Cline Common Shares outstanding on the Plan Implementation Date at the relevant time (including, for the avoidance of doubt, any Cline Common Shares that are Existing Cline Shares and any Cline Common Shares that are New Cline Common Shares issued pursuant to the Plan) are consolidated pursuant to the Plan, as agreed by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders).

"**Convenience Claim**" means any Affected Unsecured Claim that is not more than $10,000, provided that (i) no Claims of the Secured Noteholders shall constitute Convenience Claims; (ii) Creditors shall not be entitled to divide a Claim for the purpose of qualifying such Claim as a Convenience Claim; (iii) no Restructuring Period Claim referred to in section 3.5(d)(i) shall constitute a Convenience Claim, and (iv) for greater certainty, none of the WARN Act Claims shall constitute Convenience Claims.

"**Convenience Creditor**" means an Affected Unsecured Creditor having a Convenience Claim.

"**Court**" has the meaning ascribed thereto in the recitals.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Procedure Order or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person.

"**Directors**" means all current and former directors (or their estates) of the Applicants, in such capacity, and "**Director**" means any one of them.

"**Director/Officer Claim**" means any right or claim of any Person against one or more of the Directors and/or Officers howsoever arising, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, including any right of contribution or indemnity, for which any Director or Officer is alleged to be, by statute or otherwise by law or equity, liable to pay in his or her capacity as a Director or Officer.

"**Disputed Distribution Claim**" means an Affected Unsecured Claim or a WARN Act Claim (including a contingent Affected Unsecured Claim or WARN Act Claim that crystallizes upon the occurrence of an event or events occurring after the Filing Date) or such portion thereof that has not been Allowed, which is validly disputed for distribution purposes in accordance with the Claims Procedure Order and that remains subject to adjudication for distribution purposes in accordance with the Claims Procedure Order.

"**Disputed Distribution Claims Reserve**" means the reserve, if any, to be established by Cline, which shall be comprised of the following:

- 6 -

(a)   in respect of Affected Unsecured Claims that are Disputed Distribution Claims and are not Convenience Claims, an amount reserved on the Unsecured Plan Entitlement Date equal to the Unsecured Plan Entitlement Proceeds that would have been paid in respect of such Disputed Distribution Claims on the Unsecured Plan Entitlement Date if such Disputed Distribution Claims had been Allowed Claims as of the Promissory Note Maturity Date

(b)   in respect of Affected Unsecured Claims that are Disputed Distribution Claims and that are Convenience Claims, an amount reserved on the Plan Implementation Date equal to the amount that would have been paid in respect of such Disputed Distribution Claims on the Plan Implementation Date if such Disputed Distribution Claims had been Allowed Claims as of the Plan Implementation Date, and

(c)   in respect of WARN Act Claims that are Disputed Distribution Claims, an amount reserved on the WARN Act Plan Entitlement Date equal to the WARN Act Plan Entitlement Proceeds that would have been paid in respect of such Disputed Distribution Claims on the WARN Act Plan Entitlement Date if such Disputed Distribution Claims had been Allowed Claims as of the WARN Act Plan Entitlement Date.

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Allowed Claims, excluding the Initial Distribution Date, and (i) in the case of distributions of Unsecured Plan Entitlement Proceeds, means the Unsecured Plan Entitlement Date or such later date from time to time established in accordance with the provisions of the Plan if any Affected Unsecured Claim is a Disputed Distribution Claim on the Unsecured Plan Entitlement Date; and (ii) in the case of distributions of WARN Act Plan Entitlement Proceeds, means the WARN Act Plan Entitlement Date or such later date from time to time established in accordance with the provisions of the Plan if any WARN Act Claim is a Disputed Distribution Claim on the WARN Act Plan Entitlement Date.

"**Effective Time**" means 12:01 a.m. (Toronto time) on the Plan Implementation Date or such other time on such date as the Applicants may determine.

"**Employee Priority Claims**" means the following Claims of Employees and former employees of the Applicants:

(a)   Claims equal to the amounts that such Employees and former employees would have been entitled to receive under paragraph 136(I)(d) of the *Bankruptcy and Insolvency Act* (Canada) if the applicable Applicant had become bankrupt on the Filing Date; and

(b)   Claims for wages, salaries, commissions or compensation for services rendered by such Employees and former employees after the Filing Date and on or before the Plan Implementation Date together with, in the case of travelling salespersons, disbursements properly incurred by them in and about the Applicants' business during the same period.

- 7 -

"**Employees**" means any and all (a) employees of the Applicants who are actively at work (including full-time, part-time or temporary employees) and (b) employees of the Applicants who are on approved leaves of absence (including maternity leave, parental leave, short-term disability leave, workers' compensation and other statutory leaves), and who have not tendered notice of resignation as of the Filing Date, in each case.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that meets the definition of "equity claim" in section 2(1) of the CCAA.

"**Equity Claimants**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity, and for greater certainty includes the Existing Cline Shareholders in their capacity as such.

"**Equity Interests**" has the meaning ascribed thereto in section 2(1) of the CCAA and, for greater certainty, includes the Existing Cline Shares, the Existing New Elk Units, the Existing North Central Shares, the Existing Options and any other interest in or entitlement to shares or units in the capital of the Applicants but, for greater certainty, does not include the New Cline Common Shares issued on the Plan Implementation Date in accordance with the Plan.

"**Existing Cline Shareholder**" means any Person who holds, is entitled to or has any rights in or to the Existing Cline Shares or any shares in the authorized capital of Cline immediately prior to the Effective Time, but only in such capacity, and for greater certainty does not include any Person that is issued New Cline Common Shares on the Plan Implementation Date.

"**Existing Cline Shares**" means all shares in the capital of Cline that are issued and outstanding immediately prior to the Effective Time.

"**Existing New Elk Units**" means all units in the capital of New Elk that are issued and outstanding immediately prior to the Effective Time.

"**Existing North Central Shares**" means all shares in the capital of North Central that are issued and outstanding immediately prior to the Effective Time.

"**Existing Options**" means any options, warrants (including the Warrants), conversion privileges, puts, calls, subscriptions, exchangeable securities, or other rights, entitlements, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating any of the Applicants to issue, acquire or sell shares or units in the capital of the Applicants or to purchase any shares, units, securities, options or warrants, or any securities or obligations of any kind convertible into or exchangeable for shares or units in the capital of the Applicants, in each case that are existing or issued and outstanding immediately prior to the Effective Time, including any options to acquire shares, units or other equity securities of the Applicants issued

- 8 -

under the Stock Option Plans, any warrants exercisable for common shares, units or other equity securities of the Applicants (including the Warrants), any put rights exercisable against the Applicants in respect of any shares, units, options, warrants or other securities, and any rights, entitlements or other claims of any kind to receive any other form of consideration in respect of any prior or future exercise of any of the foregoing.

"**Filing Date**" has the meaning ascribed thereto in the recitals.

"**Final Order**" means any order, ruling or judgment of the Court, or any other court of competent jurisdiction, (i) that is in full force and effect; (ii) that has not been reversed, modified or vacated and is not subject to any stay and (iii) in respect of which all applicable appeal periods have expired and any appeals therefrom have been finally disposed of, leaving such order, ruling or judgment wholly operable.

"**Fractional Interests**" has the meaning given in section 4.12 hereof.

"**Government Priority Claims**" means all Claims of Governmental Entities against any of the Applicants in respect of amounts that are outstanding and that are of a kind that could be subject to a demand under:

(a)     subsections 224(1.2) of the Canadian Tax Act;

(b)     any provision of the Canada Pension Plan or the *Employment Insurance Act* (Canada) that refers to subsection 224(1.2) of the Canadian Tax Act and provides for the collection of a contribution, as defined in the Canada Pension Plan, or employee's premium or employer's premium as defined in the *Employment Insurance Act* (Canada), or a premium under Part VII.1 of that Act, and of any related interest, penalties or other amounts; or

(c)     any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the Canadian Tax Act, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum:

(i)     has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the Canadian Tax Act; or

(ii)     is of the same nature as a contribution under the Canada Pension Plan if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the Canada Pension Plan and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to

- 9 -

exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Indentures**" means, collectively, the 2011 Indenture and the 2013 Indenture.

"**Indenture Trustee**" means Computershare Trust Company of Canada, as trustee in respect of the Secured Notes under the Indentures.

"**Individual Unsecured Plan Entitlement**" means, with respect to each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim that is not a Convenience Creditor and that is not a Secured Noteholder, its entitlement to receive its respective individual portion of the Unsecured Plan Entitlement Proceeds payable on the Unsecured Plan Entitlement Date, the quantum of which entitlement shall be calculated as follows at the relevant time:

    (A)    the Allowed Affected Unsecured Claim of such Affected Unsecured Creditor

    divided by

    (B)    the total amount of all Allowed Affected Unsecured Claims and Disputed Distribution Claims of Affected Unsecured Creditors less the Secured Noteholders Allowed Unsecured Claim less the Marret Unsecured Claim less the amount of all Convenience Claims

    multiplied by

    (C)    $225,000.

"**Individual WARN Act Plan Entitlement**" means with respect to each WARN Act Plaintiff with an Allowed WARN Act Claim, its entitlement to receive its individual WARN Act Plaintiff's Share of the WARN Act Plan Entitlement Proceeds payable on the WARN Act Plan Entitlement Date.

"**Information Statement**" means the information statement to be distributed by the Applicants concerning the Plan, the Meetings and the hearing in respect of the Sanction Order, as contemplated in the Meetings Order.

"**Initial Distribution Date**" means a date no more than two (2) Business Days after the Plan Implementation Date or such other date as the Applicants and the Monitor may agree.

"**Initial Order**" has the meaning ascribed thereto in the recitals.

"**Insurance Policy**" means any insurance policy maintained by any of the Applicants pursuant to which any of the Applicants or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim arising from a cause of action for which the applicable insurer or a court of competent jurisdiction has definitively and unconditionally confirmed that the applicable Applicant is insured under an Insurance Policy, to the extent that such Claim, or portion thereof, is so insured.

- 10 -

"**Intercompany Claim**" means any Claim by any Applicant against another Applicant.

"**Marret**" has the meaning ascribed to it in the recitals.

"**Marret Unsecured Claim**" means all Claims of Marret, in its individual corporate capacity and not on behalf of the Secured Noteholders, against one or more of the Applicants, if any, including any secured Claims of Marret, in such capacity, in respect of which there is a deficiency in the realizable value of the security held by Marret relative to the amount of such secured Claim.

"**Material**" means a fact, circumstance, change, effect, matter, action, condition, event, occurrence or development that, individually or in the aggregate, is, or would reasonably be expected to be, material to the business, affairs, results of operations or financial condition of the Applicants (taken as a whole).

"**Meeting Date**" means the date on which the Meetings are held in accordance with the Meetings Order.

"**Meetings**" means, collectively, the Secured Noteholders Meeting, the Unsecured Creditors Meeting and the WARN Act Plaintiffs Meeting.

"**Meetings Order**" means the Order under the CCAA that, among other things, sets the date for the Meetings, as same may be amended, restated or varied from time to time.

"**Monitor**" means FTI Consulting Canada Inc., as Court-appointed Monitor of the Applicants in the CCAA Proceeding.

"**Monitor's Website**" means http://cfcanada.fticonsulting.com/cline

"**New Cline Common Shares**" means the new Cline Common Shares to be issued pursuant to section 5.2(1) hereof.

"**New Credit Agreement**" means the credit agreement in respect of the New Secured Debt dated as of the Plan Implementation Date among Cline, as borrower, New Elk and North Central, as guarantors, and the New Secured Debt Agent.

"**New Secured Debt**" means the new secured indebtedness of Cline, which is to be guaranteed by New Elk and North Central, to be established on the Plan Implementation Date pursuant to section 5.2(2) hereof, the terms of which shall be consistent with the summary of terms set forth in Schedule "A" and which shall be governed by the New Credit Agreement.

"**New Secured Debt Agent**" means Marret Asset Management Inc., in its capacity as administrative and collateral agent under the New Credit Agreement.

"**Noteholder Advisors**" means Davies Ward Phillips & Vineberg LLP.

"**Notice of Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

- 11 -

"**Officers**" means all current and former officers (or their estates) of the Applicants, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Court made in connection with the CCAA Proceeding and any order of the U.S. Court made in connection with the Chapter 15 Proceeding.

"**Original Plan**" has the meaning ascribed thereto in the recitals.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Plan**" means this Amended and Restated Plan of Compromise and Arrangement filed by the Applicants pursuant to the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Implementation Date**" means the Business Day on which the Plan becomes effective, which shall be the Business Day on which, pursuant to section 9.2, the Applicants and Marret (on behalf of the Secured Noteholders) or their respective counsel deliver written notice to the Monitor (or its counsel) that the conditions set out in section 9.1 have been satisfied or waived in accordance with the terms hereof.

"**Post-Filing Trade Payables**" means trade payables that were incurred by any of the Applicants (a) after the Filing Date but before the Plan Implementation Date; and (b) in compliance with the Initial Order and other Orders issued in connection with the CCAA Proceeding and the Chapter 15 Proceeding.

"**Prior Ranking Secured Claims**" means Allowed Claims existing on both the Filing Date and the Plan Implementation Date, other than Government Priority Claims, Employee Priority Claims, and Claims secured by the Charges, that (a) are secured by a valid, perfected and enforceable security interest in, mortgage, encumbrance or charge over, lien against or other similar interest in, any of the assets that any of the Applicants owns or to which any of the Applicants is entitled, but only to the extent of the realizable value of the property subject to such security; and (b) would have ranked senior in priority to the Secured Noteholders Allowed Secured Claim if the Applicants had become bankrupt on the Filing Date, but only to the extent that it would have ranked senior in priority, including any Allowed Claims relating to the security registrations listed on Schedule "A" to the Initial Order, which, for greater certainty, includes the registration in favour of Bank of Montreal/Banque de Montreal listed thereon, to the extent that such Claims satisfy the terms of this definition.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Recapitalization**" means the transactions contemplated by the Plan.

"**Released Claims**" has the meaning ascribed thereto in section 7.1.

"**Released Director/Officer Claim**" means any Director/Officer Claim that is released pursuant to section 7.1.

- 12 -

"**Released Party**" and "**Released Parties**" have the meaning ascribed thereto in section 7.1.

"**Restructuring Period Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Required Majorities**" means with respect to each Voting Class, a majority in number of Affected Creditors representing at least two thirds in value of the Voting Claims of Affected Creditors, in each case who are entitled to vote at the Meetings in accordance with the Meetings Order and who are present and voting in person or by proxy on the resolution approving the Plan at the applicable Meeting.

"**Sanction Order**" means the Order of the Court sanctioning and approving the Plan.

"**Secured Noteholders**" means the holders of the Secured Notes, and "**Secured Noteholder**" means any one of them.

"**Secured Noteholders Allowed Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and the aggregate amount of such Claim is $110,173,897.

"**Secured Noteholders Allowed Secured Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and, for the purpose of voting at the Secured Noteholders Meeting and receiving distributions under the Plan, the aggregate amount of such Claims is $92,673,897.

"**Secured Noteholders Allowed Unsecured Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and, for the purpose of voting at the Unsecured Creditors Meeting, the aggregate amount of such Claims is $17,500,000.

"**Secured Noteholders Class**" means the class of Secured Noteholders collectively holding the Secured Noteholders Allowed Secured Claim entitled to vote on this Plan at the Secured Noteholders Meeting in accordance with the terms of the Meetings Order.

"**Secured Noteholders Meeting**" means the meeting of the Secured Noteholders Class to be held on the Meeting Date for the purpose of considering and voting on the Plan pursuant to the CCAA and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**Secured Noteholder's Share**" means, with respect to each Secured Noteholder, either: (i) the principal amount of Secured Notes held by such Secured Noteholder as at the Filing Date divided by the total aggregate principal amount of all Secured Notes as at the Filing Date; or (ii) such other proportionate share as may be agreed by the Applicants, Marret (on behalf of the Secured Noteholders) and the Monitor and as confirmed by Marret (on behalf of the Secured Noteholders) to the Indenture Trustee in writing.

"**Secured Note Obligations**" means all obligations, liabilities and indebtedness of the Applicants or any of the Cline Companies (whether as guarantor, surety or otherwise) to the Indenture Trustee, the Secured Noteholders and/or Marret (whether on behalf of the Secured Noteholders or in its individual corporate capacity) under, arising out of or in connection with the Secured Notes, the Indentures or the guarantees granted in connection with any of the foregoing as well as any other agreements or documents relating thereto as at the Plan Implementation Date.

- 13 -

"**Secured Notes**" has the meaning ascribed thereto in the recitals.

"**Stock Option Plans**" means any options plans, stock-based compensation plans or other obligations of any of the Applicants in respect of shares, options or warrants for equity in any of the Cline Companies, in each case as such plans or other obligations may be amended, restated or varied from time to time in accordance with the terms thereof.

"**Tax**" or "**Taxes**" means any and all federal, provincial, state, municipal, local, Canadian, U.S. and foreign taxes, assessments, reassessments and other governmental charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and federal, provincial, state, municipal, local, Canadian, U.S., foreign and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means any one of Her Majesty the Queen, Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United States, and any Canadian, American or other government, regulatory authority, government department, agency, commission, bureau, minister, court, tribunal or body or regulation making entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**Unaffected Claim**" means any:

      (a)      Claim secured by any of the Charges;

      (b)      Insured Claim;

      (c)      Intercompany Claim;

      (d)      Post-Filing Trade Payable;

      (e)      Unaffected Secured Claim;

      (f)      Claim by an Unaffected Trade Creditor arising from an Unaffected Trade Claim;

      (g)      Claim that is not permitted to be compromised pursuant to section 19(2) of the CCAA;

      (h)      Employee Priority Claims; and

      (i)      Government Priority Claims.

- 14 -

"**Unaffected Creditor**" means a Creditor who has an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unaffected Secured Claims**" means: (i) the Prior Ranking Secured Claims; and (ii) all other Claims against one or more of the Applicants that (a) are secured by a valid security interest over assets or property of the Applicants and (b) the Applicants have identified to the Monitor in writing prior to the Plan Implementation Date as Unaffected Claims under the Plan.

"**Unaffected Trade Claim**" means an Allowed Claim of an Unaffected Trade Creditor that (i) is not a Post-Filing Trade Payable, (ii) arises out of or in connection with any contract, license, lease, agreement, obligation, arrangement or document with any of the Applicants related to the business of the Applicants and (iii) the Applicants have identified to the Monitor in writing prior to the Plan Implementation Date as an Unaffected Claim.

"**Unaffected Trade Creditor**" means any Person that has been designated by the Applicants, with the consent of the Monitor, as a critical supplier in accordance with the Initial Order.

"**Undeliverable Distribution**" has the meaning ascribed thereto in section 4.10 hereof.

"**Unsecured Creditors Meeting**" means a meeting of Affected Unsecured Creditors to be held on the Meeting Date called for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**Unsecured Plan Entitlement**" means an unsecured, non-interest-bearing entitlement of the Affected Unsecured Creditors, other than Convenience Creditors, with Allowed Affected Unsecured Claims to receive $225,000 in cash (collectively, and not individually) from Cline on the date that is eight years from the Plan Implementation Date, which entitlement shall be subordinated to all present and future secured indebtedness and obligations of Cline and may be paid by Cline at any time without penalty.

"**Unsecured Plan Entitlement Date**" means the earlier of the date that is eight years following the Plan Implementation Date and the date on which the Unsecured Plan Entitlement is paid by Cline.

"**Unsecured Plan Entitlement Proceeds**" means the amounts payable to the beneficiaries of the Unsecured Plan Entitlement on the Unsecured Plan Entitlement Date.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Colorado.

"**Voting Claims**" means any Claim or portion thereof that has been finally allowed as a Voting Claim (as defined in the Claims Procedure Order) for purposes of voting at a Meeting in accordance with the Claims Procedure Order or a Final Order of the Court.

"**Voting Classes**" means the Secured Noteholders Class, the Affected Unsecured Creditors Class and the WARN Act Plaintiffs Class.

"**WARN Act**" means the U.S. federal Worker Adjustment and Retraining Notification Act of 1988 (29 U.S.C. §§ 2101 – 2109).

- 15 -

"**WARN Act Cash Payment**" means the cash payment in the amount of $90,000 less the Class Action Initial Expense Reimbursement, which cash payment is to be made to the Class Action Counsel on the Plan Implementation Date for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims.

"**WARN Act Claim**" means any Claim against any of the Applicants advanced by the WARN Act Plaintiffs in the WARN Act Class Action and any other Claims of individuals similarly situated to the WARN Act Plaintiffs that may be asserted against any of the Applicants pursuant to the WARN Act.

"**WARN Act Class Action**" means the class action lawsuit filed against Cline and New Elk by the WARN Act Plaintiffs in the United States District Court for the District of Colorado, Case Number 1:13-CV-00277, as amended.

"**WARN Act Plaintiffs**" means the plaintiffs in the WARN Act Class Action and all others who are alleged in the WARN Act Class Action to be similarly situated, and any other individual who is simliarly situated to the plaintiffs in the WARN Act Class Action who asserts Claims against any of the Applicants pursuant to the WARN Act.

"**WARN Act Plaintiffs Class**" means the class of WARN Act Plaintiffs entitled to vote on the Plan at the WARN Act Plaintiffs Meeting in accordance with the terms of the Meetings Order.

"**WARN Act Plaintiffs Meeting**" means a meeting of WARN Act Plaintiffs Class to be held on the Meeting Date called for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**WARN Act Plaintiff's Share**" means, at the relevant time, with respect to each WARN Act Plaintiff with an Allowed WARN Act Claim, the applicable share of such WARN Act Plaintiff in the distributions to be made to the WARN Act Plaintiffs with Allowed WARN Act Claims hereunder, as determined by Class Action Counsel in accordance with the parameters of the WARN Act Class Action.

"**WARN Act Plan Entitlement**" means the unsecured, non-interest-bearing entitlement of the WARN Act Plaintiffs with Allowed WARN Act Claims to receive $120,000 less the amount of the Class Action Second Expense Reimbursement in cash (collectively, and not individually) from New Elk on the date that is eight years from the Plan Implementation Date, which entitlement shall be subordinated to all present and future secured indebtedness and obligations of Cline and may be paid by Cline at any time without penalty.

"**WARN Act Plan Entitlement Date**" means the earlier of the date that is eight years following the Plan Implementation Date and the date on which the WARN Act Plan Entitlement is paid by Cline.

"**WARN Act Plan Entitlement Proceeds**" means the amounts payable to the beneficiaries of the WARN Act Plan Entitlement on the WARN Act Plan Entitlement Date.

- 16 -

"**Warrants**" means all warrants, options, rights or entitlements for the purchase of Cline Common Shares that are issued and outstanding immediately prior to the Effective Time.

### 1.2    Certain Rules of Interpretation

For the purposes of the Plan:

(a)    any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(b)    any reference in the Plan to an Order or an existing document or exhibit filed or to be filed means such Order, document or exhibit as it may have been or may be amended, modified, or supplemented;

(c)    unless otherwise specified, all references to currency are in Canadian dollars;

(d)    the division of the Plan into "articles" and "sections" and the insertion of a table of contents are for convenience of reference only and do not affect the construction or interpretation of the Plan, nor are the descriptive headings of "articles" and "sections" intended as complete or accurate descriptions of the content thereof;

(e)    the use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of the Plan or a schedule hereto to such Person (or Persons) or circumstances as the context otherwise permits;

(f)    the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

(g)    unless otherwise specified, all references to time herein and in any document issued pursuant hereto mean local time in Toronto, Ontario and any reference to an event occurring on a Business Day shall mean prior to 5:00 p.m. (Toronto time) on such Business Day;

(h)    unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next succeeding Business Day if the last day of the period is not a Business Day;

(i)    unless otherwise provided, any reference to a statute or other enactment of parliament or a legislature includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time

- 17 -

to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation; and

(j) references to a specified "article" or "section" shall, unless something in the subject matter or context is inconsistent therewith, be construed as references to that specified article or section of the Plan, whereas the terms "the Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to the Plan and not to any particular "article", "section" or other portion of the Plan and include any documents supplemental hereto.

## 1.3 Successors and Assigns

The Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and assigns of any Person or party directly or directly named or referred to in or subject to Plan.

## 1.4 Governing Law

The Plan shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. All questions as to the interpretation of or application of the Plan and all proceedings taken in connection with the Plan and its provisions shall be subject to the jurisdiction of the Court, provided that the Chapter 15 Proceeding shall be subject to the jurisdiction of the U.S. Court.

## 1.5 Schedules

The following are the Schedules to the Plan, which are incorporated by reference into the Plan and form a part of it:

| | |
|---|---|
| Schedule "A" | New Secured Debt – Summary of Terms |
| Schedule "B" | Alternate Plan – Summary of Terms |

## ARTICLE 2
## PURPOSE AND EFFECT OF THE PLAN

## 2.1 Purpose

The purpose of the Plan is:

(a) to implement a recapitalization of the Applicants;

(b) to provide for a settlement of, and consideration for, all Allowed Affected Claims;

(c) to effect a release and discharge of all Affected Claims and Released Claims; and

(d) to ensure the continuation of the Applicants,

- 18 -

in the expectation that the Persons who have a valid economic interest in the Applicants will derive a greater benefit from the implementation of the Plan than they would derive from a bankruptcy of the Applicants.

### 2.2    Persons Affected

The Plan provides for a full and final release and discharge of the Affected Claims and Released Claims, a settlement of, and consideration for, all Allowed Affected Claims and a recapitalization of the Applicants. The Plan will become effective at the Effective Time in accordance with its terms and in the sequence set forth in section 5.3 and shall be binding on and enure to the benefit of the Applicants, the Affected Creditors, the Released Parties and all other Persons directly or indirectly named or referred to in or subject to Plan.

### 2.3    Persons Not Affected

The Plan does not affect the Unaffected Creditors, subject to the express provisions hereof providing for the treatment of Insured Claims and the unsecured deficiency portion of Unaffected Secured Claims. Nothing in the Plan shall affect the Applicants' rights and defences, both legal and equitable, with respect to any Unaffected Claims including all rights with respect to legal and equitable defences or entitlements to set-offs or recoupments against such Unaffected Claims.

## ARTICLE 3
## CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED MATTERS

### 3.1    Claims Procedure

The procedure for determining the validity and quantum of the Affected Claims for voting and distribution purposes under the Plan shall be governed by the Claims Procedure Order, the Meetings Order, the CCAA, the Plan and any further Order of the Court.

### 3.2    Classification of Creditors

In accordance with the Meetings Order and subject to section 10.5(d) hereof, the classes of creditors for the purposes of considering and voting on the Plan will be (i) the Secured Noteholders Class, (ii) the Affected Unsecured Creditors Class and (iii) the WARN Act Plaintiffs Class. For greater certainty, Equity Claimants shall constitute a separate class but shall not be entitled to attend the Meetings, vote on the Plan or receive any distributions under or in respect of the Plan.

### 3.3    Creditors' Meetings

The Meetings shall be held in accordance with the Meetings Order and any further Order of the Court. The only Persons entitled to attend and vote at the Meetings are those specified in the Meetings Order.

- 19 -

### 3.4    Treatment of Affected Claims

An Affected Claim shall receive distributions as set forth below only to the extent that such Claim is an Allowed Affected Claim and has not been paid, released, or otherwise satisfied prior to the Plan Implementation Date.

#### (1)    Secured Noteholders Class

In accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of the Secured Noteholders Allowed Secured Claim, each Secured Noteholder will receive its Secured Noteholder's Share of the following consideration on the Plan Implementation Date:

(a)     the New Cline Common Shares issued on the Plan Implementation Date; and

(b)     the New Secured Debt.

The Claims comprising the Secured Noteholders Allowed Claim and the Secured Note Obligations shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date.  For greater certainty, the Secured Noteholders Allowed Unsecured Claim, the Marret Unsecured Claim and any portion of any other Affected Claim that is validly secured but in respect of which there is a deficiency in the realizable value of the security held in respect of such Claim, shall be deemed to be and shall be treated as Allowed Affected Unsecured Claims notwithstanding that they are secured by a valid security interest over the assets or property of the Applicants.

#### (2)    Affected Unsecured Creditors Class

In accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of all Affected Unsecured Claims, each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim will receive the following consideration:

(a)     with respect to Affected Unsecured Creditors with Allowed Affected Unsecured Claims that are not Convenience Creditors, each such Affected Unsecured Creditor shall become entitled on the Plan Implementation Date to its Individual Unsecured Plan Entitlement (which, for greater certainty, shall not be payable until the Unsecured Plan Entitlement Date); and

(b)     with respect to Convenience Creditors with Allowed Affected Unsecured Claims, each such Convenience Creditor shall receive a cash payment on the Plan Implementation Date equal to the lesser of (i) $10,000; and (ii) the amount of its Allowed Affected Unsecured Claim.

The Secured Noteholders and Marret (on behalf of the Secured Noteholders and in its individual corporate capacity) hereby waive, and shall not receive, any distributions in respect of the Secured Noteholders Allowed Unsecured Claim and the Marret Unsecured Claim, respectively. All Affected Unsecured Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date.

- 20 -

**(3)     WARN Act Plaintiffs Class**

If the Required Majorities of the WARN Act Plaintiffs Class vote to approve the Plan at the WARN Act Plaintiffs Meeting and the Plan is implemented in accordance with its terms, then:

(a)     the Proof of Claim dated January 13, 2015 filed by Class Action Counsel in respect of the WARN Act Claims shall be deemed to be Allowed as an aggregate Distribution Claim in the amount set forth on such Proof of Claim, provided that the WARN Act Claims (including the associated attorneys' fees included therein) shall be deemed to be unsecured and to have no security or priority status, and the 307 individuals identified in such Proof of Claim shall be deemed to be WARN Act Plaintiffs with Allowed WARN Act Claims in amounts to be determined by Class Action Counsel in accordance with the parameters of the WARN Act Class Action, with all such amounts totalling the aggregate amount set forth on such Proof of Claim;

(b)     in accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of all WARN Act Claims:

(i)     each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled on the Plan Implementation Date to the following:

(A)     its Individual WARN Act Plan Entitlement (which, for greater certainty, shall not be payable until the WARN Act Plan Entitlement Date); and

(B)     its WARN Act Plaintiff's Share of the WARN Act Cash Payment (which for greater certainty shall be payable to Class Action Counsel, for the benefit of the WARN Act Plaintiffs, on the Plan Implementation Date); and

(ii)     New Elk shall pay the Class Action Initial Expense Reimbursement to Class Action Counsel on the Plan Implementation Date.

All WARN Act Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date, provided that neither the foregoing nor the provisions of Article 7 hereof releases any defendants presently named in the WARN Act Class Action other that the Applicants.   Forthwith following the Plan Implementation Date, Class Action Counsel shall irrevocably terminate and discontinue the WARN Act Class Action against the Applicants and no Person shall take any steps or actions against the Applicants in furtherance of a WARN Act Claim.   Forthwith following the Plan Implementation Date, the Applicants shall provide Class Action Counsel with addresses and social security numbers of the individual WARN Act Plaintiffs to the extent that such information is available based on the Applicants' books and records for the purpose of enabling Class Action Counsel to make distributions to such individuals.

- 21 -

**(4)    Equity Claimants**

Equity Claimants shall not receive any distributions or other consideration under the Plan or otherwise recover anything in respect of their Equity Claims or Equity Interests and shall not be entitled to attend or vote on the Plan at the Meetings. On the Plan Implementation Date, in accordance with the steps and sequences set out in section 5.3, all Equity Interests shall be cancelled and extinguished and all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, provided that, notwithstanding anything to the contrary herein: (i) the Existing New Elk Units shall not be cancelled or extinguished and shall remain outstanding and shall remain solely owned by Cline following completion of the steps and sequences set out in section 5.3; and (ii) the Existing North Central Units shall not be cancelled or extinguished and shall remain outstanding and shall remain solely owned by New Elk following completion of the steps and sequences set out in section 5.3.

### 3.5    Unaffected Claims

(a)    Unaffected Claims shall not be compromised, released, discharged, cancelled or barred by the Plan.

(b)    Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims, and they shall not be entitled to vote on the Plan at the Meetings in respect of their Unaffected Claims.

(c)    Notwithstanding anything to the contrary herein, Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Implementation Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, including any of the Applicants, any of the Cline Companies or any Released Party, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies. This section 3.5(c) may be relied upon and raised or pled by any of the Applicants, any of the Cline Companies or any Released Party in defence or estoppel of or to enjoin any claim, action or proceeding brought in contravention of this section. Nothing in the Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insurer in respect of an Insurance Policy or any insured in respect of an Insured Claim.

(d)    Notwithstanding anything to the contrary herein, in the case of Unaffected Secured Claims, at the election of the Applicants:

(i)    the Applicants may satisfy any Unaffected Secured Claims by returning the applicable property of the Applicants that is secured as collateral for such Claims, in which case the Unaffected Secured Claim shall be deemed to be fully satisfied, provided that if the applicable Unaffected Secured Creditor asserts that there is a deficiency in the value of the applicable

- 22 -

collateral relative the value of the Unaffected Secured Claim, such Creditor shall be permitted to file such unsecured deficiency Claim as a Restructuring Period Claim prior to the Restructuring Period Claims Bar Date (as defined in the Claims Procedure Order) in accordance with the Claims Procedure Order, and such unsecured deficiency Claim shall be treated as an Affected Unsecured Claim for the purpose of this Plan, the Meetings Order and all related matters; and

(ii)   if the Applicants do not elect to satisfy an Unaffected Secured Claim in the manner described in section 3.5(d)(i), then such Unaffected Secured Claim shall continue unaffected as against the applicable Applicants following the Plan Implementation Date.

### 3.6    Disputed Distribution Claims

Any Affected Creditor with a Disputed Distribution Claim shall not be entitled to receive any distribution hereunder with respect to such Disputed Distribution Claim unless and until such Claim becomes an Allowed Affected Claim. A Disputed Distribution Claim shall be resolved in the manner set out in the Claims Procedure Order. Distributions pursuant to section 3.4 shall be made in respect of any Disputed Distribution Claim that is finally determined to be an Allowed Affected Claim in accordance with the Claims Procedure Order.

### 3.7    Director/Officer Claims

All Released Director/Officer Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Implementation Date. Any Director/Officer Claim that is not a Released Director/Officer Claim will not be compromised, released, discharged, cancelled and barred. For greater certainty, any Claim of a Director or Officer against the Applicants for indemnification or contribution in respect of any Director/Officer Claim that is not otherwise covered by the Directors' Charge shall be treated for all purposes under the Plan as an Affected Unsecured Claim.

### 3.8    Extinguishment of Claims

On the Plan Implementation Date, in accordance with the terms and in the sequence set forth in section 5.3 and in accordance with the provisions of the Sanction Order, the treatment of Affected Claims and all Released Claims, in each case as set forth herein, shall be final and binding on the Applicants, all Affected Creditors  and any Person having a Released Claim (and their respective heirs, executors, administrators, legal personal representatives, successors and assigns), and all Affected Claims and all Released Claims shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred, and the Applicants and the Released Parties shall thereupon have no further obligation whatsoever in respect of the Affected Claims or the Released Claims; *provided that* nothing herein releases the Applicants or any other Person from their obligations to make distributions in the manner and to the extent provided for in the Plan and *provided further* that such discharge and release of the Applicants shall be without prejudice to the right of a Creditor in respect of a Disputed Distribution Claim to prove such Disputed Distribution Claim in accordance with the Claims Procedure Order so that such Disputed

- 23 -

Distribution Claim may become an Allowed Claim entitled to receive consideration under section 3.4 hereof.

### 3.9 Guarantees and Similar Covenants

No Person who has a Claim under any guarantee, surety, indemnity or similar covenant in respect of any Claim that is compromised and released under the Plan or who has any right to claim over in respect of or to be subrogated to the rights of any Person in respect of a Claim that is compromised under the Plan shall be entitled to any greater rights than the Person whose Claim is compromised under the Plan.

### 3.10 Set-Off

The law of set-off applies to all Claims.

## ARTICLE 4
## PROVISIONS REGARDING DISTRIBUTIONS AND PAYMENTS

### 4.1 Distributions of New Cline Common Shares and New Secured Debt

(a) Upon receipt of and in accordance with written instructions from the Monitor, the Indenture Trustee shall instruct CDS to, and CDS shall, block any further trading in the Secured Notes effective as of the close of business on the Business Day immediately prior to the Plan Implementation Date, all in accordance with the customary procedures of CDS.

(b) The distribution mechanics with respect to the New Cline Common Shares and the Secured Noteholders' respective entitlements to the New Secured Debt in accordance with section 3.4(1) shall be agreed by the Applicants, Marret (on behalf of the Secured Noteholders) and the Monitor in writing, in consultation with the Indenture Trustee, if applicable, prior to the Plan Implementation Date. If it is deemed necessary by any of the Applicants, the Monitor or Marret (on behalf of the Secured Noteholders), any such party shall be entitled to seek an Order of the Court, in the Sanction Order or otherwise, providing advice and directions with respect to such distribution mechanics.

(c) Except as may be otherwise agreed in writing by the Applicants and the Monitor, the Applicants and the Monitor shall have no liability or obligation in respect of deliveries of consideration issued under this Plan: (i) from Marret to any Secured Noteholder; (ii) from CDS, or its nominee, to CDS Participants, if applicable; (iii) from CDS Participants to beneficial holders of the Secured Notes, if applicable; or (iv) from the Indenture Trustee to beneficial holders of the Secured Notes, if applicable.

### 4.2 Distribution Mechanics with respect to the Unsecured Plan Entitlement

(a) Each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim, other than the Secured Noteholders and the Convenience Creditors, shall become

- 24 -

entitled to its Individual Unsecured Plan Entitlement on the Plan Implementation Date without any further steps or actions by the Applicants, such Affected Unsecured Creditor or any other Person.

(b) From and after the Plan Implementation Date, and until all Unsecured Plan Entitlement Proceeds have been distributed in accordance with the Plan, Cline shall maintain a register of the Individual Unsecured Plan Entitlements as well as the address and notice information set forth on each applicable Affected Unsecured Creditor's Notice of Claim or Proof of Claim. Any applicable Affected Unsecured Creditor whose address or notice information changes shall be solely responsible for notifying Cline of such change. Cline shall also record on the register the aggregate amount of any applicable Disputed Distribution Claims. Within ten (10) Business Days following the Plan Implementation Date, the Applicants shall notify each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim of such Affected Unsecured Creditor's Individual Unsecured Plan Entitlement as at the Plan Implementation Date.

(c) On the Unsecured Plan Entitlement Date, Cline shall calculate the amount of the Unsecured Plan Entitlement Proceeds to be paid to each applicable Affected Unsecured Creditor with an Allowed Unsecured Claim. Cline shall also calculate the amount of the Unsecured Plan Entitlement Proceeds that are not to be distributed as a result of Disputed Distribution Claims that remain outstanding, if any. Cline shall then distribute the applicable amount by way of cheque sent by prepaid ordinary mail to each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim (other than the Secured Noteholders and the Convenience Creditors who, for greater certainty, shall have no Individual Unsecured Plan Entitlement). With respect to any portion of the Unsecured Plan Entitlement Proceeds that are reserved in respect of Disputed Distribution Claims, Cline shall segregate such amounts to and hold such amounts in the Disputed Distribution Claims Reserve.

### 4.3 Distribution Mechanics with respect to Convenience Claims

On the Plan Implementation Date, under the supervision of the Monitor, Cline shall pay each Convenience Creditor with an Allowed Convenience Claim the amount that is required to be paid to each such Creditor under this Plan by way of cheque sent by prepaid ordinary mail to the address set forth on such Convenience Creditor's Notice of Claim or Proof of Claim. Under the supervision of the Monitor, Cline shall also calculate the aggregate amount of Convenience Claims that are Disputed Distribution Claims on the Plain Implementation Date and shall segregate such amounts and hold such amounts in the Disputed Distribution Claims Reserve.

### 4.4 Distribution Mechanics with respect to the WARN Act Plan Entitlement and the WARN Act Cash Payment

(a) Each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled to its Individual WARN Act Plan Entitlement on the Plan Implementation Date without any further steps or actions by the Applicants, such WARN Act Plaintiffs, Class Action Counsel or any other Person.

- 25 -

(b)     On the WARN Act Plan Entitlement Date, New Elk shall pay an amount equal to the WARN Act Plan Entitlement to Class Action Counsel for the benefit of the WARN Act Plaintiffs with Allowed WARN Act Claims. Class Action Counsel shall distribute such amounts among the applicable WARN Act Plaintiffs. New Elk shall also pay the Class Action Second Expense Reimbursement to Class Action Counsel on the WARN Act Plan Entitlement Date. The WARN Act Plan Entitlement payment and the Class Action Second Expense Reimbursement shall be paid to Class Action Counsel in a single check or wire transfer of $120,000.

(c)     On the Plan Implementation Date, New Elk shall pay an amount equal to the WARN Act Cash Payment to Class Action Counsel for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims. Class Action Counsel shall distribute all such amounts among the applicable WARN Act Plaintiffs with Allowed WARN Act Claims. New Elk shall also pay the Class Action Initial Expense Reimbursement to Class Action Counsel on the Plan Implementation Date. The WARN Act Cash Payment and the Class Action Initial Expense Reimbursement shall be paid to Class Action Counsel in a single check or wire transfer of $90,000.

(d)     The Applicants and the Monitor shall have no responsibility or liability whatsoever for determining the allocation of the WARN Act Plan Entitlement or the WARN Act Cash Payment among the WARN Act Plaintiffs or for ensuring payments from Class Action Counsel to the WARN Act Plaintiffs.

### 4.5     Modifications to Distribution Mechanics

Subject to the consent of the Monitor, the Applicants shall be entitled to make such additions and modifications to the process for making distributions pursuant to the Plan (including the process for delivering and/or registering the New Cline Common Shares and/or the Secured Noteholders' respective entitlements to the New Secured Debt) as the Applicants deem necessary or desirable in order to achieve the proper distribution and allocation of consideration to be distributed pursuant to the Plan, and such additions or modifications shall not require an amendment to the Plan or any further Order of the Court.

### 4.6     Cancellation of Certificates and Notes

Following completion of the steps in the sequence set forth in section 5.3, all debentures, notes (including the Secured Notes), certificates, agreements, invoices and other instruments evidencing Affected Claims, Secured Note Obligations or Equity Interests (other than the Existing New Elk Units owned by Cline and the North Central Shares owned by New Elk, which are unaffected by the Plan and which shall remain outstanding) will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and will be cancelled and will be null and void. Notwithstanding the foregoing, if and to the extent the Indenture Trustee is required to transfer consideration issued pursuant to this Plan to the Secured Noteholders, then the Indentures shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the Indenture Trustee to make such distributions to the Secured Noteholders on the Initial Distribution Date and each subsequent Distribution Date (if applicable); and (ii) maintain all of the protections the Indenture Trustee enjoys pursuant to the

- 26 -

Indentures, including its lien rights with respect to any distributions under the Plan, until all distributions are made to the Secured Noteholders hereunder. For greater certainty, any and all obligations of the Applicants and the Cline Companies (as guarantor, surety or otherwise) under and with respect to the Secured Notes and the Indentures, including the Secured Note Obligations, shall be extinguished on the Plan Implementation Date and shall not continue beyond the Plan Implementation Date.

### 4.7    Currency

Unless specifically provided for in the Plan or the Sanction Order, all monetary amounts referred to in the Plan shall be denominated in Canadian dollars and, for the purposes of distributions under the Plan, Claims shall be denominated in Canadian dollars and all payments and distributions provided for in the Plan shall be made in Canadian dollars.    Any Claims denominated in a foreign currency shall be converted to Canadian dollars at the Bank of Canada noon exchange rate in effect at the Filing Date.

### 4.8    Interest

Interest shall not accrue or be paid on Affected Claims on or after the Filing Date, and no holder of an Affected Claim shall be entitled to interest accruing on or after the Filing Date.

### 4.9    Allocation of Distributions

All distributions made to Creditors pursuant to the Plan shall be allocated first towards the repayment of the principal amount in respect of such Creditor's Claim and second, if any, towards the repayment of all accrued but unpaid interest in respect of such Creditor's Claim.

### 4.10    Treatment of Undeliverable Distributions

If any Creditor's distribution under this Article 4 is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Applicant is notified by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor. All claims for Undeliverable Distributions must be made on or before the date that is six months following the final Distribution Date, after which date any entitlement with respect to such Undeliverable Distribution shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or provincial laws to the contrary, at which time any such Undeliverable Distributions shall be returned to Cline. Nothing contained in the Plan shall require the Applicant to attempt to locate any Person to whom a distribution is payable. No interest is payable in respect of an Undeliverable Distribution. Unless otherwise expressly agreed by the Monitor and the Applicants in writing, any distribution under the Plan on account of the Secured Notes shall be deemed made when delivered to Marret, CDS, the CDS Participants or the Indenture Trustee, as applicable, and any distribution under the Plan to the WARN Act Plaintiffs shall be deemed made when delivered to Class Action Counsel.   With respect to distributions to be made by Class Action Counsel to WARN Act Plaintiffs with Allowed WARN Act Claims: (i) Class Action Counsel shall not be responsible or liable for any undeliverable distributions to WARN Act Plaintiffs who cannot be located based on deficiencies in the address information to be provided by the Applicants pursuant to section 3.4(3) hereof; and (ii) if any

- 27 -

distributions to the WARN Act Plaintiffs are returned as undeliverable or the applicable WARN Act Plaintiff cannot reasonably be located, and no claim has been made for such distribution by such WARN Act Plaintiff within six months following the WARN Act Plan Entitlement Date, then Class Action Counsel shall be permitted to donate such amounts to a cy-près recipient in accordance with customary class action practice in the United States.

### 4.11   Withholding Rights

The Applicants, the Monitor and, to the extent CDS or the Indenture Trustee are required to transfer consideration to Secured Noteholders pursuant to this Plan, then CDS and the Indenture Trustee, shall be entitled to deduct and withhold from any consideration payable to any Person such amounts as the Applicants, the Monitor, CDS or the Indenture Trustee, as applicable, are required to deduct and withhold with respect to such payment under the Canadian Tax Act, or other Applicable Laws, or entitled to withhold under section 116 of the Canadian Tax Act or corresponding provision of provincial or territorial law. To the extent that amounts are so withheld or deducted, such withheld or deducted amounts shall be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made, provided that such amounts are actually remitted to the appropriate Taxing Authority. The Applicants, the Monitor CDS and/or the Indenture Trustee, as applicable, are hereby authorized to sell or otherwise dispose of such portion of any such consideration in their posssession as is necessary to provide sufficient funds to the Applicants, the Monitor, CDS and/or the Indenture Trustee, as applicable, to enable them to comply with such deduction or withholding requirement or entitlement, and the Applicants, the Monitor, CDS and/or the Indenture Trustee, as applicable, shall notify the Person thereof and remit to such Person any unapplied balance of the net proceeds of such sale.

### 4.12   Fractional Interests

No fractional interests of New Cline Common Shares ("**Fractional Interests**") will be issued under the Plan. Recipients of New Cline Common Shares will have their entitlements adjusted downwards to the nearest whole number of New Cline Common Shares to eliminate any such Fractional Interests and no compensation will be given for any Fractional Interests.

### 4.13   Calculations

All amounts of consideration to be received hereunder will be calculated to the nearest cent ($0.01). All calculations and determination made by the Monitor and/or the Applicants and agreed to by the Monitor for the purposes of and in accordance with the Plan, including, without limitation, the allocation of consideration, shall be conclusive, final and binding upon the Affected Creditors and the Applicants.

### ARTICLE 5
### RECAPITALIZATION

### 5.1   Corporate Actions

The adoption, execution, delivery, implementation and consummation of all matters contemplated under the Plan involving corporate actions of the Applicants will occur and be

- 28 -

effective as of the Plan Implementation Date, and shall be deemed to be authorized and approved under the Plan and by the Court, where applicable, as part of the Sanction Order, in all respects and for all purposes without any requirement of further action by shareholders, directors or officers of the Applicants. All necessary approvals to take actions shall be deemed to have been obtained from the directors, officers or the shareholders of the Applicants, as applicable, including the deemed passing by any class of shareholders of any resolution or special resolution and any shareholders' agreement or agreement between a shareholder and another Person limiting in any way the right to vote shares held by such shareholder or shareholders with respect to any of the steps contemplated by the Plan shall be deemed to have no force or effect.

### 5.2    Issuance of Plan Consideration

#### (1)    New Cline Common Shares

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, Cline shall issue the Agreed Number of New Cline Common Shares, and such New Cline Common Shares shall be allocated and distributed in the manner set forth in the Plan.

#### (2)    New Secured Debt

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, (i) the New Credit Agreement shall become effective in accordance with its terms and the Applicants shall become bound to satisfy their obligations thereunder and (ii) the entitlements to the New Secured Debt shall be allocated among the Secured Noteholders in the manner and in the amounts set forth in the Plan.

#### (3)    Unsecured Plan Entitlement

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, the Unsecured Plan Entitlements shall become effective and the Individual Unsecured Plan Entitlements shall be allocated in the manner and in the amounts set forth in the Plan.

#### (4)    Convenience Claim Payments

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, Cline shall pay the applicable amounts to the Convenience Creditors with Allowed Convenience Claims and reserve the applicable amounts into the Disputed Claims Reserve in respect of Convenience Creditors with Disputed Distribution Claims, in each case in the manner and in the amounts set forth in the Plan.

#### (5)    WARN Act Plan Entitlement and WARN Act Cash Payment

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor: (i) the WARN Act Plan Entitlement shall become effective and the Individual WARN Act Plan Entitlements shall be allocated in the manner and in the amounts set forth in the Plan; and (ii) New Elk shall make the WARN Act Cash Payment to Class Action Counsel for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims.

- 29 -

### 5.3    Sequence of Plan Implementation Date Transactions

The following steps and compromises and releases to be effected in the implementation of the Plan shall occur, and be deemed to have occurred in the following order in five minute increments (unless otherwise noted), without any further act or formality on the Plan Implementation Date beginning at the Effective Time:

(a)    all Existing Options shall be cancelled and terminated without any liability, payment or other compensation in respect thereof;

(b)    the Stock Option Plans shall be terminated;

(c)    Cline shall issue to each Secured Noteholder its Secured Noteholder's Share of the New Cline Common Shares and the Applicants shall become bound to satisfy their obligations in respect of the New Secured Debt, all in accordance with section 3.4(1), in full consideration for the irrevocable, final and full compromise and satisfaction of the Secured Noteholders Allowed Claim and all Secured Noteholder Obligations;

(d)    simultaneously with step 5.3(c), and in accordance with sections 3.4(2) and 5.2(4), Cline shall pay to each Convenience Creditor with an Allowed Affected Unsecured Claim the amount in cash that it is entitled to receive pursuant to section 3.4(2)(b) in full consideration for the irrevocable, final and full compromise and satisfaction of such Convenience Creditor's Affected Unsecured Claim;

(e)    simultaneously with step 5.3(c), Cline shall reserve the applicable amount of cash in respect of Convenience Claims that are Disputed Distribution Claims and shall hold such cash in the Disputed Distribution Claims Reserve;

(f)    simultaneously with step 5.3(c), and in accordance with sections 3.4(2) and 5.2(3), each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim that is not a Convenience Creditor or a Secured Noteholder shall become entitled to its Individual Unsecured Plan Entitlement (as it may be adjusted based on the final determination of Disputed Distribution Claims in the manner set forth herein) in full consideration for the irrevocable, final and full compromise and satisfaction of such Affected Unsecured Creditor's Affected Unsecured Claim;

(g)    simultaneously with step 5.3(c), in accordance with sections 3.4(3) and 5.2(5), and in full consideration for the irrevocable, final and full compromise and satisfaction of such WARN Act Claim: (i) each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled to its Individual WARN Act Plan Entitlement and (ii) New Elk shall pay the WARN Act Cash Payment to Class Action Counsel for the benefit of the WARN Act Plaintiffs with Allowed WARN Act Claims, and simultaneously therewith, New Elk shall pay the Class Action Initial Expense Reimbursement;

- 30 -

(h)    the Articles shall be altered to, among other things, (i) consolidate the issued and outstanding Cline Common Shares (including, for the avoidance of doubt, Cline Common Shares that are Existing Cline Shares and New Cline Common Shares issued pursuant to Section 5.3(c)) on the basis of the Consolidation Ratio; and (ii) provide for such additional changes to the rights and conditions attached to the Cline Common Shares as may be agreed to by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders);

(i)    any fractional Cline Common Shares held by any holder of Cline Common Shares immediately following the consolidation of the Cline Common Shares referred to in section 5.3(h) shall be cancelled without any liability, payment or other compensation in respect thereof, and the Articles shall be altered as necessary to achieve such cancellation;

(j)    all Equity Interests (for greater certainty, not including any Cline Common Shares that remain issued and outstanding immediately following the cancellation of fractional interests in section 5.3(i)) shall be cancelled and extinguished without any liability, payment or other compensation in respect thereof and all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without any liability, payment or other compensation in respect thereof, provided that, notwithstanding anything to the contrary herein, the Existing New Elk Units shall not be cancelled or extinguished and shall remain outstanding and solely owned by Cline and the Existing North Central Shares shall not be cancelled or extinguished and shall remain outstanding and solely owned by New Elk;

(k)    Cline shall pay in cash all fees and expenses incurred by the Indenture Trustee, including its reasonable legal fees, in connection with the performance of its duties under the Indentures and the Plan;

(l)    subject only to section 4.6 hereof, all of the Secured Notes, the Indentures and all Secured Note Obligations shall be deemed to be fully, finally, irrevocably and forever compromised, released, discharged cancelled and barred;

(m)    all Affected Claims remaining after the step referred to in section 5.3(l) shall be fully, finally, irrevocably and forever compromised, released, discharged cancelled and barred without any liability, payment or other compensation in respect thereof; and

(n)    the releases set forth in Article 7 shall become effective.

The steps described in sub-sections (h) and (i) of this section 5.3 will be implemented pursuant to section 6(2) of the CCAA and shall constitute a valid alteration of the Articles pursuant to a court order under the BCBCA.

- 31 -

### 5.4    Issuances Free and Clear

Any issuance of any securities or other consideration pursuant to the Plan will be free and clear of any Encumbrances.

### 5.5    Stated Capital

The aggregate stated capital for purposes of the BCBCA for the New Cline Common Shares issued pursuant to the Plan will be as determined by the new board of directors of Cline appointed pursuant to the Sanction Order.

# ARTICLE 6
# PROCEDURE FOR DISTRIBUTIONS REGARDING DISPUTED DISTRIBUTION CLAIMS

### 6.1    No Distribution Pending Allowance

An Affected Creditor holding a Disputed Distribution Claim will not be entitled to receive a distribution under the Plan in respect of such Disputed Distribution Claim or any portion thereof unless and until, and then only to the extent that, such Disputed Distribution Claim becomes an Allowed Claim.

### 6.2    Disputed Distribution Claims

(a)     On the Plan Implementation Date, under the supervision of the Monitor, an amount equal to each Disputed Distribution Claim of the Convenience Creditors shall be reserved and held by Cline, in the Disputed Distribution Claims Reserve, for the benefit of the Convenience Creditors with Allowed Convenience Claims, pending the final determination of the Disputed Distribution Claim in accordance with the Claims Procedure Order and the Plan.

(b)     On the Unsecured Plan Entitlement Date, distributions of Unsecured Plan Entitlement Proceeds in relation to a Disputed Distribution Claim of any Affected Unsecured Creditor (other than Convenience Creditors and Secured Noteholders) in existence at the Unsecured Plan Entitlement Date will be reserved and held by Cline, in the Disputed Distribution Claims Reserve, for the benefit of the Affected Unsecured Creditors (other than Convenience Creditors and Secured Noteholders) with Allowed Affected Unsecured Claims until the final determination of the Disputed Distribution Claim in accordance with the Claims Procedure Order and the Plan.

(c)     To the extent that any Disputed Distribution Claim becomes an Allowed Affected Unsecured Claim in accordance with the Claims Procedure and it is a Convenience Claim, Cline shall distribute (on the next Distribution Date), under the supervision of the Monitor, the applicable amount of such Allowed Claim to the holder of such Allowed Claim in accordance with section 3.4(2)(b) hereof from the Disputed Distribution Claims Reserve.

- 32 -

(d)     To the extent that any Disputed Distribution Claim becomes an Allowed Affected
        Unsecured Claim in accordance with the Claims Procedure Order and it is not a
        Convenience Claim or the Claim of a Secured Noteholder, the applicable Affected
        Unsecured Creditor shall become entitled to its applicable Individual Unsecured
        Plan Entitlement, and if this occurs after the Unsecured Plan Entitlement Date,
        Cline shall distribute (on the next Distribution Date) to the holder of such
        Allowed Claim an amount from the Disputed Distribution Claims Reserve equal
        to the applicable Affected Unsecured Creditor's Individual Unsecured Plan
        Entitlement.

(e)     At any applicable time, Cline shall be permitted, with the consent of the Monitor,
        to release and retain for itself any amounts in the Disputed Distribution Claims
        Reserve that were reserved to pay Convenience Claims that have been definitively
        not been Allowed in accordance with the Claims Procedure Order.

(f)     Prior to any Distribution Date and under the supervision of the Monitor, Cline
        shall re-calculate the Individual Unsecured Plan Entitlements of the Affected
        Unsecured Creditors (other than Convenience Creditors and Secured
        Noteholders), in each case to reflect any applicable Disputed Distribution Claims
        that were definitively not Allowed, and such Creditors shall become entitled to
        their re-calculated Individual Unsecured Plan Entitlements. If this occurs after the
        Unsecured Plan Entitlement Date, as applicable, Cline shall (on the next
        Distribution Date) distribute to such Creditors the applicable amounts from the
        Disputed Distribution Claims Reserve as are necessary to give effect to their re-
        calculated Individual Unsecured Plan Entitlements.

(g)     On the date that all Disputed Distribution Claims have been finally resolved in
        accordance with the Claims Procedure Order, Cline shall, with the consent of the
        Monitor, release all remaining cash, if any, from the Disputed Distribution Claims
        Reserve and shall be entitled to retain such cash.

## ARTICLE 7
## RELEASES

### 7.1    Plan Releases

On the Plan Implementation Date, in accordance with the sequence set forth in section 5.3, (i) the
Applicants, the Applicants' employees and contractors, the Directors and Officers and (ii) the
Monitor, the Monitor's counsel, the Indenture Trustee, Marret (on behalf of the Secured
Noteholders and in its individual corporate capacity), the Secured Noteholders, the Company
Advisors, the Noteholder Advisors and each and every present and former shareholder, affiliate,
subsidiary, director, officer, member, partner, employee, auditor, financial advisor, legal counsel
and agent of any of the foregoing Persons (each of the Persons named in (i) or (ii) of this section
**7.1**, in their capacity as such, being herein referred to individually as a "**Released Party**" and all
referred to collectively as "**Released Parties**") shall be released and discharged from any and all
demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts,
covenants, damages, judgments, orders, including for injunctive relief or specific performance
and compliance orders, expenses, executions, Encumbrances and other recoveries on account of

- 33 -

any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity which any Creditor or other Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the later of the Plan Implementation Date and the date on which actions are taken to implement the Plan, that constitute or are in any way relating to, arising out of or in connection with any Claims, any Director/Officer Claims and any indemnification obligations with respect thereto, the Secured Notes and related guarantees, the Indentures, the Secured Note Obligations, the Equity Interests, the Stock Option Plans, the New Cline Common Shares, the New Secured Debt, the New Credit Agreement, the Unsecured Plan Entitlement, the WARN Act Plan Entitlement, any payments to Convenience Creditors, the business and affairs of the Applicants whenever or however conducted, the administration and/or management of the Applicants, the Recapitalization, the Plan, the CCAA Proceeding, the Chapter 15 Proceeding or any document, instrument, matter or transaction involving any of the Applicants or the Cline Companies taking place in connection with the Recapitalization or the Plan (referred to collectively as the "**Released Claims**"), and all Released Claims shall be deemed to be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law; provided that nothing herein will waive, discharge, release, cancel or bar (x) the right to enforce the Applicants' obligations under the Plan, (y) the Applicants from or in respect of any Unaffected Claim or any Claim that is not permitted to be released pursuant to section 19(2) of the CCAA, or (z) any Director or Officer from any Director/Officer Claim that is not permitted to be released pursuant to section 5.1(2) of the CCAA.

### 7.2    Limitation on Insured Claims

Notwithstanding anything to the contrary in section 7.1, Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Implementation Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with an Insured Claim shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries in respect thereof from the Applicants, any of the Cline Companies, any Director or Officer or any other Released Party, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

### 7.3    Injunctions

All Persons are permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, with respect to any and all Released Claims, from (i) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any of the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against any of the Released Parties or their property; (iii) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or their

- 34 -

property; or (iv) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan. For greater certainty, the provisions of this section 7.3 shall apply to Insured Claims in the same manner as Released Claims, except to the extent that the rights of such Persons to enforce such Insured Claims against an insurer in respect of an Insurance Policy are expressly preserved pursuant to section 3.5(c) and/or section 7.2, and provided further that, notwithstanding the restrictions on making a claim that are set forth in sections 3.5(c) and 7.2, any claimant in respect of an Insured Claim that was duly filed with the Monitor by the Claims Bar Date shall be permitted to file a statement of claim in respect thereof to the extent necessary solely for the purpose of preserving such claimant's ability to pursue such Insured Claim against an insurer in respect of an Insurance Policy in the manner authorized pursuant to section 3.5(c) and/or section 7.2.

### 7.4     Applicants' Release of Class Action Counsel

On the Plan Implementation Date, any and all claims of the Applicants against Class Action Counsel, Lankenau & Miller LLP and/or Himelfarb Proszanski and any other counsel of record for the WARN Act Plaintiffs in the WARN Act Class Action, in their capacity as counsel to the WARN Act Plaintiffs, shall be released, discharged, cancelled and barred automatically and without any further act or formality, provided that nothing herein shall waive, discharge, release, cancel or bar the obligations of Class Action Counsel to make any distributions to WARN Act Plaintiffs with Allowed WARN Act Claims that they are required to make pursuant to the Plan.

### ARTICLE 8
### COURT SANCTION

### 8.1     Application for Sanction Order

If the Required Majorities of the Affected Creditors in each Voting Class approve the Plan, the Applicants shall apply for the Sanction Order on or before the date set for the hearing of the Sanction Order or such later date as the Court may set.

### 8.2     Sanction Order

The Applicants shall seek a Sanction Order that, among other things:

(a)     declares that (i) the Plan has been approved by the Required Majorities of Affected Creditors in each Voting Class in conformity with the CCAA; (ii) the activities of the Applicants have been in reasonable compliance with the provisions of the CCAA and the Orders of the Court made in this CCAA Proceeding in all respects; (iii) the Court is satisfied that the Applicants have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(b)     declares that as of the Effective Time, the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved pursuant to section 6 of the CCAA, binding and effective as

- 35 -

herein set out upon and with respect to the Applicants, all Affected Creditors, the Directors and Officers, any Person with a Director/Officer Claim, the Released Parties and all other Persons named or referred to in or subject to Plan;

(c)     declares that the steps to be taken and the compromises and releases to be effective on the Plan Implementation Date are deemed to occur and be effected in the sequential order contemplated by section 5.3 on the Plan Implementation Date, beginning at the Effective Time;

(d)     declare that the releases effected by this Plan shall be approved and declared to be binding and effective as of the Plan Implementation Date upon all Affected Creditors and all other Persons affected by this Plan and shall enure to the benefit of such Persons;

(e)     declares that, subject to performance by the Applicants of their obligations under the Plan and except as provided in the Plan, all obligations, agreements or leases to which any of the Applicants or Cline Companies is a party on the Plan Implementation Date shall be and remain in full force and effect, unamended, as at the Plan Implementation Date and no party to any such obligation or agreement shall on or following the Plan Implementation Date, accelerate, terminate, refuse to renew, rescind, refuse to perform or otherwise disclaim or resiliate its obligations thereunder, or enforce or exercise (or purport to enforce or exercise) any right or remedy under or in respect of any such obligation or agreement, by reason:

(i)      of any event which occurred prior to, and not continuing after, the Plan Implementation Date, or which is or continues to be suspended or waived under the Plan, which would have entitled such party to enforce those rights or remedies;

(ii)     that the Applicants have sought or obtained relief or have taken steps as part of the Plan or under the CCAA or Chapter 15;

(iii)    of any default or event of default arising as a result of the financial condition or insolvency of the Applicants;

(iv)    of the effect upon the Applicants of the completion of any of the transactions contemplated by the Plan; or

(v)     of any compromises, settlements, restructurings, recapitalizations or reorganizations effected pursuant to the Plan,

and declares that no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any non-competition agreement or obligation, provided that such agreement shall terminate or expire in accordance with the terms thereof or as otherwise agreed by the Applicants and the applicable Persons;

- 36 -

(f) authorizes the Monitor to perform its functions and fulfil its obligations under the Plan to facilitate the implementation of the Plan;

(g) subject to payment of any amounts secured thereby, declares that each of the Charges shall be terminated, discharged and released upon a filing of the Monitor of a certificate confirming the termination of the CCAA Proceedings;

(h) provides advice and directions with respect to the distribution mechanics in respect of the New Cline Common Shares and the Secured Noteholders' respective entitlements to the New Secured Debt, as both are referred to in section 4.1(b);

(i) declares that the Applicants and the Monitor may apply to the Court for advice and direction in respect of any matters arising from or under the Plan; and

(j) declares the Persons to be appointed to the boards of directors of the Applicants on the Plan Implementation Date shall be the Persons named on a certificate to be filed with the Court by the Applicants prior to the Plan Implementation Date, provided that such certificate and the Persons listed thereon shall be subject to the prior consent of Marret (on behalf of the Secured Noteholders).

### ARTICLE 9
### CONDITIONS PRECEDENT AND IMPLEMENTATION

#### 9.1    Conditions Precedent to Implementation of the Plan

The implementation of the Plan shall be conditional upon satisfaction of the following conditions prior to or at the Effective Time, each of which is for the benefit of the Applicants and may be waived only by the Applicants, provided that the conditions in paragraphs (a), (b) and (c) of this section 9.1 shall also be for the benefit of Marret (on behalf of the Secured Noteholders) and may be waived only by the mutual agreement of both the Applicants and Marret:

(a) all definitive agreements in respect of the Recapitalization and the new (or amended) Articles, by-laws and other constating documents, and all definitive legal documentation in connection with all of the foregoing shall be in a form satisfactory to the Applicants and Marret (on behalf of the Secured Noteholders);

(b) the New Credit Agreement governing the New Secured Debt, together with all guarantees and security agreements contemplated thereunder, shall have been entered into and become effective, subject only to the implementation of the Plan, and all required filings related to the security as contemplated in the security agreements shall have been made;

(c) the terms of the New Cline Common Shares and the New Credit Agreement shall be satisfactory to the Applicants and Marret (on behalf of the Secured Noteholders);

(d) there shall not be in effect any preliminary or final decision, order or decree by a Governmental Entity, no application shall have been made to any Governmental

- 37 -

Entity, and no action or investigation shall have been announced, threatened or commenced by any Governmental Entity, in consequence of or in connection with the Recapitalization or the Plan that restrains, impedes or prohibits (or if granted could reasonably be expected to restrain, impede or inhibit), the Recapitalization or the Plan or any part thereof or requires or purports to require a variation of the Recapitalization or the Plan;

(e)   the Plan shall have been approved by the Required Majorities of each Voting Class;

(f)   all orders made and judgments rendered by any competent court of law, and all rulings and decrees of any competent regulatory body, agent or official in relation to the CCAA Proceeding, the Chapter 15 Proceeding, the Recapitalization or the Plan shall be satisfactory to the Applicants, including all court orders made in relation to the Recapitalization, and without limiting the generality of the foregoing:

(i)   the Sanction Order shall have been made on terms acceptable to the Applicants, and it shall have become a Final Order;

(ii)   the Sanction Order shall have been recognized and deemed binding and enforceable in the United States pursuant to an Order of the US Court in the Chapter 15 Proceeding on terms acceptable to the Applicants, and such Order shall have become a Final Order; and

(iii)   any other Order deemed necessary by the Applicants for the purpose of implementing the Recapitalization shall have been made on terms acceptable to the Applicants, and any such Order shall have become a Final Order;

(g)   all material agreements, consents and other documents relating to the Recapitalization and the Plan shall be in form and in content satisfactory to the Applicants;

(h)   any and all court-imposed charges on any assets, property or undertaking of the Applicants shall have been discharged as at the Effective Time on terms acceptable to the Applicants, acting reasonably;

(i)   all Material filings under Applicable Laws shall have been made and any Material regulatory consents or approvals that are required in connection with the Recapitalization shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated;

(j)   all securities of the Applicants, when issued and delivered, shall be duly authorized, validly issued and fully paid and non-assessable and the issuance thereof shall be exempt from all prospectus and registration requirements of Applicable Laws;

- 38 -

(k)     all necessary filings in respect of the alteration of the Articles shall have been made on terms providing that they will become effective in accordance with and at the times of section 5.3(h) and 5.3(i); and

(l)     all fees and expenses owing to the Company Advisors and the Noteholder Advisors as of the Plan Implementation Date shall have been paid, and the Applicants shall be satisfied that adequate provision has been made for any fees and expenses due or accruing due to the Company Advisors and the Noteholder Advisors from and after the Plan Implementation Date.

### 9.2    Monitor's Certificate

Upon delivery of written notice from the Company Advisors (on behalf of the Applicants) of the satisfaction or waiver of the conditions set out in section 9.1, the Monitor shall forthwith deliver to the Company Advisors a certificate stating that the Plan Implementation Date has occurred and that the Plan is effective in accordance with its terms and the terms of the Sanction Order. As soon as practicable following the Plan Implementation Date, the Monitor shall file such certificate with the Court and with the US Court.

## ARTICLE 10
## GENERAL

### 10.1    Binding Effect

The Plan will become effective on the Plan Implementation Date.  On the Plan Implementation Date:

(a)     the treatment of Affected Claims and Released Claims under the Plan shall be final and binding for all purposes and shall be binding upon and enure to the benefit of the Applicants, all Affected Creditors, any Person having a Released Claim and all other Persons directly or indirectly named or referred to in or subject to Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns;

(b)     all Affected Claims shall be forever discharged and released;

(c)     all Released Claims shall be forever discharged and released;

(d)     each Affected Creditor, each Person holding a Released Claim and each of the Existing Shareholders shall be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety; and

(e)     each Affected Creditor and each Person holding a Released Claim shall be deemed to have executed and delivered to the Applicants and to the Released Parties, as applicable, all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

- 39 -

### 10.2    Waiver of Defaults

From and after the Plan Implementation Date, all Persons shall be deemed to have waived any and all defaults of the Applicants then existing or previously committed by any of the Applicants, or caused by any of the Applicants, by any of the provisions in the Plan or steps or transactions contemplated in the Plan or the Recapitalization, or any non-compliance with any covenant, warranty, representation, term, provision, condition or obligation, expressed or implied, in any contract, instrument, credit document, indenture, note, lease, guarantee, agreement for sale or other agreement, written or oral, and any and all amendments or supplements thereto, existing between such Person and any of the Applicants, and any and all notices of default and demands for payment or any step or proceeding taken or commenced in connection therewith shall be deemed to have been rescinded and of no further force or effect, provided that nothing shall be deemed to excuse the Applicants from performing their obligations under the Plan or be a waiver of defaults by any of the Applicants under the Plan and the related documents.

### 10.3    Deeming Provisions

In the Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

### 10.4    Non-Consummation

The Applicants reserve the right to revoke or withdraw the Plan at any time prior to the Plan Implementation Date. If the Applicants revoke or withdraw the Plan, or if the Sanction Order is not issued or if the Plan Implementation Date does not occur, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against any of the Applicants or any other Person; (ii) prejudice in any manner the rights of the Applicants or any other Person in any further proceedings involving any of the Applicants; or (iii) constitute an admission of any sort by any of the Applicants or any other Person.

### 10.5    Modification of the Plan

(a)     The Applicants reserve the right, at any time and from time to time, to amend, restate, modify and/or supplement the Plan, provided that any such amendment, restatement, modification or supplement must be contained in a written document and (i) if made prior to or at the Meetings, communicated to the Affected Creditors prior to or at the Meetings; and (ii) if made following the Meetings, approved by the Court following notice to the Affected Creditors.

(b)     Notwithstanding section 10.5(a), any amendment, restatement, modification or supplement may be made by the Applicants with the consent of the Monitor and Marret (on behalf of the Secured Noteholders), without further Court Order or approval, provided that it concerns a matter which, in the opinion of the Applicants, acting reasonably, is of an administrative nature  required to better give effect to the implementation of the Plan and the Sanction Order or to cure

- 40 -

any errors, omissions or ambiguities and is not materially adverse to the financial or economic interests of the Affected Creditors.

(c)   Any amended, restated, modified or supplementary plan or plans of compromise or arrangement filed with the Court and, if required by this section, approved by the Court, shall, for all purposes, be and be deemed to constitute the Plan.

(d)   Notwithstanding anything to the contrary herein or in the Plan, if the requisite quorum is not present at the WARN Act Plaintiffs Meeting or if it is determined in accordance with the Claims Procedure Order that there are no Voting Claims in the WARN Act Plaintiffs Class, the Applicants shall be entitled, but not required, to amend the Plan without further Order of the Court to combine the WARN Act Plaintiffs Class with the Affected Unsecured Creditors Class on such terms as may be set forth in such amended Plan (including on the basis that the WARN Act Plan Entitlement shall not be payable under the Plan), in which case the Applicants shall have no further obligation to hold the WARN Act Plaintiffs Meeting or otherwise seek a vote of the WARN Act Plaintiffs Class with respect to the resolution to approve the Plan or any other matter.

(e)   Without limiting the generality of anything in this section 10.5, if (i) the Plan is not approved by the Required Majorities of the Affected Unsecured Creditors Class, or (ii) the Applicants determine, in their discretion, that the Plan may not be approved by the Required Majorities of the Affected Unsecured Creditors Class, then the Applicants are permitted, without any further Order, to file an amended and restated Plan (the "**Alternate Plan**") with the attributes described on Schedule B to the Plan and to proceed with a meeting of the Secured Noteholders Class for the purpose of considering and voting on the resolution to approve the Alternate Plan, in which case the Applicants and the Monitor will have no obligation whatsoever to proceed with the Unsecured Creditors Meeting or the WARN Act Plaintiff's Meeting.

(f)   Notwithstanding the references herein to the New Credit Agreement and the New Secured Debt Agent, the Applicants and Marret, with the consent of the Monitor, shall be entitled to modify the form and structure of the New Secured Debt and the manner in which the New Secured Debt is held by the Secured Noteholders to allow such debt to be issued as secured notes or in such other form as may be agreed by the Applicants and Marret with the consent of the Monitor, provided that such modifications do not affect the material economic attributes of the New Secured Debt. In the event of the foregoing, no formal amendment to the Plan (or the Alternate Plan, as applicable) shall be required and the steps and provisions of this Plan (and any Alternate Plan) pertaining to the New Secured Debt shall be read so as to give effect to such modified form and structure of the New Secured Debt.

### 10.6    Marret and the Secured Noteholders

For the purposes of the Plan, so long as Marret exercises sole investment discretion and control over the all of the Secured Noteholders, then the Applicants, the Company Advisors, the

- 41 -

Monitor, the Indenture Trustee, CDS and all other interested parties with respect to the Plan shall be entitled to rely on confirmation from Marret or the Noteholder Advisors that the Secured Noteholders have agreed to, waived, consented to or approved a particular matter, even if such confirmation would otherwise require the action or agreement of the Indenture Trustee.

### 10.7 Paramountcy

From and after the Effective Time on the Plan Implementation Date, any conflict between:

(a)     the Plan or any Order in the CCAA Proceeding or the Chapter 15 Proceeding; and

(b)     the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, mortgage, security agreement, indenture, trust indenture, note, loan agreement, commitment letter, agreement for sale, lease or other agreement, written or oral and any and all amendments or supplements thereto existing between one or more of the Affected Creditors and the Applicants as at the Plan Implementation Date or the notice of articles, articles or bylaws of the Applicants at the Plan Implementation Date;

will be deemed to be governed by the terms, conditions and provisions of the Plan and the applicable Order, which shall take precedence and priority , provided that any settlement agreement executed by the Applicants and any Person asserting a Claim or a Director/Officer Claim that was entered into from and after the Filing Date shall be read and interpreted in a manner that assumes such settlement agreement is intended to operate congruously with, and not in conflict with, the Plan.

### 10.8 Severability of Plan Provisions

If, prior to the Sanction Date, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of the Applicants and with the consent of the Monitor, shall have the power to either (a) sever such term or provision from the balance of the Plan and provide the Applicants with the option to proceed with the implementation of the balance of the Plan, (b) alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; or (c) withdraw the Plan. Provided that the Applicants proceed with the implementation of the Plan, then notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 10.9 Responsibilities of the Monitor

FTI Consulting Canada Inc. is acting in its capacity as Monitor in the CCAA Proceeding and as foreign representative in the Chapter 15 Proceeding with respect to the Applicants, the CCAA Proceedings and this Plan and not in its personal or corporate capacity, and will not be responsible or liable for any obligations of the Applicants under the Plan or otherwise.

- 42 -

### 10.10  Different Capacities

Persons who are affected by the Plan may be affected in more than one capacity. Unless expressly provided to the contrary herein, a Person will be entitled to participate hereunder in each such capacity. Any action taken by a Person in one capacity will not affect such Person in any other capacity, unless expressly agreed by the Applicants and the Person in writing or unless its Claims overlap or are otherwise duplicative.

### 10.11  Notices

Any notice or other communication to be delivered hereunder must be in writing and reference the Plan and may, subject as hereinafter provided, be made or given by personal delivery, ordinary mail or by facsimile or email addressed to the respective parties as follows:

If to the Applicants:

> c/o Cline Mining Corporation
> 161 Bay Street
> 26th Floor
> Toronto, Ontario, Canada
> M5J 2S1

> Attention:     Matthew Goldfarb
> Fax:            (416) 572-2094
> Email:          mgoldfarb@clinemining.com

with a copy to:

> Goodmans LLP
> Bay Adelaide Centre
> 333 Bay Street, Suite 3400
> Toronto, Ontario M5H 2S7

> Attention:     Robert Chadwick / Logan Willis
> Fax:            (416) 979-1234
> Email:          rchadwick@goodmans.ca / lwillis@goodmans.ca

If to Marret or the Secured Noteholders:

> Marret Asset Management Inc.
> 200 King Street West, Suite 1902
> Toronto, Ontario M5H 3T4

> Attention:  Dorothea Mell
> Fax:            (647) 439-6471
> Email:          dmell@marret.com

with a copy to:

- 43 -

Davies Ward Phillips & Vineberg LLP
155 Wellington Street West
Toronto, Ontario M5V 3J7

| Attention: | Jay A. Swartz |
|---|---|
| Fax: | (416) 863-5520 |
| Email: | jswartz@dwpv.com |

If to an Affected Creditor (other than Marret or the Secured Noteholders), to the mailing address, facsimile address or email address provided on such Affected Creditor's Notice of Claim or Proof of Claim;

If to the Monitor:

FTI Consulting Canada Inc.

TD Waterhouse Tower
79 Wellington Street West
Suite 2010, P.O. Box 104
Toronto, Ontario M5K 1G8

| Attention: | Pamela Luthra |
|---|---|
| Fax: | (416) 649-8101 |
| Email | cline@fticonsulting.com |

with a copy to:

Osler, Hoskin & Harcourt LLP
100 King Street West,
Toronto, Ontario M5X 1B8

| Attention: | Marc Wasserman / Michael De Lellis |
|---|---|
| Fax: | 416.862.6666 |
| Email: | mwasserman@osler.com / mdelellis@osler.com, |

or to such other address as any party may from time to time notify the others in accordance with this section. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 5:00 p.m. (Toronto time) on such day; otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

### 10.12   Further Assurances

Each of the Persons directly or indirectly named or referred to in or subject to Plan will execute and deliver all such documents and instruments and do all such acts and things as may be

- 44 -

necessary or desirable to carry out the full intent and meaning of the Plan and to give effect to the transactions contemplated herein.

**DATED** as of the 20th day of January, 2015.

## SCHEDULE A

## <u>SUMMARY OF TERMS OF NEW SECURED DEBT</u>

- $55,000,000 aggregate principal amount.
- Cline is the borrower and New Elk and North Central are the guarantors of the New Secured Debt.
- 7-year term.
- Interest equal to the aggregate of:
    (i).    base interest at a rate of 0.01% per annum payable annually; and
    (ii).   additional interest payable quarterly equal to 5% of the consolidated operating revenues of the Applicants for the preceding fiscal quarter, provided that such additional interest shall only be applicable if the consolidated operating revenues of the Applicants exceed $1.25 million in such preceding fiscal quarter, and provided further that such additional interest shall not exceed 11.99% per annum of the principal amount of the New Secured Debt in any year.
- Subject to 10.5(f) of the Plan, the New Secured Debt will be governed by (i) the New Credit Agreement between the Applicants and Marret (as administrative and collateral agent for the Secured Noteholders) and (ii) guarantees of the New Secured Debt executed by New Elk and North Central, in each case in form and in content satisfactory to the Applicants and Marret.
- The New Credit Agreement will contain a prepayment premium equal to 10% of the aggregate principal amount of the New Secured Debt, payable if the New Secured Debt is repaid or accelerated at any time prior to its stated maturity.
- Other than as set out herein or as may be agreed by the Applicants and Marret in writing, the material financial terms of the Credit Agreement are to be substantially similar to the terms of the trust indenture in respect of the 2011 Notes.
- The New Secured Debt will be secured by a first-ranking security interest in all or substantially all of the assets and property of Cline, New Elk and North Central.
- Each of the Secured Noteholders will be entitled to its Secured Noteholder's Share of the New Secured Debt, as described in the Plan.
- Marret Asset Management Inc. will act as the administrative and collateral agent in respect of the New Secured Debt and the corresponding security on behalf of the Secured Noteholders.

## SCHEDULE B

## ALTERNATE PLAN – SUMMARY OF TERMS

- All unsecured Claims and all WARN Act Claims:

    (i).    are treated as Unaffected Claims;

    (ii).   are not entitled to vote or attend any creditors' meeting in respect of the Alternate Plan, including the Meeting of Secured Noteholders Class;

    (iii).  receive no distributions or consideration of any kind whatsoever under the Alternate Plan.

- The only Affected Creditors under the Alternate Plan are the Secured Noteholders.

- The only Voting Class under the Alternate Plan is the Secured Noteholders Class.

- The New Cline Common Shares, the New Secured Debt, the Unsecured Plan Entitlement, the payments to Convenience Creditors and the WARN Act Plan Entitlement will not be distributed or established or become payable under the Alternate Plan.

- The Alternate Plan would provide that all assets and property of the Applicants will be transferred to an entity designated by the Secured Noteholders and/or Marret (on behalf of the Secured Noteholders), free and clear of all claims and encumbrances, in exchange for the cancellation of the Secured Notes and a release of all Secured Noteholder Obligations.

6414355

Schedule "B"

Monitor's Certificate of Plan Implementation

Court File No. CV14-10781-00CL

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE AND ARRANGEMENT OF CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND NORTH CENTRAL ENERGY COMPANY

CERTIFICATE OF FTI CONSULTING CANADA INC.
AS THE COURT-APPOINTED MONITOR OF CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND NORTH CENTRAL ENERGY COMPANY

(Plan Implementation)

All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Amended and Restated Plan of Compromise and Arrangement concerning, affecting and involving Cline Mining Corporation, New Elk Coal Company LLC and North Central Energy Company (collectively, the "**Applicants**") dated January 20, 2014 (the "**Plan**"), which is attached as Schedule "A" to the Plan Sanction Order of the Honourable Regional Senior Justice Morawetz made in these proceedings on January 27, 2015 (the "**Plan Sanction Order**"), as the Plan may be further amended, varied or supplemented from time to time in accordance with its terms.

Pursuant to section 9.2 of the Plan and paragraph 10 of the Plan Sanction Order, FTI Consulting Canada Inc. in its capacity as the Court-appointed monitor of the Applicants (the "**Monitor**") delivers this certificate to counsel to the Applicants (on behalf of the Applicants) and hereby certifies that:

- 2 -

1.      The Monitor has received written confirmation from the Applicants and Marret (or their respective counsel) that the conditions precedent set out in section 9.1 of the Plan have been satisfied or waived, as applicable.

2.      Pursuant to the terms of the Plan, the Plan Implementation Date has occurred.

3.      The Plan is effective in accordance with its terms.

4.      This Certificate will be filed with the Court.

**DATED** at the City of Toronto, in the Province of Ontario, this ___ day of ___, 2015.

**FTI CONSULTING CANADA INC.,** in its capacity as Court-appointed Monitor of the Applicants

By:

_____

Name: Paul Bishop

Title:   Senior Managing Director

Court File No.: CV14-10781-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF
COMPROMISE AND ARRANGEMENT OF CLINE MINING CORPORATION,
NEW ELK COAL COMPANY LLC AND NORTH CENTRAL ENERGY
COMPANY

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**PLAN SANCTION ORDER**
**(Returnable January 27, 2015)**

---

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Canada M5H 2S7

Robert J. Chadwick    (LSUC# 35165K)
Logan Willis          (LSUC# 53894K)
Bradley Wiffen        (LSUC# 64279L)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Applicants

6404640

## **EXHIBIT 2**

Plan

Court File No. CV-14-10781-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND**

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
CLINE MINING CORPORATION, NEW ELK COAL COMPANY LLC AND
NORTH CENTRAL ENERGY COMPANY**

**APPLICANTS**

---

**AMENDED AND RESTATED**
**PLAN OF COMPROMISE AND ARRANGEMENT**
**pursuant to the *Companies' Creditors Arrangement Act***
**concerning, affecting and involving**

**CLINE MINING CORPORATION,**
**NEW ELK COAL COMPANY LLC and**
**NORTH CENTRAL ENERGY COMPANY**

---

**January 20, 2015**

# TABLE OF CONTENTS

ARTICLE 1 INTERPRETATION..................................................................................1
1.1     Definitions.............................................................................................................1
1.2     Certain Rules of Interpretation............................................................................16
1.3     Successors and Assigns.......................................................................................17
1.4     Governing Law ....................................................................................................17
1.5     Schedules .............................................................................................................17

ARTICLE 2 PURPOSE AND EFFECT OF THE PLAN..................................................17
2.1     Purpose.................................................................................................................17
2.2     Persons Affected ..................................................................................................18
2.3     Persons Not Affected ...........................................................................................18

ARTICLE 3 CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED
MATTERS ..........................................................................................................................18
3.1     Claims Procedure .................................................................................................18
3.2     Classification of Creditors ...................................................................................18
3.3     Creditors' Meetings .............................................................................................18
3.4     Treatment of Affected Claims ..............................................................................19
3.5     Unaffected Claims ...............................................................................................21
3.6     Disputed Distribution Claims ..............................................................................22
3.7     Director/Officer Claims .......................................................................................22
3.8     Extinguishment of Claims ....................................................................................22
3.9     Guarantees and Similar Covenants ......................................................................23
3.10    Set-Off23

ARTICLE 4 PROVISIONS REGARDING DISTRIBUTIONS AND PAYMENTS ..................23
4.1     Distributions of New Cline Common Shares and New Secured Debt....................23
4.2     Distribution Mechanics with respect to the Unsecured Plan Entitlement.............23
4.3     Distribution Mechanics with respect to Convenience Claims ...........................24
4.4     Distribution Mechanics with respect to the WARN Act Plan Entitlement and the
        WARN Act Cash Payment...................................................................................24
4.5     Modifications to Distribution Mechanics .............................................................25
4.6     Cancellation of Certificates and Notes .................................................................25
4.7     Currency...............................................................................................................26
4.8     Interest26
4.9     Allocation of Distributions ..................................................................................26
4.10    Treatment of Undeliverable Distributions ...........................................................26
4.11    Withholding Rights..............................................................................................27
4.12    Fractional Interests...............................................................................................27
4.13    Calculations.........................................................................................................27

ARTICLE 5 RECAPITALIZATION ...............................................................................27
5.1     Corporate Actions ................................................................................................27
5.2     Issuance of Plan Consideration............................................................................28
5.3     Sequence of Plan Implementation Date Transactions ...........................................29
5.4     Issuances Free and Clear.......................................................................................31

5.5     Stated Capital ..................................................................................................................31

ARTICLE 6 PROCEDURE FOR DISTRIBUTIONS REGARDING DISPUTED
DISTRIBUTION CLAIMS .....................................................................................................31
6.1     No Distribution Pending Allowance ...............................................................................31
6.2     Disputed Distribution Claims ........................................................................................31

ARTICLE 7 RELEASES ..........................................................................................................32
7.1     Plan Releases ..................................................................................................................32
7.2     Limitation on Insured Claims .........................................................................................33
7.3     Injunctions......................................................................................................................33
7.4     Applicants' Release of Class Action Counsel ................................................................34

ARTICLE 8 COURT SANCTION ...........................................................................................34
8.1     Application for Sanction Order .......................................................................................34
8.2     Sanction Order ................................................................................................................34

ARTICLE 9 CONDITIONS PRECEDENT AND IMPLEMENTATION................................36
9.1     Conditions Precedent to Implementation of the Plan .....................................................36
9.2     Monitor's Certificate ......................................................................................................38

ARTICLE 10 GENERAL ........................................................................................................38
10.1    Binding Effect................................................................................................................38
10.2    Waiver of Defaults .........................................................................................................39
10.3    Deeming Provisions .......................................................................................................39
10.4    Non-Consummation ........................................................................................................39
10.5    Modification of the Plan .................................................................................................39
10.6    Marret and the Secured Noteholders...............................................................................40
10.7    Paramountcy ...................................................................................................................41
10.8    Severability of Plan Provisions.......................................................................................41
10.9    Responsibilities of the Monitor.......................................................................................41
10.10  Different Capacities ........................................................................................................42
10.11  Notices ...........................................................................................................................42
10.12  Further Assurances..........................................................................................................43

## AMENDED AND RESTATED
## PLAN OF COMPROMISE AND ARRANGEMENT

**WHEREAS** Cline Mining Corporation ("**Cline**"), New Elk Coal Company LLC ("**New Elk**") and North Central Energy Company ("**North Central**" and together with Cline and New Elk, the "**Applicants**") are debtor companies under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**");

**AND WHEREAS** the Applicants have obtained an order (as may be amended, restated or varied from time to time, the "**Initial Order**") of the Ontario Superior Court of Justice (the "**Court**") under the CCAA (the date of such Initial Order being the "**Filing Date**");

**AND WHEREAS** Marret Asset Management Inc. ("**Marret**") exercises sole investment discretion and control over all of the beneficial holders of (i) the $71,381,900 million aggregate principal amount of 10% senior secured notes due June 15, 2014 issued by Cline pursuant to the indenture dated December 13, 2011, as amended (the "**2011 Notes**") and (ii) the $12,340,998 aggregate principal amount of 10% senior secured notes due June 15, 2014 issued by Cline pursuant to the indenture dated July 8, 2013, as amended (the "**2013 Notes**", and collectively with the 2011 Notes, the "**Secured Notes**");

**AND WHEREAS** the Applicants have developed a recapitalization transaction (the "**Recapitalization**") as set forth herein, and Marret (on behalf of all of the beneficial holders of the Secured Notes) has agreed to support the terms of the Recapitalization;

**AND WHEREAS** the Applicants filed a Plan of Compromise and Arrangement dated December 3, 2014 pursuant to the Meetings Order (as defined below) (the "**Original Plan**");

**AND WHEREAS**, following discussions with counsel for the WARN Act Plaintiffs, Marret and the Monitor, the Applicants have agreed to make certain amendments to the Original Plan to address the settlement of the WARN Act Claims;

**AND WHEREAS** the Applicants file this amended and restated consolidated plan of compromise and arrangement with the Court pursuant to the CCAA and hereby propose and present the plan of compromise and arrangement to the Secured Noteholders Class, the Affected Unsecured Creditors Class and the WARN Act Plaintiffs Class (each as defined below) under and pursuant to the CCAA.

## ARTICLE 1
## INTERPRETATION

### 1.1    Definitions

In the Plan, unless otherwise stated or unless the subject matter or context otherwise requires:

"**2011 Indenture**" means the note indenture dated December 13, 2011 that was entered into between Cline, Marret and the 2011 Trustee in connection with the issuance of the 2011 Notes, as amended from time to time.

- 2 -

"**2011 Noteholders**" means the holders of the 2011 Notes, and "**2011 Noteholder**" means any one of them.

"**2011 Trustee**" means the Indenture Trustee, Computershare Trust Company of Canada, specifically in its capacity as trustee in respect of the 2011 Secured Notes under the 2011 Indenture.

"**2013 Indenture**" means the note indenture dated July 8, 2013 that was entered into between Cline, Marret and the 2013 Trustee in connection with the issuance of the 2013 Notes, as amended from time to time.

"**2013 Noteholders**" means the holders of the 2013 Notes, and "**2013 Noteholder**" means any one of them.

"**2013 Trustee**" means the Indenture Trustee, Computershare Trust Company of Canada, specifically in its capacity as trustee in respect of the 2013 Secured Notes under the 2013 Indenture.

"**Affected Claim**" means any Claim that is not an Unaffected Claim, and, for greater certainty, includes any Secured Noteholder Claim, Affected Unsecured Claim, WARN Act Claim and Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claims**" means all Claims against one or more of the Applicants that are not secured by a valid security interest over assets or property of the Applicants and that are not (i) Unaffected Claims, (ii) the Claims comprising the Secured Noteholders Allowed Secured Claim, (iii) WARN Act Claims or (iv) Equity Claims; and, for greater certainty, the Affected Unsecured Claims shall include the Secured Noteholders Allowed Unsecured Claim, the Marret Unsecured Claim and any portion of any other Affected Claim that is secured but in respect of which there is a deficiency in the realizable value of the security held in respect of such Claim relative to the amount of such Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditors Class**" means the class of Affected Unsecured Creditors entitled to vote on the Plan at the Unsecured Creditors Meeting in accordance with the terms of the Meetings Order.

"**Agreed Number**" means, with respect to the New Cline Common Shares, that number of New Cline Common Shares to be issued on the Plan Implementation Date pursuant to the Plan as agreed to by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders).

"**Allowed**" means, with respect to a Claim, any Claim or any portion thereof that has been finally allowed as a Distribution Claim (as defined in the Claims Procedure Order) for purposes of receiving distributions under the Plan in accordance with the Claims Procedure Order or a Final Order of the Court.

- 3 -

"**Applicable Law**" means any law, statute, order, decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision of any Governmental Entity.

"**Articles**" means the articles and/or the notice of articles of Cline, as applicable.

"**Assessments**" has the meaning ascribed thereto in the Claims Procedure Order.

"**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended.

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in Toronto, Ontario and New York, New York.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada), as amended.

"**CCAA**" has the meaning ascribed thereto in the recitals.

"**CCAA Proceeding**" means the proceeding commenced by the Applicants pursuant to the CCAA.

"**CDS**" means CDS Clearing and Depositary Services Inc. or any successor thereof.

"**CDS Participants**" means CDS participant holders of the 2011 Notes and the 2013 Notes.

"**Chapter 15**" means Chapter 15, Title 11 of the United States Code.

"**Chapter 15 Proceeding**" means the proceeding to be commenced by the foreign representative of the Applicants pursuant to Chapter 15.

"**Charges**" means the Administration Charge and the Directors' Charge, each as defined in the Initial Order.

"**Claim**" means:

> (a)     any right or claim of any Person against any of the Applicants, whether or not asserted, in connection with any indebtedness, liability or obligation of any kind whatsoever of any such Applicant in existence on the Filing Date, and costs payable in respect thereof to and including the Filing Date, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including any Assessment and any right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation is based in whole or in part on facts which existed prior to the Filing Date and any other claims that would have been claims provable in bankruptcy had such Applicant become bankrupt on the

- 4 -

Filing Date, including for greater certainty any Equity Claim and any claim against any of the Applicants for indemnification by any Director or Officer in respect of a Director/Officer Claim (but excluding any such claim for indemnification that is covered by the Directors' Charge (as defined in the Initial Order)); and

(b)     any right or claim of any Person against any of the Applicants in connection with any indebtedness, liability or obligation of any kind whatsoever owed by any such Applicant to such Person arising out of the restructuring, disclaimer, resiliation, termination or breach by such Applicant on or after the Filing Date of any contract, lease or other agreement whether written or oral and includes any other right or claim that is to be treated as a Restructuring Period Claim under the Plan,

provided that, for greater certainty, the definition of "Claim" herein shall not include any Director/Officer Claim.

"**Claims Bar Date**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Claims Procedure Order**" means the Order under the CCAA establishing a claims procedure in respect of the Applicants, as same may be further amended, restated or varied from time to time.

"**Class Action Counsel**" means The Gardner Firm, P.C., in its capacity as counsel to James Gerard Jr. and Michael Cox, on behalf of themselves and all others who are alleged to be similarly situated, in the WARN Act Class Action.

"**Class Action Initial Expense Reimbursement**" means an amount to be agreed by Class Action Counsel and James Gerard Jr. and Michael Cox, as representative plaintiffs in the WARN Act Class Action, in respect of: the reasonable attorneys fees, expenses and costs of the WARN Act Plaintiffs' counsel; the reasonable local attorneys fees, expenses and costs incurred by the WARN Act Plaintiffs' counsel; and class representative fees, expenses and costs in connection with the WARN Act Class Action.  The Class Action Initial Expense Reimbursement is to be paid on the Plan Implementation Date and shall not exceed $90,000 (being the maximum amount of the WARN Act Cash Payment).

"**Class Action Second Expense Reimbursement**" means an amount to be agreed by Class Action Counsel and James Gerard Jr. and Michael Cox, as representative plaintiffs in the WARN Act Class Action, in respect of the reasonable attorneys fees and expenses of the WARN Act Plaintiffs' counsel.  The Class Action Second Expense Reimbursement is to be paid on the WARN Act Plan Entitlement Date and shall not exceed $120,000 (being the maximum amount of the WARN Act Plan Entitlement).

"**Cline Common Shares**" means the common shares in the capital of Cline designated as Common Shares in the Notice of Articles of Cline.

"**Cline Companies**" means Cline, New Elk, North Central Energy Company, Raton Basin Analytical, LLC.

"**Company Advisors**" means Goodmans LLP, Moelis & Company and Aab & Botts, LLC.

- 5 -

"**Consolidation Ratio**" means, with respect to the Cline Common Shares, the ratio by which Cline Common Shares outstanding on the Plan Implementation Date at the relevant time (including, for the avoidance of doubt, any Cline Common Shares that are Existing Cline Shares and any Cline Common Shares that are New Cline Common Shares issued pursuant to the Plan) are consolidated pursuant to the Plan, as agreed by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders).

"**Convenience Claim**" means any Affected Unsecured Claim that is not more than $10,000, provided that (i) no Claims of the Secured Noteholders shall constitute Convenience Claims; (ii) Creditors shall not be entitled to divide a Claim for the purpose of qualifying such Claim as a Convenience Claim; (iii) no Restructuring Period Claim referred to in section 3.5(d)(i) shall constitute a Convenience Claim, and (iv) for greater certainty, none of the WARN Act Claims shall constitute Convenience Claims.

"**Convenience Creditor**" means an Affected Unsecured Creditor having a Convenience Claim.

"**Court**" has the meaning ascribed thereto in the recitals.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Procedure Order or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person.

"**Directors**" means all current and former directors (or their estates) of the Applicants, in such capacity, and "**Director**" means any one of them.

"**Director/Officer Claim**" means any right or claim of any Person against one or more of the Directors and/or Officers howsoever arising, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, including any right of contribution or indemnity, for which any Director or Officer is alleged to be, by statute or otherwise by law or equity, liable to pay in his or her capacity as a Director or Officer.

"**Disputed Distribution Claim**" means an Affected Unsecured Claim or a WARN Act Claim (including a contingent Affected Unsecured Claim or WARN Act Claim that crystallizes upon the occurrence of an event or events occurring after the Filing Date) or such portion thereof that has not been Allowed, which is validly disputed for distribution purposes in accordance with the Claims Procedure Order and that remains subject to adjudication for distribution purposes in accordance with the Claims Procedure Order.

"**Disputed Distribution Claims Reserve**" means the reserve, if any, to be established by Cline, which shall be comprised of the following:

- 6 -

(a)     in respect of Affected Unsecured Claims that are Disputed Distribution Claims and are not Convenience Claims, an amount reserved on the Unsecured Plan Entitlement Date equal to the Unsecured Plan Entitlement Proceeds that would have been paid in respect of such Disputed Distribution Claims on the Unsecured Plan Entitlement Date if such Disputed Distribution Claims had been Allowed Claims as of the Promissory Note Maturity Date

(b)     in respect of Affected Unsecured Claims that are Disputed Distribution Claims and that are Convenience Claims, an amount reserved on the Plan Implementation Date equal to the amount that would have been paid in respect of such Disputed Distribution Claims on the Plan Implementation Date if such Disputed Distribution Claims had been Allowed Claims as of the Plan Implementation Date, and

(c)     in respect of WARN Act Claims that are Disputed Distribution Claims, an amount reserved on the WARN Act Plan Entitlement Date equal to the WARN Act Plan Entitlement Proceeds that would have been paid in respect of such Disputed Distribution Claims on the WARN Act Plan Entitlement Date if such Disputed Distribution Claims had been Allowed Claims as of the WARN Act Plan Entitlement Date.

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Allowed Claims, excluding the Initial Distribution Date, and (i) in the case of distributions of Unsecured Plan Entitlement Proceeds, means the Unsecured Plan Entitlement Date or such later date from time to time established in accordance with the provisions of the Plan if any Affected Unsecured Claim is a Disputed Distribution Claim on the Unsecured Plan Entitlement Date; and (ii) in the case of distributions of WARN Act Plan Entitlement Proceeds, means the WARN Act Plan Entitlement Date or such later date from time to time established in accordance with the provisions of the Plan if any WARN Act Claim is a Disputed Distribution Claim on the WARN Act Plan Entitlement Date.

"**Effective Time**" means 12:01 a.m. (Toronto time) on the Plan Implementation Date or such other time on such date as the Applicants may determine.

"**Employee Priority Claims**" means the following Claims of Employees and former employees of the Applicants:

(a)     Claims equal to the amounts that such Employees and former employees would have been entitled to receive under paragraph 136(l)(d) of the *Bankruptcy and Insolvency Act* (Canada) if the applicable Applicant had become bankrupt on the Filing Date; and

(b)     Claims for wages, salaries, commissions or compensation for services rendered by such Employees and former employees after the Filing Date and on or before the Plan Implementation Date together with, in the case of travelling salespersons, disbursements properly incurred by them in and about the Applicants' business during the same period.

- 7 -

"**Employees**" means any and all (a) employees of the Applicants who are actively at work (including full-time, part-time or temporary employees) and (b) employees of the Applicants who are on approved leaves of absence (including maternity leave, parental leave, short-term disability leave, workers' compensation and other statutory leaves), and who have not tendered notice of resignation as of the Filing Date, in each case.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that meets the definition of "equity claim" in section 2(1) of the CCAA.

"**Equity Claimants**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity, and for greater certainty includes the Existing Cline Shareholders in their capacity as such.

"**Equity Interests**" has the meaning ascribed thereto in section 2(1) of the CCAA and, for greater certainty, includes the Existing Cline Shares, the Existing New Elk Units, the Existing North Central Shares, the Existing Options and any other interest in or entitlement to shares or units in the capital of the Applicants but, for greater certainty, does not include the New Cline Common Shares issued on the Plan Implementation Date in accordance with the Plan.

"**Existing Cline Shareholder**" means any Person who holds, is entitled to or has any rights in or to the Existing Cline Shares or any shares in the authorized capital of Cline immediately prior to the Effective Time, but only in such capacity, and for greater certainty does not include any Person that is issued New Cline Common Shares on the Plan Implementation Date.

"**Existing Cline Shares**" means all shares in the capital of Cline that are issued and outstanding immediately prior to the Effective Time.

"**Existing New Elk Units**" means all units in the capital of New Elk that are issued and outstanding immediately prior to the Effective Time.

"**Existing North Central Shares**" means all shares in the capital of North Central that are issued and outstanding immediately prior to the Effective Time.

"**Existing Options**" means any options, warrants (including the Warrants), conversion privileges, puts, calls, subscriptions, exchangeable securities, or other rights, entitlements, agreements, arrangements or commitments (pre-emptive, contingent or otherwise) obligating any of the Applicants to issue, acquire or sell shares or units in the capital of the Applicants or to purchase any shares, units, securities, options or warrants, or any securities or obligations of any kind convertible into or exchangeable for shares or units in the capital of the Applicants, in each case that are existing or issued and outstanding immediately prior to the Effective Time, including any options to acquire shares, units or other equity securities of the Applicants issued

- 8 -

under the Stock Option Plans, any warrants exercisable for common shares, units or other equity securities of the Applicants (including the Warrants), any put rights exercisable against the Applicants in respect of any shares, units, options, warrants or other securities, and any rights, entitlements or other claims of any kind to receive any other form of consideration in respect of any prior or future exercise of any of the foregoing.

"**Filing Date**" has the meaning ascribed thereto in the recitals.

"**Final Order**" means any order, ruling or judgment of the Court, or any other court of competent jurisdiction, (i) that is in full force and effect; (ii) that has not been reversed, modified or vacated and is not subject to any stay and (iii) in respect of which all applicable appeal periods have expired and any appeals therefrom have been finally disposed of, leaving such order, ruling or judgment wholly operable.

"**Fractional Interests**" has the meaning given in section 4.12 hereof.

"**Government Priority Claims**" means all Claims of Governmental Entities against any of the Applicants in respect of amounts that are outstanding and that are of a kind that could be subject to a demand under:

    (a)    subsections 224(1.2) of the Canadian Tax Act;

    (b)    any provision of the Canada Pension Plan or the *Employment Insurance Act* (Canada) that refers to subsection 224(1.2) of the Canadian Tax Act and provides for the collection of a contribution, as defined in the Canada Pension Plan, or employee's premium or employer's premium as defined in the *Employment Insurance Act* (Canada), or a premium under Part VII. I of that Act, and of any related interest, penalties or other amounts; or

    (c)    any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the Canadian Tax Act, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum:

        (i)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the Canadian Tax Act; or

        (ii)    is of the same nature as a contribution under the Canada Pension Plan if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the Canada Pension Plan and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to

- 9 -

exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Indentures**" means, collectively, the 2011 Indenture and the 2013 Indenture.

"**Indenture Trustee**" means Computershare Trust Company of Canada, as trustee in respect of the Secured Notes under the Indentures.

"**Individual Unsecured Plan Entitlement**" means, with respect to each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim that is not a Convenience Creditor and that is not a Secured Noteholder, its entitlement to receive its respective individual portion of the Unsecured Plan Entitlement Proceeds payable on the Unsecured Plan Entitlement Date, the quantum of which entitlement shall be calculated as follows at the relevant time:

      (A)      the Allowed Affected Unsecured Claim of such Affected Unsecured Creditor

      divided by

      (B)      the total amount of all Allowed Affected Unsecured Claims and Disputed Distribution Claims of Affected Unsecured Creditors less the Secured Noteholders Allowed Unsecured Claim less the Marret Unsecured Claim less the amount of all Convenience Claims

      multiplied by

      (C)      $225,000.

"**Individual WARN Act Plan Entitlement**" means with respect to each WARN Act Plaintiff with an Allowed WARN Act Claim, its entitlement to receive its individual WARN Act Plaintiff's Share of the WARN Act Plan Entitlement Proceeds payable on the WARN Act Plan Entitlement Date.

"**Information Statement**" means the information statement to be distributed by the Applicants concerning the Plan, the Meetings and the hearing in respect of the Sanction Order, as contemplated in the Meetings Order.

"**Initial Distribution Date**" means a date no more than two (2) Business Days after the Plan Implementation Date or such other date as the Applicants and the Monitor may agree.

"**Initial Order**" has the meaning ascribed thereto in the recitals.

"**Insurance Policy**" means any insurance policy maintained by any of the Applicants pursuant to which any of the Applicants or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim arising from a cause of action for which the applicable insurer or a court of competent jurisdiction has definitively and unconditionally confirmed that the applicable Applicant is insured under an Insurance Policy, to the extent that such Claim, or portion thereof, is so insured.

- 10 -

"**Intercompany Claim**" means any Claim by any Applicant against another Applicant.

"**Marret**" has the meaning ascribed to it in the recitals.

"**Marret Unsecured Claim**" means all Claims of Marret, in its individual corporate capacity and not on behalf of the Secured Noteholders, against one or more of the Applicants, if any, including any secured Claims of Marret, in such capacity, in respect of which there is a deficiency in the realizable value of the security held by Marret relative to the amount of such secured Claim.

"**Material**" means a fact, circumstance, change, effect, matter, action, condition, event, occurrence or development that, individually or in the aggregate, is, or would reasonably be expected to be, material to the business, affairs, results of operations or financial condition of the Applicants (taken as a whole).

"**Meeting Date**" means the date on which the Meetings are held in accordance with the Meetings Order.

"**Meetings**" means, collectively, the Secured Noteholders Meeting, the Unsecured Creditors Meeting and the WARN Act Plaintiffs Meeting.

"**Meetings Order**" means the Order under the CCAA that, among other things, sets the date for the Meetings, as same may be amended, restated or varied from time to time.

"**Monitor**" means FTI Consulting Canada Inc., as Court-appointed Monitor of the Applicants in the CCAA Proceeding.

"**Monitor's Website**" means http://cfcanada.fticonsulting.com/cline

"**New Cline Common Shares**" means the new Cline Common Shares to be issued pursuant to section 5.2(1) hereof.

"**New Credit Agreement**" means the credit agreement in respect of the New Secured Debt dated as of the Plan Implementation Date among Cline, as borrower, New Elk and North Central, as guarantors, and the New Secured Debt Agent.

"**New Secured Debt**" means the new secured indebtedness of Cline, which is to be guaranteed by New Elk and North Central, to be established on the Plan Implementation Date pursuant to section 5.2(2) hereof, the terms of which shall be consistent with the summary of terms set forth in Schedule "A" and which shall be governed by the New Credit Agreement.

"**New Secured Debt Agent**" means Marret Asset Management Inc., in its capacity as administrative and collateral agent under the New Credit Agreement.

"**Noteholder Advisors**" means Davies Ward Phillips & Vineberg LLP.

"**Notice of Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

- 11 -

"**Officers**" means all current and former officers (or their estates) of the Applicants, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Court made in connection with the CCAA Proceeding and any order of the U.S. Court made in connection with the Chapter 15 Proceeding.

"**Original Plan**" has the meaning ascribed thereto in the recitals.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Plan**" means this Amended and Restated Plan of Compromise and Arrangement filed by the Applicants pursuant to the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Implementation Date**" means the Business Day on which the Plan becomes effective, which shall be the Business Day on which, pursuant to section 9.2, the Applicants and Marret (on behalf of the Secured Noteholders) or their respective counsel deliver written notice to the Monitor (or its counsel) that the conditions set out in section 9.1 have been satisfied or waived in accordance with the terms hereof.

"**Post-Filing Trade Payables**" means trade payables that were incurred by any of the Applicants (a) after the Filing Date but before the Plan Implementation Date; and (b) in compliance with the Initial Order and other Orders issued in connection with the CCAA Proceeding and the Chapter 15 Proceeding.

"**Prior Ranking Secured Claims**" means Allowed Claims existing on both the Filing Date and the Plan Implementation Date, other than Government Priority Claims, Employee Priority Claims, and Claims secured by the Charges, that (a) are secured by a valid, perfected and enforceable security interest in, mortgage, encumbrance or charge over, lien against or other similar interest in, any of the assets that any of the Applicants owns or to which any of the Applicants is entitled, but only to the extent of the realizable value of the property subject to such security; and (b) would have ranked senior in priority to the Secured Noteholders Allowed Secured Claim if the Applicants had become bankrupt on the Filing Date, but only to the extent that it would have ranked senior in priority, including any Allowed Claims relating to the security registrations listed on Schedule "A" to the Initial Order, which, for greater certainty, includes the registration in favour of Bank of Montreal/Banque de Montreal listed thereon, to the extent that such Claims satisfy the terms of this definition.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Recapitalization**" means the transactions contemplated by the Plan.

"**Released Claims**" has the meaning ascribed thereto in section 7.1.

"**Released Director/Officer Claim**" means any Director/Officer Claim that is released pursuant to section 7.1.

- 12 -

"**Released Party**" and "**Released Parties**" have the meaning ascribed thereto in section 7.1.

"**Restructuring Period Claim**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Required Majorities**" means with respect to each Voting Class, a majority in number of Affected Creditors representing at least two thirds in value of the Voting Claims of Affected Creditors, in each case who are entitled to vote at the Meetings in accordance with the Meetings Order and who are present and voting in person or by proxy on the resolution approving the Plan at the applicable Meeting.

"**Sanction Order**" means the Order of the Court sanctioning and approving the Plan.

"**Secured Noteholders**" means the holders of the Secured Notes, and "**Secured Noteholder**" means any one of them.

"**Secured Noteholders Allowed Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and the aggregate amount of such Claim is $110,173,897.

"**Secured Noteholders Allowed Secured Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and, for the purpose of voting at the Secured Noteholders Meeting and receiving distributions under the Plan, the aggregate amount of such Claims is $92,673,897.

"**Secured Noteholders Allowed Unsecured Claim**" has the meaning ascribed thereto in the Claims Procedure Order, and, for the purpose of voting at the Unsecured Creditors Meeting, the aggregate amount of such Claims is $17,500,000.

"**Secured Noteholders Class**" means the class of Secured Noteholders collectively holding the Secured Noteholders Allowed Secured Claim entitled to vote on this Plan at the Secured Noteholders Meeting in accordance with the terms of the Meetings Order.

"**Secured Noteholders Meeting**" means the meeting of the Secured Noteholders Class to be held on the Meeting Date for the purpose of considering and voting on the Plan pursuant to the CCAA and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**Secured Noteholder's Share**" means, with respect to each Secured Noteholder, either: (i) the principal amount of Secured Notes held by such Secured Noteholder as at the Filing Date divided by the total aggregate principal amount of all Secured Notes as at the Filing Date; or (ii) such other proportionate share as may be agreed by the Applicants, Marret (on behalf of the Secured Noteholders) and the Monitor and as confirmed by Marret (on behalf of the Secured Noteholders) to the Indenture Trustee in writing.

"**Secured Note Obligations**" means all obligations, liabilities and indebtedness of the Applicants or any of the Cline Companies (whether as guarantor, surety or otherwise) to the Indenture Trustee, the Secured Noteholders and/or Marret (whether on behalf of the Secured Noteholders or in its individual corporate capacity) under, arising out of or in connection with the Secured Notes, the Indentures or the guarantees granted in connection with any of the foregoing as well as any other agreements or documents relating thereto as at the Plan Implementation Date.

- 13 -

"**Secured Notes**" has the meaning ascribed thereto in the recitals.

"**Stock Option Plans**" means any options plans, stock-based compensation plans or other obligations of any of the Applicants in respect of shares, options or warrants for equity in any of the Cline Companies, in each case as such plans or other obligations may be amended, restated or varied from time to time in accordance with the terms thereof.

"**Tax**" or "**Taxes**" means any and all federal, provincial, state, municipal, local, Canadian, U.S. and foreign taxes, assessments, reassessments and other governmental charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and federal, provincial, state, municipal, local, Canadian, U.S., foreign and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means any one of Her Majesty the Queen, Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United States, and any Canadian, American or other government, regulatory authority, government department, agency, commission, bureau, minister, court, tribunal or body or regulation making entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**Unaffected Claim**" means any:

(a)     Claim secured by any of the Charges;

(b)     Insured Claim;

(c)     Intercompany Claim;

(d)     Post-Filing Trade Payable;

(e)     Unaffected Secured Claim;

(f)     Claim by an Unaffected Trade Creditor arising from an Unaffected Trade Claim;

(g)     Claim that is not permitted to be compromised pursuant to section 19(2) of the CCAA;

(h)     Employee Priority Claims; and

(i)     Government Priority Claims.

- 14 -

"**Unaffected Creditor**" means a Creditor who has an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unaffected Secured Claims**" means: (i) the Prior Ranking Secured Claims; and (ii) all other Claims against one or more of the Applicants that (a) are secured by a valid security interest over assets or property of the Applicants and (b) the Applicants have identified to the Monitor in writing prior to the Plan Implementation Date as Unaffected Claims under the Plan.

"**Unaffected Trade Claim**" means an Allowed Claim of an Unaffected Trade Creditor that (i) is not a Post-Filing Trade Payable, (ii) arises out of or in connection with any contract, license, lease, agreement, obligation, arrangement or document with any of the Applicants related to the business of the Applicants and (iii) the Applicants have identified to the Monitor in writing prior to the Plan Implementation Date as an Unaffected Claim.

"**Unaffected Trade Creditor**" means any Person that has been designated by the Applicants, with the consent of the Monitor, as a critical supplier in accordance with the Initial Order.

"**Undeliverable Distribution**" has the meaning ascribed thereto in section 4.10 hereof.

"**Unsecured Creditors Meeting**" means a meeting of Affected Unsecured Creditors to be held on the Meeting Date called for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**Unsecured Plan Entitlement**" means an unsecured, non-interest-bearing entitlement of the Affected Unsecured Creditors, other than Convenience Creditors, with Allowed Affected Unsecured Claims to receive $225,000 in cash (collectively, and not individually) from Cline on the date that is eight years from the Plan Implementation Date, which entitlement shall be subordinated to all present and future secured indebtedness and obligations of Cline and may be paid by Cline at any time without penalty.

"**Unsecured Plan Entitlement Date**" means the earlier of the date that is eight years following the Plan Implementation Date and the date on which the Unsecured Plan Entitlement is paid by Cline.

"**Unsecured Plan Entitlement Proceeds**" means the amounts payable to the beneficiaries of the Unsecured Plan Entitlement on the Unsecured Plan Entitlement Date.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Colorado.

"**Voting Claims**" means any Claim or portion thereof that has been finally allowed as a Voting Claim (as defined in the Claims Procedure Order) for purposes of voting at a Meeting in accordance with the Claims Procedure Order or a Final Order of the Court.

"**Voting Classes**" means the Secured Noteholders Class, the Affected Unsecured Creditors Class and the WARN Act Plaintiffs Class.

"**WARN Act**" means the U.S. federal Worker Adjustment and Retraining Notification Act of 1988 (29 U.S.C. §§ 2101 – 2109).

- 15 -

"**WARN Act Cash Payment**" means the cash payment in the amount of $90,000 less the Class Action Initial Expense Reimbursement, which cash payment is to be made to the Class Action Counsel on the Plan Implementation Date for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims.

"**WARN Act Claim**" means any Claim against any of the Applicants advanced by the WARN Act Plaintiffs in the WARN Act Class Action and any other Claims of individuals similarly situated to the WARN Act Plaintiffs that may be asserted against any of the Applicants pursuant to the WARN Act.

"**WARN Act Class Action**" means the class action lawsuit filed against Cline and New Elk by the WARN Act Plaintiffs in the United States District Court for the District of Colorado, Case Number 1:13-CV-00277, as amended.

"**WARN Act Plaintiffs**" means the plaintiffs in the WARN Act Class Action and all others who are alleged in the WARN Act Class Action to be similarly situated, and any other individual who is simliarly situated to the plaintiffs in the WARN Act Class Action who asserts Claims against any of the Applicants pursuant to the WARN Act.

"**WARN Act Plaintiffs Class**" means the class of WARN Act Plaintiffs entitled to vote on the Plan at the WARN Act Plaintiffs Meeting in accordance with the terms of the Meetings Order.

"**WARN Act Plaintiffs Meeting**" means a meeting of WARN Act Plaintiffs Class to be held on the Meeting Date called for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meetings Order.

"**WARN Act Plaintiff's Share**" means, at the relevant time, with respect to each WARN Act Plaintiff with an Allowed WARN Act Claim, the applicable share of such WARN Act Plaintiff in the distributions to be made to the WARN Act Plaintiffs with Allowed WARN Act Claims hereunder, as determined by Class Action Counsel in accordance with the parameters of the WARN Act Class Action.

"**WARN Act Plan Entitlement**" means the unsecured, non-interest-bearing entitlement of the WARN Act Plaintiffs with Allowed WARN Act Claims to receive $120,000 less the amount of the Class Action Second Expense Reimbursement in cash (collectively, and not individually) from New Elk on the date that is eight years from the Plan Implementation Date, which entitlement shall be subordinated to all present and future secured indebtedness and obligations of Cline and may be paid by Cline at any time without penalty.

"**WARN Act Plan Entitlement Date**" means the earlier of the date that is eight years following the Plan Implementation Date and the date on which the WARN Act Plan Entitlement is paid by Cline.

"**WARN Act Plan Entitlement Proceeds**" means the amounts payable to the beneficiaries of the WARN Act Plan Entitlement on the WARN Act Plan Entitlement Date.

- 16 -

"**Warrants**" means all warrants, options, rights or entitlements for the purchase of Cline Common Shares that are issued and outstanding immediately prior to the Effective Time.

## 1.2     Certain Rules of Interpretation

For the purposes of the Plan:

(a)     any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(b)     any reference in the Plan to an Order or an existing document or exhibit filed or to be filed means such Order, document or exhibit as it may have been or may be amended, modified, or supplemented;

(c)     unless otherwise specified, all references to currency are in Canadian dollars;

(d)     the division of the Plan into "articles" and "sections" and the insertion of a table of contents are for convenience of reference only and do not affect the construction or interpretation of the Plan, nor are the descriptive headings of "articles" and "sections" intended as complete or accurate descriptions of the content thereof;

(e)     the use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of the Plan or a schedule hereto to such Person (or Persons) or circumstances as the context otherwise permits;

(f)     the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

(g)     unless otherwise specified, all references to time herein and in any document issued pursuant hereto mean local time in Toronto, Ontario and any reference to an event occurring on a Business Day shall mean prior to 5:00 p.m. (Toronto time) on such Business Day;

(h)     unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next succeeding Business Day if the last day of the period is not a Business Day;

(i)     unless otherwise provided, any reference to a statute or other enactment of parliament or a legislature includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time

- 17 -

to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation; and

(j)     references to a specified "article" or "section" shall, unless something in the subject matter or context is inconsistent therewith, be construed as references to that specified article or section of the Plan, whereas the terms "the Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to the Plan and not to any particular "article", "section" or other portion of the Plan and include any documents supplemental hereto.

### 1.3     Successors and Assigns

The Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and assigns of any Person or party directly or directly named or referred to in or subject to Plan.

### 1.4     Governing Law

The Plan shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. All questions as to the interpretation of or application of the Plan and all proceedings taken in connection with the Plan and its provisions shall be subject to the jurisdiction of the Court, provided that the Chapter 15 Proceeding shall be subject to the jurisdiction of the U.S. Court.

### 1.5     Schedules

The following are the Schedules to the Plan, which are incorporated by reference into the Plan and form a part of it:

    Schedule "A"          New Secured Debt – Summary of Terms

    Schedule "B"          Alternate Plan – Summary of Terms

## ARTICLE 2
## PURPOSE AND EFFECT OF THE PLAN

### 2.1     Purpose

The purpose of the Plan is:

(a)     to implement a recapitalization of the Applicants;

(b)     to provide for a settlement of, and consideration for, all Allowed Affected Claims;

(c)     to effect a release and discharge of all Affected Claims and Released Claims; and

(d)     to ensure the continuation of the Applicants,

- 18 -

in the expectation that the Persons who have a valid economic interest in the Applicants will derive a greater benefit from the implementation of the Plan than they would derive from a bankruptcy of the Applicants.

### 2.2 Persons Affected

The Plan provides for a full and final release and discharge of the Affected Claims and Released Claims, a settlement of, and consideration for, all Allowed Affected Claims and a recapitalization of the Applicants. The Plan will become effective at the Effective Time in accordance with its terms and in the sequence set forth in section 5.3 and shall be binding on and enure to the benefit of the Applicants, the Affected Creditors, the Released Parties and all other Persons directly or indirectly named or referred to in or subject to Plan.

### 2.3 Persons Not Affected

The Plan does not affect the Unaffected Creditors, subject to the express provisions hereof providing for the treatment of Insured Claims and the unsecured deficiency portion of Unaffected Secured Claims.  Nothing in the Plan shall affect the Applicants' rights and defences, both legal and equitable, with respect to any Unaffected Claims including all rights with respect to legal and equitable defences or entitlements to set-offs or recoupments against such Unaffected Claims.

# ARTICLE 3
# CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED MATTERS

### 3.1 Claims Procedure

The procedure for determining the validity and quantum of the Affected Claims for voting and distribution purposes under the Plan shall be governed by the Claims Procedure Order, the Meetings Order, the CCAA, the Plan and any further Order of the Court.

### 3.2 Classification of Creditors

In accordance with the Meetings Order and subject to section 10.5(d) hereof, the classes of creditors for the purposes of considering and voting on the Plan will be (i) the Secured Noteholders Class, (ii) the Affected Unsecured Creditors Class and (iii) the WARN Act Plaintiffs Class.  For greater certainty, Equity Claimants shall constitute a separate class but shall not be entitled to attend the Meetings, vote on the Plan or receive any distributions under or in respect of the Plan.

### 3.3 Creditors' Meetings

The Meetings shall be held in accordance with the Meetings Order and any further Order of the Court. The only Persons entitled to attend and vote at the Meetings are those specified in the Meetings Order.

- 19 -

### 3.4     Treatment of Affected Claims

An Affected Claim shall receive distributions as set forth below only to the extent that such Claim is an Allowed Affected Claim and has not been paid, released, or otherwise satisfied prior to the Plan Implementation Date.

### (1)     Secured Noteholders Class

In accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of the Secured Noteholders Allowed Secured Claim, each Secured Noteholder will receive its Secured Noteholder's Share of the following consideration on the Plan Implementation Date:

(a)     the New Cline Common Shares issued on the Plan Implementation Date; and

(b)     the New Secured Debt.

The Claims comprising the Secured Noteholders Allowed Claim and the Secured Note Obligations shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date.  For greater certainty, the Secured Noteholders Allowed Unsecured Claim, the Marret Unsecured Claim and any portion of any other Affected Claim that is validly secured but in respect of which there is a deficiency in the realizable value of the security held in respect of such Claim, shall be deemed to be and shall be treated as Allowed Affected Unsecured Claims notwithstanding that they are secured by a valid security interest over the assets or property of the Applicants.

### (2)     Affected Unsecured Creditors Class

In accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of all Affected Unsecured Claims, each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim will receive the following consideration:

(a)     with respect to Affected Unsecured Creditors with Allowed Affected Unsecured Claims that are not Convenience Creditors, each such Affected Unsecured Creditor shall become entitled on the Plan Implementation Date to its Individual Unsecured Plan Entitlement (which, for greater certainty, shall not be payable until the Unsecured Plan Entitlement Date); and

(b)     with respect to Convenience Creditors with Allowed Affected Unsecured Claims, each such Convenience Creditor shall receive a cash payment on the Plan Implementation Date equal to the lesser of (i) $10,000; and (ii) the amount of its Allowed Affected Unsecured Claim.

The Secured Noteholders and Marret (on behalf of the Secured Noteholders and in its individual corporate capacity) hereby waive, and shall not receive, any distributions in respect of the Secured Noteholders Allowed Unsecured Claim and the Marret Unsecured Claim, respectively. All Affected Unsecured Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date.

- 20 -

**(3)** **WARN Act Plaintiffs Class**

If the Required Majorities of the WARN Act Plaintiffs Class vote to approve the Plan at the WARN Act Plaintiffs Meeting and the Plan is implemented in accordance with its terms, then:

(a) the Proof of Claim dated January 13, 2015 filed by Class Action Counsel in respect of the WARN Act Claims shall be deemed to be Allowed as an aggregate Distribution Claim in the amount set forth on such Proof of Claim, provided that the WARN Act Claims (including the associated attorneys' fees included therein) shall be deemed to be unsecured and to have no security or priority status, and the 307 individuals identified in such Proof of Claim shall be deemed as WARN Act Plaintiffs with Allowed WARN Act Claims in amounts to be determined by Class Action Counsel in accordance with the parameters of the WARN Act Class Action, with all such amounts totalling the aggregate amount set forth on such Proof of Claim;

(b) in accordance with the steps and sequence set forth in section 5.3, under the supervision of the Monitor, and in full and final satisfaction of all WARN Act Claims:

 (i) each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled on the Plan Implementation Date to the following:

  (A) its Individual WARN Act Plan Entitlement (which, for greater certainty, shall not be payable until the WARN Act Plan Entitlement Date); and

  (B) its WARN Act Plaintiff's Share of the WARN Act Cash Payment (which for greater certainty shall be payable to Class Action Counsel, for the benefit of the WARN Act Plaintiffs, on the Plan Implementation Date); and

 (ii) New Elk shall pay the Class Action Initial Expense Reimbursement to Class Action Counsel on the Plan Implementation Date.

All WARN Act Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date, provided that neither the foregoing nor the provisions of Article 7 hereof releases any defendants presently named in the WARN Act Class Action other that the Applicants.  Forthwith following the Plan Implementation Date, Class Action Counsel shall irrevocably terminate and discontinue the WARN Act Class Action against the Applicants and no Person shall take any steps or actions against the Applicants in furtherance of a WARN Act Claim.  Forthwith following the Plan Implementation Date, the Applicants shall provide Class Action Counsel with addresses and social security numbers of the individual WARN Act Plaintiffs to the extent that such information is available based on the Applicants' books and records for the purpose of enabling Class Action Counsel to make distributions to such individuals.

- 21 -

**(4)    Equity Claimants**

Equity Claimants shall not receive any distributions or other consideration under the Plan or otherwise recover anything in respect of their Equity Claims or Equity Interests and shall not be entitled to attend or vote on the Plan at the Meetings.  On the Plan Implementation Date, in accordance with the steps and sequences set out in section 5.3, all Equity Interests shall be cancelled and extinguished and all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, provided that, notwithstanding anything to the contrary herein: (i) the Existing New Elk Units shall not be cancelled or extinguished and shall remain outstanding and shall remain solely owned by Cline following completion of the steps and sequences set out in section 5.3; and (ii) the Existing North Central Units shall not be cancelled or extinguished and shall remain outstanding and shall remain solely owned by New Elk following completion of the steps and sequences set out in section 5.3.

### 3.5    Unaffected Claims

(a)    Unaffected Claims shall not be compromised, released, discharged, cancelled or barred by the Plan.

(b)    Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims, and they shall not be entitled to vote on the Plan at the Meetings in respect of their Unaffected Claims.

(c)    Notwithstanding anything to the contrary herein, Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Implementation Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, including any of the Applicants, any of the Cline Companies or any Released Party, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.  This section 3.5(c) may be relied upon and raised or pled by any of the Applicants, any of the Cline Companies or any Released Party in defence or estoppel of or to enjoin any claim, action or proceeding brought in contravention of this section.  Nothing in the Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insurer in respect of an Insurance Policy or any insured in respect of an Insured Claim.

(d)    Notwithstanding anything to the contrary herein, in the case of Unaffected Secured Claims, at the election of the Applicants:

(i)    the Applicants may satisfy any Unaffected Secured Claims by returning the applicable property of the Applicants that is secured as collateral for such Claims, in which case the Unaffected Secured Claim shall be deemed to be fully satisfied, provided that if the applicable Unaffected Secured Creditor asserts that there is a deficiency in the value of the applicable

- 22 -

collateral relative the value of the Unaffected Secured Claim, such Creditor shall be permitted to file such unsecured deficiency Claim as a Restructuring Period Claim prior to the Restructuring Period Claims Bar Date (as defined in the Claims Procedure Order) in accordance with the Claims Procedure Order, and such unsecured deficiency Claim shall be treated as an Affected Unsecured Claim for the purpose of this Plan, the Meetings Order and all related matters; and

(ii)    if the Applicants do not elect to satisfy an Unaffected Secured Claim in the manner described in section 3.5(d)(i), then such Unaffected Secured Claim shall continue unaffected as against the applicable Applicants following the Plan Implementation Date.

### 3.6    Disputed Distribution Claims

Any Affected Creditor with a Disputed Distribution Claim shall not be entitled to receive any distribution hereunder with respect to such Disputed Distribution Claim unless and until such Claim becomes an Allowed Affected Claim.  A Disputed Distribution Claim shall be resolved in the manner set out in the Claims Procedure Order.  Distributions pursuant to section 3.4 shall be made in respect of any Disputed Distribution Claim that is finally determined to be an Allowed Affected Claim in accordance with the Claims Procedure Order.

### 3.7    Director/Officer Claims

All Released Director/Officer Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Implementation Date.  Any Director/Officer Claim that is not a Released Director/Officer Claim will not be compromised, released, discharged, cancelled and barred.  For greater certainty, any Claim of a Director or Officer against the Applicants for indemnification or contribution in respect of any Director/Officer Claim that is not otherwise covered by the Directors' Charge shall be treated for all purposes under the Plan as an Affected Unsecured Claim.

### 3.8    Extinguishment of Claims

On the Plan Implementation Date, in accordance with the terms and in the sequence set forth in section 5.3 and in accordance with the provisions of the Sanction Order, the treatment of Affected Claims and all Released Claims, in each case as set forth herein, shall be final and binding on the Applicants, all Affected Creditors  and any Person having a Released Claim (and their respective heirs, executors, administrators, legal personal representatives, successors and assigns), and all Affected Claims and all Released Claims shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred, and the Applicants and the Released Parties shall thereupon have no further obligation whatsoever in respect of the Affected Claims or the Released Claims; *provided that* nothing herein releases the Applicants or any other Person from their obligations to make distributions in the manner and to the extent provided for in the Plan and *provided further* that such discharge and release of the Applicants shall be without prejudice to the right of a Creditor in respect of a Disputed Distribution Claim to prove such Disputed Distribution Claim in accordance with the Claims Procedure Order so that such Disputed

- 23 -

Distribution Claim may become an Allowed Claim entitled to receive consideration under section 3.4 hereof.

### 3.9  Guarantees and Similar Covenants

No Person who has a Claim under any guarantee, surety, indemnity or similar covenant in respect of any Claim that is compromised and released under the Plan or who has any right to claim over in respect of or to be subrogated to the rights of any Person in respect of a Claim that is compromised under the Plan shall be entitled to any greater rights than the Person whose Claim is compromised under the Plan.

### 3.10  Set-Off

The law of set-off applies to all Claims.

### ARTICLE 4
### PROVISIONS REGARDING DISTRIBUTIONS AND PAYMENTS

### 4.1  Distributions of New Cline Common Shares and New Secured Debt

(a)    Upon receipt of and in accordance with written instructions from the Monitor, the Indenture Trustee shall instruct CDS to, and CDS shall, block any further trading in the Secured Notes effective as of the close of business on the Business Day immediately prior to the Plan Implementation Date, all in accordance with the customary procedures of CDS.

(b)    The distribution mechanics with respect to the New Cline Common Shares and the Secured Noteholders' respective entitlements to the New Secured Debt in accordance with section 3.4(1) shall be agreed by the Applicants, Marret (on behalf of the Secured Noteholders) and the Monitor in writing, in consultation with the Indenture Trustee, if applicable, prior to the Plan Implementation Date. If it is deemed necessary by any of the Applicants, the Monitor or Marret (on behalf of the Secured Noteholders), any such party shall be entitled to seek an Order of the Court, in the Sanction Order or otherwise, providing advice and directions with respect to such distribution mechanics.

(c)    Except as may be otherwise agreed in writing by the Applicants and the Monitor, the Applicants and the Monitor shall have no liability or obligation in respect of deliveries of consideration issued under this Plan: (i) from Marret to any Secured Noteholder; (ii) from CDS, or its nominee, to CDS Participants, if applicable; (iii) from CDS Participants to beneficial holders of the Secured Notes, if applicable; or (iv) from the Indenture Trustee to beneficial holders of the Secured Notes, if applicable.

### 4.2  Distribution Mechanics with respect to the Unsecured Plan Entitlement

(a)    Each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim, other than the Secured Noteholders and the Convenience Creditors, shall become

- 24 -

entitled to its Individual Unsecured Plan Entitlement on the Plan Implementation Date without any further steps or actions by the Applicants, such Affected Unsecured Creditor or any other Person.

(b) From and after the Plan Implementation Date, and until all Unsecured Plan Entitlement Proceeds have been distributed in accordance with the Plan, Cline shall maintain a register of the Individual Unsecured Plan Entitlements as well as the address and notice information set forth on each applicable Affected Unsecured Creditor's Notice of Claim or Proof of Claim.   Any applicable Affected Unsecured Creditor whose address or notice information changes shall be solely responsible for notifying Cline of such change.   Cline shall also record on the register the aggregate amount of any applicable Disputed Distribution Claims.   Within ten (10) Business Days following the Plan Implementation Date, the Applicants shall notify each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim of such Affected Unsecured Creditor's Individual Unsecured Plan Entitlement as at the Plan Implementation Date.

(c) On the Unsecured Plan Entitlement Date, Cline shall calculate the amount of the Unsecured Plan Entitlement Proceeds to be paid to each applicable Affected Unsecured Creditor with an Allowed Unsecured Claim.   Cline shall also calculate the amount of the Unsecured Plan Entitlement Proceeds that are not to be distributed as a result of Disputed Distribution Claims that remain outstanding, if any.   Cline shall then distribute the applicable amount by way of cheque sent by prepaid ordinary mail to each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim (other than the Secured Noteholders and the Convenience Creditors who, for greater certainty, shall have no Individual Unsecured Plan Entitlement).   With respect to any portion of the Unsecured Plan Entitlement Proceeds that are reserved in respect of Disputed Distribution Claims, Cline shall segregate such amounts to and hold such amounts in the Disputed Distribution Claims Reserve.

### 4.3   Distribution Mechanics with respect to Convenience Claims

On the Plan Implementation Date, under the supervision of the Monitor, Cline shall pay each Convenience Creditor with an Allowed Convenience Claim the amount that is required to be paid to each such Creditor under this Plan by way of cheque sent by prepaid ordinary mail to the address set forth on such Convenience Creditor's Notice of Claim or Proof of Claim.   Under the supervision of the Monitor, Cline shall also calculate the aggregate amount of Convenience Claims that are Disputed Distribution Claims on the Plain Implementation Date and shall segregate such amounts and hold such amounts in the Disputed Distribution Claims Reserve.

### 4.4   Distribution Mechanics with respect to the WARN Act Plan Entitlement and the WARN Act Cash Payment

(a) Each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled to its Individual WARN Act Plan Entitlement on the Plan Implementation Date without any further steps or actions by the Applicants, such WARN Act Plaintiffs, Class Action Counsel or any other Person.

- 25 -

(b)    On the WARN Act Plan Entitlement Date, New Elk shall pay an amount equal to the WARN Act Plan Entitlement to Class Action Counsel for the benefit of the WARN Act Plaintiffs with Allowed WARN Act Claims.  Class Action Counsel shall distribute such amounts among the applicable WARN Act Plaintiffs.  New Elk shall also pay the Class Action Second Expense Reimbursement to Class Action Counsel on the WARN Act Plan Entitlement Date.  The WARN Act Plan Entitlement payment and the Class Action Second Expense Reimbursement shall be paid to Class Action Counsel in a single check or wire transfer of $120,000.

(c)    On the Plan Implementation Date, New Elk shall pay an amount equal to the WARN Act Cash Payment to Class Action Counsel for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims.  Class Action Counsel shall distribute all such amounts among the applicable WARN Act Plaintiffs with Allowed WARN Act Claims.  New Elk shall also pay the Class Action Initial Expense Reimbursement to Class Action Counsel on the Plan Implementation Date.  The WARN Act Cash Payment and the Class Action Initial Expense Reimbursement shall be paid to Class Action Counsel in a single check or wire transfer of $90,000.

(d)    The Applicants and the Monitor shall have no responsibility or liability whatsoever for determining the allocation of the WARN Act Plan Entitlement or the WARN Act Cash Payment among the WARN Act Plaintiffs or for ensuring payments from Class Action Counsel to the WARN Act Plaintiffs.

### 4.5    Modifications to Distribution Mechanics

Subject to the consent of the Monitor, the Applicants shall be entitled to make such additions and modifications to the process for making distributions pursuant to the Plan (including the process for delivering and/or registering the New Cline Common Shares and/or the Secured Noteholders' respective entitlements to the New Secured Debt) as the Applicants deem necessary or desirable in order to achieve the proper distribution and allocation of consideration to be distributed pursuant to the Plan, and such additions or modifications shall not require an amendment to the Plan or any further Order of the Court.

### 4.6    Cancellation of Certificates and Notes

Following completion of the steps in the sequence set forth in section 5.3, all debentures, notes (including the Secured Notes), certificates, agreements, invoices and other instruments evidencing Affected Claims, Secured Note Obligations or Equity Interests (other than the Existing New Elk Units owned by Cline and the North Central Shares owned by New Elk, which are unaffected by the Plan and which shall remain outstanding) will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and will be cancelled and will be null and void.  Notwithstanding the foregoing, if and to the extent the Indenture Trustee is required to transfer consideration issued pursuant to this Plan to the Secured Noteholders, then the Indentures shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the Indenture Trustee to make such distributions to the Secured Noteholders on the Initial Distribution Date and each subsequent Distribution Date (if applicable); and (ii) maintain all of the protections the Indenture Trustee enjoys pursuant to the

- 26 -

Indentures, including its lien rights with respect to any distributions under the Plan, until all distributions are made to the Secured Noteholders hereunder.  For greater certainty, any and all obligations of the Applicants and the Cline Companies (as guarantor, surety or otherwise) under and with respect to the Secured Notes and the Indentures, including the Secured Note Obligations, shall be extinguished on the Plan Implementation Date and shall not continue beyond the Plan Implementation Date.

### 4.7    Currency

Unless specifically provided for in the Plan or the Sanction Order, all monetary amounts referred to in the Plan shall be denominated in Canadian dollars and, for the purposes of distributions under the Plan, Claims shall be denominated in Canadian dollars and all payments and distributions provided for in the Plan shall be made in Canadian dollars.   Any Claims denominated in a foreign currency shall be converted to Canadian dollars at  the Bank of Canada noon exchange rate in effect at the Filing Date.

### 4.8    Interest

Interest shall not accrue or be paid on Affected Claims on or after the Filing Date, and no holder of an Affected Claim shall be entitled to interest accruing on or after the Filing Date.

### 4.9    Allocation of Distributions

All distributions made to Creditors pursuant to the Plan shall be allocated first towards the repayment of the principal amount in respect of such Creditor's Claim and second, if any, towards the repayment of all accrued but unpaid interest in respect of such Creditor's Claim.

### 4.10    Treatment of Undeliverable Distributions

If any Creditor's distribution under this Article 4 is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Applicant is notified by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor. All claims for Undeliverable Distributions must be made on or before the date that is six months following the final Distribution Date, after which date any entitlement with respect to such Undeliverable Distribution shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or provincial laws to the contrary, at which time any such Undeliverable Distributions shall be returned to Cline. Nothing contained in the Plan shall require the Applicant to attempt to locate any Person to whom a distribution is payable. No interest is payable in respect of an Undeliverable Distribution. Unless otherwise expressly agreed by the Monitor and the Applicants in writing, any distribution under the Plan on account of the Secured Notes shall be deemed made when delivered to Marret, CDS, the CDS Participants or the Indenture Trustee, as applicable, and any distribution under the Plan to the WARN Act Plaintiffs shall be deemed made when delivered to Class Action Counsel.  With respect to distributions to be made by Class Action Counsel to WARN Act Plaintiffs with Allowed WARN Act Claims: (i) Class Action Counsel shall not be responsible or liable for any undeliverable distributions to WARN Act Plaintiffs who cannot be located based on deficiencies in the address information to be provided by the Applicants pursuant to section 3.4(3) hereof; and (ii) if any

- 27 -

distributions to the WARN Act Plaintiffs are returned as undeliverable or the applicable WARN Act Plaintiff cannot reasonably be located, and no claim has been made for such distribution by such WARN Act Plaintiff within six months following the WARN Act Plan Entitlement Date, then Class Action Counsel shall be permitted to donate such amounts to a cy-près recipient in accordance with customary class action practice in the United States.

### 4.11   Withholding Rights

The Applicants, the Monitor and, to the extent CDS or the Indenture Trustee are required to transfer consideration to Secured Noteholders pursuant to this Plan, then CDS and the Indenture Trustee, shall be entitled to deduct and withhold from any consideration payable to any Person such amounts as the Applicants, the Monitor, CDS or the Indenture Trustee, as applicable, are required to deduct and withhold with respect to such payment under the Canadian Tax Act, or other Applicable Laws, or entitled to withhold under section 116 of the Canadian Tax Act or corresponding provision of provincial or territorial law. To the extent that amounts are so withheld or deducted, such withheld or deducted amounts shall be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made, provided that such amounts are actually remitted to the appropriate Taxing Authority.  The Applicants, the Monitor CDS and/or the Indenture Trustee, as applicable, are hereby authorized to sell or otherwise dispose of such portion of any such consideration in their posssession as is necessary to provide sufficient funds to the Applicants, the Monitor, CDS and/or the Indenture Trustee, as applicable, to enable them to comply with such deduction or withholding requirement or entitlement, and the Applicants, the Monitor, CDS and/or the Indenture Trustee, as applicable, shall notify the Person thereof and remit to such Person any unapplied balance of the net proceeds of such sale.

### 4.12   Fractional Interests

No fractional interests of New Cline Common Shares ("**Fractional Interests**") will be issued under the Plan. Recipients of New Cline Common Shares will have their entitlements adjusted downwards to the nearest whole number of New Cline Common Shares to eliminate any such Fractional Interests and no compensation will be given for any Fractional Interests.

### 4.13   Calculations

All amounts of consideration to be received hereunder will be calculated to the nearest cent ($0.01).  All calculations and determination made by the Monitor and/or the Applicants and agreed to by the Monitor for the purposes of and in accordance with the Plan, including, without limitation, the allocation of consideration, shall be conclusive, final and binding upon the Affected Creditors and the Applicants.

### ARTICLE 5
### RECAPITALIZATION

### 5.1   Corporate Actions

The adoption, execution, delivery, implementation and consummation of all matters contemplated under the Plan involving corporate actions of the Applicants will occur and be

- 28 -

effective as of the Plan Implementation Date, and shall be deemed to be authorized and approved under the Plan and by the Court, where applicable, as part of the Sanction Order, in all respects and for all purposes without any requirement of further action by shareholders, directors or officers of the Applicants. All necessary approvals to take actions shall be deemed to have been obtained from the directors, officers or the shareholders of the Applicants, as applicable, including the deemed passing by any class of shareholders of any resolution or special resolution and any shareholders' agreement or agreement between a shareholder and another Person limiting in any way the right to vote shares held by such shareholder or shareholders with respect to any of the steps contemplated by the Plan shall be deemed to have no force or effect.

### 5.2    Issuance of Plan Consideration

**(1)    New Cline Common Shares**

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, Cline shall issue the Agreed Number of New Cline Common Shares, and such New Cline Common Shares shall be allocated and distributed in the manner set forth in the Plan.

**(2)    New Secured Debt**

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, (i) the New Credit Agreement shall become effective in accordance with its terms and the Applicants shall become bound to satisfy their obligations thereunder and (ii) the entitlements to the New Secured Debt shall be allocated among the Secured Noteholders in the manner and in the amounts set forth in the Plan.

**(3)    Unsecured Plan Entitlement**

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, the Unsecured Plan Entitlements shall become effective and the Individual Unsecured Plan Entitlements shall be allocated in the manner and in the amounts set forth in the Plan.

**(4)    Convenience Claim Payments**

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor, Cline shall pay the applicable amounts to the Convenience Creditors with Allowed Convenience Claims and reserve the applicable amounts into the Disputed Claims Reserve in respect of Convenience Creditors with Disputed Distribution Claims, in each case in the manner and in the amounts set forth in the Plan.

**(5)    WARN Act Plan Entitlement and WARN Act Cash Payment**

On the Plan Implementation Date, in the sequence set forth in section 5.3 and under the supervision of the Monitor: (i) the WARN Act Plan Entitlement shall become effective and the Individual WARN Act Plan Entitlements shall be allocated in the manner and in the amounts set forth in the Plan; and (ii) New Elk shall make the WARN Act Cash Payment to Class Action Counsel for the benefit of WARN Act Plaintiffs with Allowed WARN Act Claims.

- 29 -

### 5.3   Sequence of Plan Implementation Date Transactions

The following steps and compromises and releases to be effected in the implementation of the Plan shall occur, and be deemed to have occurred in the following order in five minute increments (unless otherwise noted), without any further act or formality on the Plan Implementation Date beginning at the Effective Time:

(a)   all Existing Options shall be cancelled and terminated without any liability, payment or other compensation in respect thereof;

(b)   the Stock Option Plans shall be terminated;

(c)   Cline shall issue to each Secured Noteholder its Secured Noteholder's Share of the New Cline Common Shares and the Applicants shall become bound to satisfy their obligations in respect of the New Secured Debt, all in accordance with section 3.4(1), in full consideration for the irrevocable, final and full compromise and satisfaction of the Secured Noteholders Allowed Claim and all Secured Noteholder Obligations;

(d)   simultaneously with step 5.3(c), and in accordance with sections 3.4(2) and 5.2(4), Cline shall pay to each Convenience Creditor with an Allowed Affected Unsecured Claim the amount in cash that it is entitled to receive pursuant to section 3.4(2)(b) in full consideration for the irrevocable, final and full compromise and satisfaction of such Convenience Creditor's Affected Unsecured Claim;

(e)   simultaneously with step 5.3(c), Cline shall reserve the applicable amount of cash in respect of Convenience Claims that are Disputed Distribution Claims and shall hold such cash in the Disputed Distribution Claims Reserve;

(f)   simultaneously with step 5.3(c), and in accordance with sections 3.4(2) and 5.2(3), each Affected Unsecured Creditor with an Allowed Affected Unsecured Claim that is not a Convenience Creditor or a Secured Noteholder shall become entitled to its Individual Unsecured Plan Entitlement (as it may be adjusted based on the final determination of Disputed Distribution Claims in the manner set forth herein) in full consideration for the irrevocable, final and full compromise and satisfaction of such Affected Unsecured Creditor's Affected Unsecured Claim;

(g)   simultaneously with step 5.3(c), in accordance with sections 3.4(3) and 5.2(5), and in full consideration for the irrevocable, final and full compromise and satisfaction of such WARN Act Claim: (i) each WARN Act Plaintiff with an Allowed WARN Act Claim shall become entitled to its Individual WARN Act Plan Entitlement and (ii) New Elk shall pay the WARN Act Cash Payment to Class Action Counsel for the benefit of the WARN Act Plaintiffs with Allowed WARN Act Claims, and simultaneously therewith, New Elk shall pay the Class Action Initial Expense Reimbursement;

- 30 -

(h)     the Articles shall be altered to, among other things, (i) consolidate the issued and outstanding Cline Common Shares (including, for the avoidance of doubt, Cline Common Shares that are Existing Cline Shares and New Cline Common Shares issued pursuant to Section 5.3(c)) on the basis of the Consolidation Ratio; and (ii) provide for such additional changes to the rights and conditions attached to the Cline Common Shares as may be agreed to by the Applicants, the Monitor and Marret (on behalf of the Secured Noteholders);

(i)      any fractional Cline Common Shares held by any holder of Cline Common Shares immediately following the consolidation of the Cline Common Shares referred to in section 5.3(h) shall be cancelled without any liability, payment or other compensation in respect thereof, and the Articles shall be altered as necessary to achieve such cancellation;

(j)      all Equity Interests (for greater certainty, not including any Cline Common Shares that remain issued and outstanding immediately following the cancellation of fractional interests in section 5.3(i)) shall be cancelled and extinguished without any liability, payment or other compensation in respect thereof and all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without any liability, payment or other compensation in respect thereof, provided that, notwithstanding anything to the contrary herein, the Existing New Elk Units shall not be cancelled or extinguished and shall remain outstanding and solely owned by Cline and the Existing North Central Shares shall not be cancelled or extinguished and shall remain outstanding and solely owned by New Elk;

(k)      Cline shall pay in cash all fees and expenses incurred by the Indenture Trustee, including its reasonable legal fees, in connection with the performance of its duties under the Indentures and the Plan;

(l)      subject only to section 4.6 hereof, all of the Secured Notes, the Indentures and all Secured Note Obligations shall be deemed to be fully, finally, irrevocably and forever compromised, released, discharged cancelled and barred;

(m)     all Affected Claims remaining after the step referred to in section 5.3(l) shall be fully, finally, irrevocably and forever compromised, released, discharged cancelled and barred without any liability, payment or other compensation in respect thereof; and

(n)      the releases set forth in Article 7 shall become effective.

The steps described in sub-sections (h) and (i) of this section 5.3 will be implemented pursuant to section 6(2) of the CCAA and shall constitute a valid alteration of the Articles pursuant to a court order under the BCBCA.

- 31 -

### 5.4    Issuances Free and Clear

Any issuance of any securities or other consideration pursuant to the Plan will be free and clear of any Encumbrances.

### 5.5    Stated Capital

The aggregate stated capital for purposes of the BCBCA for the New Cline Common Shares issued pursuant to the Plan will be as determined by the new board of directors of Cline appointed pursuant to the Sanction Order.

## ARTICLE 6
## PROCEDURE FOR DISTRIBUTIONS REGARDING DISPUTED DISTRIBUTION CLAIMS

### 6.1    No Distribution Pending Allowance

An Affected Creditor holding a Disputed Distribution Claim will not be entitled to receive a distribution under the Plan in respect of such Disputed Distribution Claim or any portion thereof unless and until, and then only to the extent that, such Disputed Distribution Claim becomes an Allowed Claim.

### 6.2    Disputed Distribution Claims

(a)    On the Plan Implementation Date, under the supervision of the Monitor, an amount equal to each Disputed Distribution Claim of the Convenience Creditors shall be reserved and held by Cline, in the Disputed Distribution Claims Reserve, for the benefit of the Convenience Creditors with Allowed Convenience Claims, pending the final determination of the Disputed Distribution Claim in accordance with the Claims Procedure Order and the Plan.

(b)    On the Unsecured Plan Entitlement Date, distributions of Unsecured Plan Entitlement Proceeds in relation to a Disputed Distribution Claim of any Affected Unsecured Creditor (other than Convenience Creditors and Secured Noteholders) in existence at the Unsecured Plan Entitlement Date will be reserved and held by Cline, in the Disputed Distribution Claims Reserve, for the benefit of the Affected Unsecured Creditors (other than Convenience Creditors and Secured Noteholders) with Allowed Affected Unsecured Claims until the final determination of the Disputed Distribution Claim in accordance with the Claims Procedure Order and the Plan.

(c)    To the extent that any Disputed Distribution Claim becomes an Allowed Affected Unsecured Claim in accordance with the Claims Procedure and it is a Convenience Claim, Cline shall distribute (on the next Distribution Date), under the supervision of the Monitor, the applicable amount of such Allowed Claim to the holder of such Allowed Claim in accordance with section 3.4(2)(b) hereof from the Disputed Distribution Claims Reserve.

- 32 -

(d)     To the extent that any Disputed Distribution Claim becomes an Allowed Affected Unsecured Claim in accordance with the Claims Procedure Order and it is not a Convenience Claim or the Claim of a Secured Noteholder, the applicable Affected Unsecured Creditor shall become entitled to its applicable Individual Unsecured Plan Entitlement, and if this occurs after the Unsecured Plan Entitlement Date, Cline shall distribute (on the next Distribution Date) to the holder of such Allowed Claim an amount from the Disputed Distribution Claims Reserve equal to the applicable Affected Unsecured Creditor's Individual Unsecured Plan Entitlement.

(e)     At any applicable time, Cline shall be permitted, with the consent of the Monitor, to release and retain for itself any amounts in the Disputed Distribution Claims Reserve that were reserved to pay Convenience Claims that have been definitively not been Allowed in accordance with the Claims Procedure Order.

(f)     Prior to any Distribution Date and under the supervision of the Monitor, Cline shall re-calculate the Individual Unsecured Plan Entitlements of the Affected Unsecured Creditors (other than Convenience Creditors and Secured Noteholders), in each case to reflect any applicable Disputed Distribution Claims that were definitively not Allowed, and such Creditors shall become entitled to their re-calculated Individual Unsecured Plan Entitlements. If this occurs after the Unsecured Plan Entitlement Date, as applicable, Cline shall (on the next Distribution Date) distribute to such Creditors the applicable amounts from the Disputed Distribution Claims Reserve as are necessary to give effect to their re-calculated Individual Unsecured Plan Entitlements.

(g)     On the date that all Disputed Distribution Claims have been finally resolved in accordance with the Claims Procedure Order, Cline shall, with the consent of the Monitor, release all remaining cash, if any, from the Disputed Distribution Claims Reserve and shall be entitled to retain such cash.

**ARTICLE 7
RELEASES**

### 7.1    Plan Releases

On the Plan Implementation Date, in accordance with the sequence set forth in section 5.3, (i) the Applicants, the Applicants' employees and contractors, the Directors and Officers and (ii) the Monitor, the Monitor's counsel, the Indenture Trustee, Marret (on behalf of the Secured Noteholders and in its individual corporate capacity), the Secured Noteholders, the Company Advisors, the Noteholder Advisors and each and every present and former shareholder, affiliate, subsidiary, director, officer, member, partner, employee, auditor, financial advisor, legal counsel and agent of any of the foregoing Persons (each of the Persons named in (i) or (ii) of this section 7.1, in their capacity as such, being herein referred to individually as a "**Released Party**" and all referred to collectively as "**Released Parties**") shall be released and discharged from any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of

- 33 -

any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity which any Creditor or other Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the later of the Plan Implementation Date and the date on which actions are taken to implement the Plan, that constitute or are in any way relating to, arising out of or in connection with any Claims, any Director/Officer Claims and any indemnification obligations with respect thereto, the Secured Notes and related guarantees, the Indentures, the Secured Note Obligations, the Equity Interests, the Stock Option Plans, the New Cline Common Shares, the New Secured Debt, the New Credit Agreement, the Unsecured Plan Entitlement, the WARN Act Plan Entitlement, any payments to Convenience Creditors, the business and affairs of the Applicants whenever or however conducted, the administration and/or management of the Applicants, the Recapitalization, the Plan, the CCAA Proceeding, the Chapter 15 Proceeding or any document, instrument, matter or transaction involving any of the Applicants or the Cline Companies taking place in connection with the Recapitalization or the Plan (referred to collectively as the "**Released Claims**"), and all Released Claims shall be deemed to be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law; provided that nothing herein will waive, discharge, release, cancel or bar (x) the right to enforce the Applicants' obligations under the Plan, (y) the Applicants from or in respect of any Unaffected Claim or any Claim that is not permitted to be released pursuant to section 19(2) of the CCAA, or (z) any Director or Officer from any Director/Officer Claim that is not permitted to be released pursuant to section 5.1(2) of the CCAA.

### 7.2     Limitation on Insured Claims

Notwithstanding anything to the contrary in section 7.1, Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Implementation Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with an Insured Claim shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries in respect thereof from the Applicants, any of the Cline Companies, any Director or Officer or any other Released Party, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

### 7.3     Injunctions

All Persons are permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, with respect to any and all Released Claims, from (i) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any of the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against any of the Released Parties or their property; (iii) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or their

- 34 -

property; or (iv) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan.  For greater certainty, the provisions of this section 7.3 shall apply to Insured Claims in the same manner as Released Claims, except to the extent that the rights of such Persons to enforce such Insured Claims against an insurer in respect of an Insurance Policy are expressly preserved pursuant to section 3.5(c) and/or section 7.2, and provided further that, notwithstanding the restrictions on making a claim that are set forth in sections 3.5(c) and 7.2, any claimant in respect of an Insured Claim that was duly filed with the Monitor by the Claims Bar Date shall be permitted to file a statement of claim in respect thereof to the extent necessary solely for the purpose of preserving such claimant's ability to pursue such Insured Claim against an insurer in respect of an Insurance Policy in the manner authorized pursuant to section 3.5(c) and/or section 7.2.

### 7.4     Applicants' Release of Class Action Counsel

On the Plan Implementation Date, any and all claims of the Applicants against Class Action Counsel, Lankenau & Miller LLP and/or Himelfarb Proszanski and any other counsel of record for the WARN Act Plaintiffs in the WARN Act Class Action, in their capacity as counsel to the WARN Act Plaintiffs, shall be released, discharged, cancelled and barred automatically and without any further act or formality, provided that nothing herein shall waive, discharge, release, cancel or bar the obligations of Class Action Counsel to make any distributions to WARN Act Plaintiffs with Allowed WARN Act Claims that they are required to make pursuant to the Plan.

### ARTICLE 8
### COURT SANCTION

### 8.1     Application for Sanction Order

If the Required Majorities of the Affected Creditors in each Voting Class approve the Plan, the Applicants shall apply for the Sanction Order on or before the date set for the hearing of the Sanction Order or such later date as the Court may set.

### 8.2     Sanction Order

The Applicants shall seek a Sanction Order that, among other things:

(a)     declares that (i) the Plan has been approved by the Required Majorities of Affected Creditors in each Voting Class in conformity with the CCAA; (ii) the activities of the Applicants have been in reasonable compliance with the provisions of the CCAA and the Orders of the Court made in this CCAA Proceeding in all respects; (iii) the Court is satisfied that the Applicants have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(b)     declares that as of the Effective Time, the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved pursuant to section 6 of the CCAA, binding and effective as

- 35 -

herein set out upon and with respect to the Applicants, all Affected Creditors, the Directors and Officers, any Person with a Director/Officer Claim, the Released Parties and all other Persons named or referred to in or subject to Plan;

(c)   declares that the steps to be taken and the compromises and releases to be effective on the Plan Implementation Date are deemed to occur and be effected in the sequential order contemplated by section 5.3 on the Plan Implementation Date, beginning at the Effective Time;

(d)   declare that the releases effected by this Plan shall be approved and declared to be binding and effective as of the Plan Implementation Date upon all Affected Creditors and all other Persons affected by this Plan and shall enure to the benefit of such Persons;

(e)   declares that, subject to performance by the Applicants of their obligations under the Plan and except as provided in the Plan, all obligations, agreements or leases to which any of the Applicants or Cline Companies is a party on the Plan Implementation Date shall be and remain in full force and effect, unamended, as at the Plan Implementation Date and no party to any such obligation or agreement shall on or following the Plan Implementation Date, accelerate, terminate, refuse to renew, rescind, refuse to perform or otherwise disclaim or resiliate its obligations thereunder, or enforce or exercise (or purport to enforce or exercise) any right or remedy under or in respect of any such obligation or agreement, by reason:

   (i)    of any event which occurred prior to, and not continuing after, the Plan Implementation Date, or which is or continues to be suspended or waived under the Plan, which would have entitled such party to enforce those rights or remedies;

   (ii)   that the Applicants have sought or obtained relief or have taken steps as part of the Plan or under the CCAA or Chapter 15;

   (iii)  of any default or event of default arising as a result of the financial condition or insolvency of the Applicants;

   (iv)   of the effect upon the Applicants of the completion of any of the transactions contemplated by the Plan; or

   (v)    of any compromises, settlements, restructurings, recapitalizations or reorganizations effected pursuant to the Plan,

and declares that no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any non-competition agreement or obligation, provided that such agreement shall terminate or expire in accordance with the terms thereof or as otherwise agreed by the Applicants and the applicable Persons;

- 36 -

(f)     authorizes the Monitor to perform its functions and fulfil its obligations under the Plan to facilitate the implementation of the Plan;

(g)     subject to payment of any amounts secured thereby, declares that each of the Charges shall be terminated, discharged and released upon a filing of the Monitor of a certificate confirming the termination of the CCAA Proceedings;

(h)     provides advice and directions with respect to the distribution mechanics in respect of the New Cline Common Shares and the Secured Noteholders' respective entitlements to the New Secured Debt, as both are referred to in section 4.1(b);

(i)     declares that the Applicants and the Monitor may apply to the Court for advice and direction in respect of any matters arising from or under the Plan; and

(j)     declares the Persons to be appointed to the boards of directors of the Applicants on the Plan Implementation Date shall be the Persons named on a certificate to be filed with the Court by the Applicants prior to the Plan Implementation Date, provided that such certificate and the Persons listed thereon shall be subject to the prior consent of Marret (on behalf of the Secured Noteholders).

## ARTICLE 9
## CONDITIONS PRECEDENT AND IMPLEMENTATION

### 9.1     Conditions Precedent to Implementation of the Plan

The implementation of the Plan shall be conditional upon satisfaction of the following conditions prior to or at the Effective Time, each of which is for the benefit of the Applicants and may be waived only by the Applicants, provided that the conditions in paragraphs (a), (b) and (c) of this section 9.1 shall also be for the benefit of Marret (on behalf of the Secured Noteholders) and may be waived only by the mutual agreement of both the Applicants and Marret:

(a)     all definitive agreements in respect of the Recapitalization and the new (or amended) Articles, by-laws and other constating documents, and all definitive legal documentation in connection with all of the foregoing shall be in a form satisfactory to the Applicants and Marret (on behalf of the Secured Noteholders);

(b)     the New Credit Agreement governing the New Secured Debt, together with all guarantees and security agreements contemplated thereunder, shall have been entered into and become effective, subject only to the implementation of the Plan, and all required filings related to the security as contemplated in the security agreements shall have been made;

(c)     the terms of the New Cline Common Shares and the New Credit Agreement shall be satisfactory to the Applicants and Marret (on behalf of the Secured Noteholders);

(d)     there shall not be in effect any preliminary or final decision, order or decree by a Governmental Entity, no application shall have been made to any Governmental

- 37 -

Entity, and no action or investigation shall have been announced, threatened or commenced by any Governmental Entity, in consequence of or in connection with the Recapitalization or the Plan that restrains, impedes or prohibits (or if granted could reasonably be expected to restrain, impede or inhibit), the Recapitalization or the Plan or any part thereof or requires or purports to require a variation of the Recapitalization or the Plan;

(e)     the Plan shall have been approved by the Required Majorities of each Voting Class;

(f)     all orders made and judgments rendered by any competent court of law, and all rulings and decrees of any competent regulatory body, agent or official in relation to the CCAA Proceeding, the Chapter 15 Proceeding, the Recapitalization or the Plan shall be satisfactory to the Applicants, including all court orders made in relation to the Recapitalization, and without limiting the generality of the foregoing:

   (i)     the Sanction Order shall have been made on terms acceptable to the Applicants, and it shall have become a Final Order;

   (ii)    the Sanction Order shall have been recognized and deemed binding and enforceable in the United States pursuant to an Order of the US Court in the Chapter 15 Proceeding on terms acceptable to the Applicants, and such Order shall have become a Final Order; and

   (iii)   any other Order deemed necessary by the Applicants for the purpose of implementing the Recapitalization shall have been made on terms acceptable to the Applicants, and any such Order shall have become a Final Order;

(g)     all material agreements, consents and other documents relating to the Recapitalization and the Plan shall be in form and in content satisfactory to the Applicants;

(h)     any and all court-imposed charges on any assets, property or undertaking of the Applicants shall have been discharged as at the Effective Time on terms acceptable to the Applicants, acting reasonably;

(i)     all Material filings under Applicable Laws shall have been made and any Material regulatory consents or approvals that are required in connection with the Recapitalization shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated;

(j)     all securities of the Applicants, when issued and delivered, shall be duly authorized, validly issued and fully paid and non-assessable and the issuance thereof shall be exempt from all prospectus and registration requirements of Applicable Laws;

- 38 -

(k)     all necessary filings in respect of the alteration of the Articles shall have been made on terms providing that they will become effective in accordance with and at the times of section 5.3(h) and 5.3(i); and

(l)     all fees and expenses owing to the Company Advisors and the Noteholder Advisors as of the Plan Implementation Date shall have been paid, and the Applicants shall be satisfied that adequate provision has been made for any fees and expenses due or accruing due to the Company Advisors and the Noteholder Advisors from and after the Plan Implementation Date.

### 9.2     Monitor's Certificate

Upon delivery of written notice from the Company Advisors (on behalf of the Applicants) of the satisfaction or waiver of the conditions set out in section 9.1, the Monitor shall forthwith deliver to the Company Advisors a certificate stating that the Plan Implementation Date has occurred and that the Plan is effective in accordance with its terms and the terms of the Sanction Order. As soon as practicable following the Plan Implementation Date, the Monitor shall file such certificate with the Court and with the US Court.

## ARTICLE 10
## GENERAL

### 10.1     Binding Effect

The Plan will become effective on the Plan Implementation Date.  On the Plan Implementation Date:

(a)     the treatment of Affected Claims and Released Claims under the Plan shall be final and binding for all purposes and shall be binding upon and enure to the benefit of the Applicants, all Affected Creditors, any Person having a Released Claim and all other Persons directly or indirectly named or referred to in or subject to Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns;

(b)     all Affected Claims shall be forever discharged and released;

(c)     all Released Claims shall be forever discharged and released;

(d)     each Affected Creditor, each Person holding a Released Claim and each of the Existing Shareholders shall be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety; and

(e)     each Affected Creditor and each Person holding a Released Claim shall be deemed to have executed and delivered to the Applicants and to the Released Parties, as applicable, all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

- 39 -

## 10.2    Waiver of Defaults

From and after the Plan Implementation Date, all Persons shall be deemed to have waived any and all defaults of the Applicants then existing or previously committed by any of the Applicants, or caused by any of the Applicants, by any of the provisions in the Plan or steps or transactions contemplated in the Plan or the Recapitalization, or any non-compliance with any covenant, warranty, representation, term, provision, condition or obligation, expressed or implied, in any contract, instrument, credit document, indenture, note, lease, guarantee, agreement for sale or other agreement, written or oral, and any and all amendments or supplements thereto, existing between such Person and any of the Applicants, and any and all notices of default and demands for payment or any step or proceeding taken or commenced in connection therewith shall be deemed to have been rescinded and of no further force or effect, provided that nothing shall be deemed to excuse the Applicants from performing their obligations under the Plan or be a waiver of defaults by any of the Applicants under the Plan and the related documents.

## 10.3    Deeming Provisions

In the Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

## 10.4    Non-Consummation

The Applicants reserve the right to revoke or withdraw the Plan at any time prior to the Plan Implementation Date. If the Applicants revoke or withdraw the Plan, or if the Sanction Order is not issued or if the Plan Implementation Date does not occur, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against any of the Applicants or any other Person; (ii) prejudice in any manner the rights of the Applicants or any other Person in any further proceedings involving any of the Applicants; or (iii) constitute an admission of any sort by any of the Applicants or any other Person.

## 10.5    Modification of the Plan

(a)    The Applicants reserve the right, at any time and from time to time, to amend, restate, modify and/or supplement the Plan, provided that any such amendment, restatement, modification or supplement must be contained in a written document and (i) if made prior to or at the Meetings, communicated to the Affected Creditors prior to or at the Meetings; and (ii) if made following the Meetings, approved by the Court following notice to the Affected Creditors.

(b)    Notwithstanding section 10.5(a), any amendment, restatement, modification or supplement may be made by the Applicants with the consent of the Monitor and Marret (on behalf of the Secured Noteholders), without further Court Order or approval, provided that it concerns a matter which, in the opinion of the Applicants, acting reasonably, is of an administrative nature  required to better give effect to the implementation of the Plan and the Sanction Order or to cure

- 40 -

any errors, omissions or ambiguities and is not materially adverse to the financial or economic interests of the Affected Creditors.

(c)    Any amended, restated, modified or supplementary plan or plans of compromise or arrangement filed with the Court and, if required by this section, approved by the Court, shall, for all purposes, be and be deemed to constitute the Plan.

(d)    Notwithstanding anything to the contrary herein or in the Plan, if the requisite quorum is not present at the WARN Act Plaintiffs Meeting or if it is determined in accordance with the Claims Procedure Order that there are no Voting Claims in the WARN Act Plaintiffs Class, the Applicants shall be entitled, but not required, to amend the Plan without further Order of the Court to combine the WARN Act Plaintiffs Class with the Affected Unsecured Creditors Class on such terms as may be set forth in such amended Plan (including on the basis that the WARN Act Plan Entitlement shall not be payable under the Plan), in which case the Applicants shall have no further obligation to hold the WARN Act Plaintiffs Meeting or otherwise seek a vote of the WARN Act Plaintiffs Class with respect to the resolution to approve the Plan or any other matter.

(e)    Without limiting the generality of anything in this section 10.5, if (i) the Plan is not approved by the Required Majorities of the Affected Unsecured Creditors Class, or (ii) the Applicants determine, in their discretion, that the Plan may not be approved by the Required Majorities of the Affected Unsecured Creditors Class, then the Applicants are permitted, without any further Order, to file an amended and restated Plan (the "**Alternate Plan**") with the attributes described on Schedule B to the Plan and to proceed with a meeting of the Secured Noteholders Class for the purpose of considering and voting on the resolution to approve the Alternate Plan, in which case the Applicants and the Monitor will have no obligation whatsoever to proceed with the Unsecured Creditors Meeting or the WARN Act Plaintiff's Meeting.

(f)    Notwithstanding the references herein to the New Credit Agreement and the New Secured Debt Agent, the Applicants and Marret, with the consent of the Monitor, shall be entitled to modify the form and structure of the New Secured Debt and the manner in which the New Secured Debt is held by the Secured Noteholders to allow such debt to be issued as secured notes or in such other form as may be agreed by the Applicants and Marret with the consent of the Monitor, provided that such modifications do not affect the material economic attributes of the New Secured Debt.  In the event of the foregoing, no formal amendment to the Plan (or the Alternate Plan, as applicable) shall be required and the steps and provisions of this Plan (and any Alternate Plan) pertaining to the New Secured Debt shall be read so as to give effect to such modified form and structure of the New Secured Debt.

### 10.6    Marret and the Secured Noteholders

For the purposes of the Plan, so long as Marret exercises sole investment discretion and control over the all of the Secured Noteholders, then the Applicants, the Company Advisors, the

- 41 -

Monitor, the Indenture Trustee, CDS and all other interested parties with respect to the Plan shall be entitled to rely on confirmation from Marret or the Noteholder Advisors that the Secured Noteholders have agreed to, waived, consented to or approved a particular matter, even if such confirmation would otherwise require the action or agreement of the Indenture Trustee.

### 10.7 Paramountcy

From and after the Effective Time on the Plan Implementation Date, any conflict between:

(a)     the Plan or any Order in the CCAA Proceeding or the Chapter 15 Proceeding; and

(b)     the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, mortgage, security agreement, indenture, trust indenture, note, loan agreement, commitment letter, agreement for sale, lease or other agreement, written or oral and any and all amendments or supplements thereto existing between one or more of the Affected Creditors and the Applicants as at the Plan Implementation Date or the notice of articles, articles or bylaws of the Applicants at the Plan Implementation Date;

will be deemed to be governed by the terms, conditions and provisions of the Plan and the applicable Order, which shall take precedence and priority , provided that any settlement agreement executed by the Applicants and any Person asserting a Claim or a Director/Officer Claim that was entered into from and after the Filing Date shall be read and interpreted in a manner that assumes such settlement agreement is intended to operate congruously with, and not in conflict with, the Plan.

### 10.8    Severability of Plan Provisions

If, prior to the Sanction Date, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, the Court, at the request of the Applicants and with the consent of the Monitor, shall have the power to either (a) sever such term or provision from the balance of the Plan and provide the Applicants with the option to proceed with the implementation of the balance of the Plan, (b) alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; or (c) withdraw the Plan. Provided that the Applicants proceed with the implementation of the Plan, then notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 10.9    Responsibilities of the Monitor

FTI Consulting Canada Inc. is acting in its capacity as Monitor in the CCAA Proceeding and as foreign representative in the Chapter 15 Proceeding with respect to the Applicants, the CCAA Proceedings and this Plan and not in its personal or corporate capacity, and will not be responsible or liable for any obligations of the Applicants under the Plan or otherwise.

- 42 -

### 10.10   Different Capacities

Persons who are affected by the Plan may be affected in more than one capacity. Unless expressly provided to the contrary herein, a Person will be entitled to participate hereunder in each such capacity. Any action taken by a Person in one capacity will not affect such Person in any other capacity, unless expressly agreed by the Applicants and the Person in writing or unless its Claims overlap or are otherwise duplicative.

### 10.11   Notices

Any notice or other communication to be delivered hereunder must be in writing and reference the Plan and may, subject as hereinafter provided, be made or given by personal delivery, ordinary mail or by facsimile or email addressed to the respective parties as follows:

If to the Applicants:

c/o Cline Mining Corporation
161 Bay Street
26th Floor
Toronto, Ontario, Canada
M5J 2S1

Attention:      Matthew Goldfarb
Fax:              (416) 572-2094
Email:           mgoldfarb@clinemining.com

with a copy to:

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Attention:      Robert Chadwick /  Logan Willis
Fax:              (416) 979-1234
Email:           rchadwick@goodmans.ca / lwillis@goodmans.ca

If to Marret or the Secured Noteholders:

Marret Asset Management Inc.
200 King Street West, Suite 1902
Toronto, Ontario M5H 3T4

Attention:  Dorothea Mell
Fax:              (647) 439-6471
Email:           dmell@marret.com

with a copy to:

- 43 -

Davies Ward Phillips & Vineberg LLP
155 Wellington Street West
Toronto, Ontario M5V 3J7

Attention:     Jay A. Swartz
Fax:          (416) 863-5520
Email:        jswartz@dwpv.com

If to an Affected Creditor (other than Marret or the Secured Noteholders), to the mailing address, facsimile address or email address provided on such Affected Creditor's Notice of Claim or Proof of Claim;

If to the Monitor:

FTI Consulting Canada Inc.

TD Waterhouse Tower
79 Wellington Street West
Suite 2010, P.O. Box 104
Toronto, Ontario M5K 1G8

Attention:     Pamela Luthra
Fax:          (416) 649-8101
Email         cline@fticonsulting.com

with a copy to:

Osler, Hoskin & Harcourt LLP
100 King Street West,
Toronto, Ontario M5X 1B8

Attention:     Marc Wasserman / Michael De Lellis
Fax:          416.862.6666
Email:        mwasserman@osler.com / mdelellis@osler.com,

or to such other address as any party may from time to time notify the others in accordance with this section. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 5:00 p.m. (Toronto time) on such day; otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

### 10.12   Further Assurances

Each of the Persons directly or indirectly named or referred to in or subject to Plan will execute and deliver all such documents and instruments and do all such acts and things as may be

- 44 -

necessary or desirable to carry out the full intent and meaning of the Plan and to give effect to the transactions contemplated herein.

**DATED** as of the 20th day of January, 2015.

**SCHEDULE A**

**SUMMARY OF TERMS OF NEW SECURED DEBT**

- $55,000,000 aggregate principal amount.
- Cline is the borrower and New Elk and North Central are the guarantors of the New Secured Debt.
- 7-year term.
- Interest equal to the aggregate of:
  - (i).   base interest at a rate of 0.01% per annum payable annually; and
  - (ii).  additional interest payable quarterly equal to 5% of the consolidated operating revenues of the Applicants for the preceding fiscal quarter, provided that such additional intrest shall only be applicable if the consolidated operating revenues of the Applicants exceed $1.25 million in such preceding fiscal quarter, and provided further that such additional interest shall not exceed 11.99% per annum of the principal amount of the New Secured Debt in any year.
- Subject to 10.5(f) of the Plan, the New Secured Debt will be governed by (i) the New Credit Agreement between the Applicants and Marret (as administrative and collateral agent for the Secured Noteholders) and (ii) guarantees of the New Secured Debt executed by New Elk and North Central, in each case in form and in content satisfactory to the Applicants and Marret.
- The New Credit Agreement will contain a prepayment premium equal to 10% of the aggregate principal amount of the New Secured Debt, payable if the New Secured Debt is repaid or accelerated at any time prior to its stated maturity.
- Other than as set out herein or as may be agreed by the Applicants and Marret in writing, the material financial terms of the Credit Agreement are to be substantially similar to the terms of the trust indenture in respect of the 2011 Notes.
- The New Secured Debt will be secured by a first-ranking security interest in all or substantially all of the assets and property of Cline, New Elk and North Central.
- Each of the Secured Noteholders will be entitled to its Secured Noteholder's Share of the New Secured Debt, as described in the Plan.
- Marret Asset Management Inc. will act as the administrative and collateral agent in respect of the New Secured Debt and the corresponding security on behalf of the Secured Noteholders.

**SCHEDULE B**

**ALTERNATE PLAN – SUMMARY OF TERMS**

- All unsecured Claims and all WARN Act Claims:

    (i).    are treated as Unaffected Claims;

    (ii).   are not entitled to vote or attend any creditors' meeting in respect of the Alternate Plan, including the Meeting of Secured Noteholders Class;

    (iii).  receive no distributions or consideration of any kind whatsoever under the Alternate Plan.

- The only Affected Creditors under the Alternate Plan are the Secured Noteholders.

- The only Voting Class under the Alternate Plan is the Secured Noteholders Class.

- The New Cline Common Shares, the New Secured Debt, the Unsecured Plan Entitlement, the payments to Convenience Creditors and the WARN Act Plan Entitlement will not be distributed or established or become payable under the Alternate Plan.

- The Alternate Plan would provide that all assets and property of the Applicants will be transferred to an entity designated by the Secured Noteholders and/or Marret (on behalf of the Secured Noteholders), free and clear of all claims and encumbrances, in exchange for the cancellation of the Secured Notes and a release of all Secured Noteholder Obligations.

6414355